ACCEPTED
04-17-00077-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
9/25/2017 9:11 PM

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

09/25/2017 9:11:33 PM

KEITH E. HOTTLE
CLERK

In the Fourth Court of Appeals
Sitting at San Antonio, Texas

**Electro Sales and Service, Inc. & Salim Merchant**,

*Appellants*

v.

**City of Terrell Hills**,

*Appellee*

Appeal from the 57th District Court, Bexar County, Texas
Cause No. 2016-CI-19821; Hon. Michael Mery, Judge Presiding

## Brief of Appellee City of Terrell Hills

Barbara L. Quirk
State Bar No. 16436750
MCKAMIE KRUEGER, LLP
941 Proton Road
San Antonio, Texas 78258
210.546.2122 Telephone
210.546.2130 Facsimile
barbara@mckamiekrueger.com

Adolfo Ruiz
State Bar No. 17385600
MCKAMIE KRUEGER, LLP
941 Proton Road
San Antonio, Texas 78258
210.546.2122 Telephone
210.546.2130 Facsimile
adolfo@mckamiekrueger.com

Attorneys for Appellee

ORAL ARGUMENTS NOT REQUESTED

## STATEMENT REGARDING ORAL ARGUMENT

1.      **Oral argument is not requested,** because Defendant/Appellee asserts the facts and legal arguments are adequately presented in the briefs and record. This appeal is made from the trial court's granting of a summary judgment motion. The merit of the arguments of the parties may be readily determined from the briefs of the parties without need for oral argument.

2.      This appeal involves questions of law; for each of Plaintiffs/Appellants causes of action, inverse condemnation and declaratory judgment, whether Defendant/Appellee negates at least one element of the cause of action, or otherwise demonstrates there is no genuine issue of fact and Defendant/Appellee is entitled to judgment as a matter of law, or alternatively, pleads and conclusively establishes each element of at least one of its affirmative defenses, governmental or sovereign immunity, lack of standing, or lack of ripeness/failure to exhaust administrative remedies; or, alternatively, whether Plaintiffs have provided summary judgment evidence to create a genuine issue of material fact regarding each of the elements of Plaintiffs' causes of action against Defendant/Appellee, the City of Terrell Hills, for inverse condemnation/regulatory taking and for declaratory judgment in their response to Defendant's traditional and no evidence summary judgment motion; and, alternatively, whether Plaintiffs' response raised a genuine issue of material fact sufficient to defeat one or more of

the elements of each of the defenses established by Defendant in its summary judgment motion, governmental/sovereign immunity, lack of standing, lack of ripeness and exhaustion of administrative remedies. Because this matter was decided on the basis of the summary judgment evidence, the pleadings of the parties, Defendant's Motion for Summary Judgment and the subsequent Response and Reply, the relevant factual and legal allegations are all contained in the record on appeal and the briefs of the parties before this Court.

3.     The movant can move for summary judgment even with no evidence on the grounds that there is no evidence of one or more essential elements of a claim or defense on which the non-movant has the burden of proof. The burden then shifts to the non-movant to present evidence raising an issue of material fact. Oral argument would not assist the Court further in this matter.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ..............................................ii

TABLE OF CONTENTS.................................................................................. iv

INDEX OF AUTHORITIES........................................................................... vi

STATEMENT OF FACTS ...............................................................................1

SUMMARY OF ARGUMENT .........................................................................5

   A. Summary Judgment Proper Because Plaintiffs Waived No Evidence Issues ...6

   B. Summary Judgment Proper on Jurisdictional Grounds ....................................7

   C. Appellee's Objections to Appellant's Issues 2, 3, and 4 Which Were not Argued in Plaintiffs' Response to Defendant's Motion for Summary Judgment ..9

   D. Summary Judgment Proper; No Fact Issue on Elements of Plaintiffs' Claims and Defendant Entitled to Judgment as a Matter of Law ....................................11

OBJECTION TO CERTAIN OF APPELLANTS' FACTUAL ALLEGATIONS .19

ARGUMENT ...................................................................................................22

I.   The Trial Court's Summary Judgment for the City should be upheld because Plaintiffs/Appellants have not raised any issue on the City's No-Evidence grounds, and, alternatively, the Trial Court's judgment should be upheld based on defensive grounds of immunity, lack of standing, and lack of ripeness/exhaustion of remedies. (Responds to Appellants' Brief at pg. 6; ref. Issue 1) ..........................................................................................................22

I-1. Appellants have failed to raise an issue on appeal regarding the no evidence portion of Defendant's Motion for Summary Judgment and on the declaratory judgment grounds and summary judgment should be upheld on these grounds..24

   A.  Standard and scope of review for subject matter jurisdiction (Responds to Appellants' Brief at pg. 6) ..............................................................................29

   B.  Plaintiffs Failed to Raise Valid Regulatory Takings Claim; City Entitled to Sovereign Immunity (Responds to Appellants' Brief at pg. 7)........................31

   C.  Plaintiffs have not provided evidence to create a fact issue to demonstrate they have standing to sue. (Responds to Appellants, Brief at pg. 9).................36

   D.  Plaintiffs' claims are not ripe because Plaintiffs failed to establish futility of other options available (Responds to Appellants' Brief at pg.10)................38

II.  No inverse condemnation/taking can be demonstrated because there is no intentional taking and no property right in having one's zoning changed to commercial or in reinstating a non-conforming use abandoned by a predecessor in interest (Responds to Appellants' Brief at pg. 11; ref. issues 2, 3 and 4). ........42

    A.    Traditional summary judgment standards of review (Responds to Appellants' Brief at pg. 11) ..............................................................................42

    B.    Appellee Objects to Appellants' "Issue 2" (Balance Between Public and Private Interests) Raised for First Time on Appeal and Not a Relevant Issue (Responds to Appellants' Brief at pg. 11 and pg. 21; ref. Issue 2) ...................44

    C.  Subject to the foregoing objection, Defendant City not required to prove that public interest in its zoning restrictions outweighs the private burden on Plaintiffs, property, Plaintiffs failed to present any evidence on this issue or raise question of fact (Responds to Appellants' Brief at pg. 13 ref. Issue 2)....44

    D.  Appellee Objects to Appellants' "Issue 4" (Stripped Economic Viability) Raised for the First Time on Appeal. Subject thereto, Plaintiffs failed to provide evidence or raise an issue of fact to support their argument that the City's zoning deprived Plaintiffs of the economically viable use of their property or unreasonably interfered with their use of the property (Responds to Appellants' Brief at pg. 16; ref. Issue 4) ..........................................................52

III.    Defendant objects to Appellants issue on the character of governmental action which was not raised by Plaintiffs in their Response to Defendant's summary judgment motion. Subject thereto, the summary judgment evidence shows no zoning intransigence and there is no regulatory taking as a matter of law (Responds to Appellants' Brief at pg. 20; ref. Issue 4) ..................................61

    IV.    Appellee has objected above to Appellants' "Issue 2" (Balance Between Public and Private Interests) Raised for First Time on Appeal and Not a Relevant Issue (Responds to Appellants' Brief at pg. 21; ref. Issue 2) ..............................62

    V.  CONCLUSION .................................................................................63

PRAYER ...................................................................................................64

CERTIFICATE OF SERVICE ..........................................................................66

CERTIFICATE OF COMPLIANCE ....................................................................67

APPENDIX ................................................................................................68

**INDEX OF AUTHORITIES**

Cases

*Abbott v. City of Princeton*, 721 S.W.2d 872, 875 (Tex. App.--Dallas 1986, writ ref'd n.r.e.)..................................................................................................37

*Ager v. Wichita Gen. Hosp.*, 977 S.W.2d 658, 660 (Tex. App.--Fort Worth 1998, no pet.) .........................................................................................................33

*Agins v. City of Tiburon,* 447 U.S. 255, 260 (1980)................................................51

*Allen v. City of Texas City*, 775 S.W.2d 863 (Tex. App.--Houston [1st Dist.] 1989, writ denied) ......................................................................................................26

*Azadpour v. City of Grapevine*, No. 02-13-00323- CV, 2014 WL 2566024, at *4 (Tex. App.—Fort Worth June 5, 2014, pet. denied) (mem. op.)..........................48

*Bland ISD v. Blue*, 34 S.W.3d 547, 44 Tex. Sup. Ct. J. 125 (Tex. 2000)................30

*Browning-Ferris, Inc. v. Brazoria County,* 742 S.W.2d 43, 49 (Tex. App.--Austin 1987, no writ)......................................................................................................41

*Carr v. Brasher*, 776 S.W.2d 567 (Tex. 1989) ........................................................6

*City of Abilene v. Burk Royalty Co.*, 470 S.W.2d 643, 14 Tex. Sup. Ct. J. 489 (Tex. 1971) ................................................................................................................26

*City of Dallas v. Blanton*, 200 S.W.3d 266 (Tex. App.--Dallas 2006, no pet.) 26, 31

*City of Dallas* v. VSC, LLC, 347 S.W.3d at 236.......................................35

*City of Fort Worth*, 388 S.W.2d 400, 402 (Tex. 1964 ...................................... 51, 60

*City of Hedwig Village Planning & Zoning Comm'n v. Howeth Invs., Inc.*, 73 S.W.3d 389 (Tex. App.--Houston [1st Dist.] 2002, no pet.) ...............................30

*City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2nd 671, 678 (Tex. 1979) ...43

*City of Pharr v. Pena*, 853 S.W.2d 56, 63 (Tex. App.—Corpus Christi 1993, writ denied)..........................................................................................60

*City of Pharr v. Tippitt*, 616 S.W.2d 173, 176 (Tex. 1981).............................. 49, 52

*City of San Antonio v. El Dorado Amusement Co., Inc.*, 195 S.W.3d 238 (Tex. App.--San Antonio 2006, pet. denied).............................................................32

*City of University Park v. Benners,* 485 S.W.2d 773, 778 (Tex. 1972) ........... 48, 52

*City of University Park v. Benners*, 485 S.W.2d 773, 779 (Tex. 1972) ..................14

*Denman v. Citgo Pipeline Co.*, 123 S.W.3d 728 (Tex. App. Texarkana 2003) ......37

*Dillard v. Austin Indep. Sch. Dist.*, 806 S.W.2d 589 (Tex. App.--Austin 1991, writ denied)..........................................................................................31

*EPGT Tex. Pipeline, L.P. v. Harris County Flood Control Dist.*, 176 S.W.3d 330 (Tex. App.—Houston, 2004, pet'n dismissed)........................................ 30, 33, 43

*Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830 (Tex. App.--Houston [1st Dist.] 1999, no pet.) ...................................................25

*FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868 (Tex. 2000) ...............22

*Foster v. Denton Indep. Sch. Dist.*, 73 S.W.3d 454 (Tex. App. – Fort Worth, 2002) ................................................................................................................6, 25

*Gen'l Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591 (Tex. 2001) .....25

*Hamilton Bank Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186 (1985)..............................................................................................40

*Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012)...........36

*Jackson v. Fiesta Mart, Inc.,* 979 S.W.2d 68 (Tex. App.--Austin 1998, no pet.) ...25

*King Ranch Inc. v. Chapman*, 118 S.W.3d 742 (Tex. 2003)....................................24

*Lay v. Aetna Ins. Co.,* 599 S.W.2d 684, 686 (Tex. Civ. App.--Austin 1980, writ ref'd n.r.e.)................................................................................................................37

*Lingle v. Chevron USA, Inc.*, 544 U.S. 528 (2005) ............ 11, 13, 16, 45, 49, 51, 57

*Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922 (Tex. 1998).. 26, 46, 47, 49, 55, 60

*McMahon Contracting, L.P. v. City of Carrollton,* 277 S.W.3d 458 (Tex. App.-Dallas 2009, pet. denied) ..........................................................................................31

*Medrano v. City of Pearsall*, 989 S.W.2d 141, 144 (Tex. App.--San Antonio 1999, no pet.) ..................................................................................................33

*Moore v. K Mart Corp.,* 981 S.W.2d 266 (Tex. App.--San Antonio 1998, pet. denied)..................................................................................................25

*Mr. W. Fireworks, Inc. v. Comal Cty.*, No. 03-06-00638-CV, 2010 WL 1253931, at *8 (Tex. App.—Austin Mar. 31, 2010, no pet.) (mem. op.) ................................48

*Public Util. Comm'n v. Houston Lighting & Power Co.,* 748 S.W.2d 439 (Tex. 1987) ..................................................................................................41

*Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 40 Tex. Sup. Ct. J. 438 (Tex. 1997) ........................................................................................ 30, 43

*Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660 (Tex. 2002)7,  8,  45, 46, 47

*State Bar of Texas v. Gomez,* 891 S.W.2d 243, 245 (Tex. 1994) ...........................41

*State v. Terrell*, 588 S.W.2d 784, 22 Tex. Sup. Ct. J. 543 (Tex. 1979)...................31

*Taub v. City of Deer Park,* 882 S.W.2d 824, 826 (Tex. 1994)................................46

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 36 Tex. Sup. Ct. J. 607 (Tex. 1993)........................................................................................ 31, 41

*Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 47 Tex. Sup. Ct. J. 386 (Tex. 2004)................................................................................. 30, 31, 32

*Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162 (Tex. 2013) 32

*Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 1993 Tex. LEXIS 22, 36 Tex. Sup. J. 607 (Tex. 1993) .......................................................36

*Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427 (Tex. 2016) .........22

Statutes
Tex. Civ. Prac. & Rem. Code Ann. §37.001 (West 2017) ........................................4

Tex. Const. Art. I, §17 ............................................................... 4, 8, 25, 26

TEX. LOC. GOV'T CODE § 211.010(b)....................................................................39

Tex. Loc. Gov't Code Ann §211.009(a)..................................................................38

Tex. Loc. Gov't Code Ann §211.010 .....................................................................38

Tex. Loc. Gov't Code Ann §211.011 .....................................................................38

TEX. R. CIV. P. 166a(i) ...................................................................... 24, 25

Other Authorities
City of Terrell Hills Code of Ordinances Ch14, Sec. XV ......................................39

City of Terrell Hills Ordinance 1347 .....................................................................4

x

City of Terrell Hills Ordinance 1349 ........................................................................4

City of Terrell Hills Ordinance 1386 ........................................................................4

**No. 04-17-00077-CV**

In the Fourth Court of Appeals
Sitting at San Antonio, Texas

**Electro Sales and Service, Inc. & Salim Merchant**,
*Appellants*
v.

**City of Terrell Hills**,
*Appellee*

Appeal from the 57th District Court, Bexar County, Texas
Cause No. 2016-CI-19821; Hon. Michael Mery, presiding

**Brief of Appellee City of Terrell Hills**

TO THE HONORABLE FOURTH COURT OF APPEALS:

NOW COMES Appellee, the CITY OF TERRELL HILLS (sometimes referred to herein as "the City"), and submits this Brief of Appellee in accordance with the Texas Rules of Appellate Procedure ("TRAP").

**STATEMENT OF FACTS**

4. This case began with the purchase by Electro Sales and Service through its President, Plaintiff/Appellant, Salim Merchant ("Merchant"), from Billy and Gin Wei Eng ("the Engs") of a property located within the City of Terrell Hills ("the Property"). See Appellant's Brief at pg. 1. The Warranty Deed and

1

purchase contract show that the purchaser of the property was a Texas corporation, Plaintiff/Appellant Electro Sales and Service, Inc. Merchant signed as the President of the Corporation. CR 564 to CR 580. Merchant has failed to provide evidence of any alleged individual ownership interest in the Property.

5.      The Property has been zoned semi-commercial since the mid-1960s. See CR 613 and 696 (excerpts of the deposition of the previous property owner, Billy Eng, who states the Property was always semi-commercial; all the way back in the 60's). In the mid-1960s the Property had been re-zoned from commercial to semi-commercial by Defendant, the City of Terrell Hills ("the City"), pursuant to the City's plans for the area. See Appellants' Brief, pg. 1, par. 1.

6.      At the time of the zoning decision in the 1960's certain commercial business uses (such as the laundromat use in the center of the Property) were allowed to continue as "non-conforming uses" for so long as they did not cease to operate the use for six months or more.

7.      Mr. Eng testified that at the time the Property was sold to Electro Sales and Service the middle space already had lost it grandfathered status for being able to be operated as a commercial laundromat and that he let Merchant know. CR 614 - 615. The Engs allowed the previous tenant of the space in question to vacate the premises because his business as a laundromat or dry cleaners was failing. CR 696. Eng intentionally allowed the non-conforming commercial

2

laundromat use to lapse because he did not intend to do a laundromat anymore; he believed he could lease it as office space (following the existing semi-commercial zoning). CR 615, Excerpts of Billy Eng's Deposition, pages 94:21 to 95:10. The non-conforming commercial uses in the outer parcels, including a bar and a convenience store, had not been abandoned since the time Mr. Eng's father acquired the Property in the 1960's and continued to operate after Merchant's purchase of the Property. CR 611, Excerpts of Billy Eng's Deposition, pages 18:4-25; 19:1-21; 20:4-8.

8.　　Minutes of the City Council of the City of Terrell Hills of August 8, 2011 show that the City Council discussed a request by Merchant to re-zone the Property to "Commercial," but City Council denied the request, discussing the fact that this area is a transition zone and there are immediate neighbors who would be directly affected. CR 622.

9.　　The minutes of the City Council of the City of Terrell Hills from October 8, 2012 show that the matter put before City Council from Merchant was a request for rezoning of the Property from "Semi-Commercial" to "Commercial". CR 628. These were not requests to reinstate the previously abandoned non-conforming laundromat use. Merchant told City Council he wished to lease to a tenant who planned to open a barber shop. CR 628. The Planning and Zoning Commission recommended City Council deny the re-zoning request. CR 628. The

re-zoning request was denied, but City Council decided a meeting should be held by the Planning and Zoning Commission to discuss amending the zoning ordinance to allow for the issuance of Special Use Permits which would allow uses such as a barber shop, but not the entire range of commercial uses. CR 628.

10. Since that time, the City Council has granted Merchant's requests for special use permits for use of the Property under City of Terrell Hills Ordinance 1347, passed on December 10, 2012, providing for a Special Use Permit process; City of Terrell Hills Ordinance 1349, passed May 13, 2013, allowing a hair and nail salon use; and City of Terrell Hills Ordinance 1386, passed April 13, 2015, allowing a hair and nail salon. See CR 632 to 639.[1]

11. Plaintiffs' filed causes of action against the City for a regulatory taking[2] under Section 17 of Article I of the Constitution of the State of Texas and a declaratory judgment under Chapter 37 of the Texas Civil Practices and Remedies Code related to interpretation of the City's Zoning Ordinance. CR 5 – 6; Tex. Civ. Prac. & Rem. Code Ann. §37.001, *et seq.* Tex. Const. Art. I, §17.

---

[1] The City requests that the Court take judicial notice of all of the provisions of the City's Zoning Code relied upon herein.

[2] In the fact section of the Petition on page 4 Plaintiff states the interpretation of the ordinance is regulatory condemnation, and the enforcement of the ordinance is regulatory taking. However, the causes of action portion of the pleading only asserts regulatory taking. CR 4 – 5. The Petition also contains a section d) which has a heading applicable to "all defendants", but this section contains no claims against the City. CR 8.

4

12. For further factual averments, Appellee incorporates herein as if set forth in full the summary judgment evidence attached to Defendant's Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment, Exhibits 1 through 8 at CR 610 to 651 and CR 696.

## SUMMARY OF ARGUMENT

13. This lawsuit arose from Plaintiffs' dispute with the Engs, the previous owners of the Property, over Merchant's own failure to investigate the long-standing "Semi-Commercial" zoning classification of the Property before purchasing the Property. Merchant has admitted his misconception regarding the previous intentional abandonment and termination by the Engs, of a non-conforming commercial laundromat use in the center suites of the Property. Merchant attempted to compensate for his error by trying to force the City to change the zoning of the Property from its long-standing "Semi-Commercial" zoning to "Commercial" zoning. Although the City denied Plaintiffs' re-zoning request, the City has granted Plaintiffs Special Use Permits for their requested uses on more than one occasion.

14. Appellants' suit against the City is one for inverse condemnation and declaratory judgment, claiming an intentional regulatory taking of their property rights for a public purpose without compensation.

5

15.   Appellants are appealing the Trial Court's decision to grant Defendant, the City of Terrell Hills' Motion for Summary Judgment. The judgment appealed from does not specify the reason for the Trial Court's decision. CR 698. This Court of Appeals should find for Defendant, the City of Terrell Hills, if any of the City's grounds for summary judgment are meritorious. *Foster v. Denton Indep. Sch. Dist.*, 73 S.W.3d 454, 464-465 (Tex. App. – Fort Worth, 2002); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

16.   The City filed its Traditional and No-Evidence Motion for Summary Judgment on all of Plaintiffs' claims against the City (including inverse condemnation/regulatory taking and declaratory judgment) on August 16, 2016. (CR 581 to 651).

*A. Summary Judgment Proper Because Plaintiffs Waived No Evidence Issues*

17.   The grounds alleged by the City include a no-evidence motion that Plaintiffs have provided no evidence of one or more of the material elements of their claims. In particular, on the inverse condemnation claim Plaintiffs have provided no evidence of a property right that was taken by the City, no evidence of deprivation of all economically viable use of the Property or of unreasonable interference with use of the property based on investment backed expectations, no evidence that City action not substantially related to legitimate public purpose (if

6

the Court applies this element), and no evidence any action of the City was the proximate cause of damages to Plaintiffs.

18.    Appellants have failed to raise a viable issue on appeal with regard to Defendant's no evidence grounds for summary judgment and, for this reason, this Court of Appeals should uphold the Trial Court's Summary Judgment for Defendant/Appellee on this ground with no need for further consideration of Appellants' issues.

*B. Summary Judgment Proper on Jurisdictional Grounds*

19.    Defendant's Motion for Summary Judgment also asserts alternative grounds that Plaintiffs failed to establish jurisdiction because the jurisdictional facts negate one or more elements Plaintiffs would need to establish to defeat Defendant's claims of immunity, lack of standing, failure to exhaust administrative remedies, and ripeness.

20.    Plaintiff has failed to properly invoke waiver of immunity under the takings clause in the Texas Constitution primarily because Defendant has demonstrated the taking of a property right is negated in this case. The undisputed summary judgment evidence establishes the Property Plaintiffs were attempting to up-zone to commercial zoning had been zoned semi-commercial (a transition area) since the 1960s. This is not a fact situation like the one in the *Sheffield* case cited by Appellants where a city passed regulations which down-zoned the uses allowed

7

on a developer's property after he purchased it. *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 663 (Tex. 2002). Landowners hold their property subject to police regulations of the cities in which they are located. There is no legal right to up-zone a property.

21. The Texas Constitution, Article I, Section 17 provides there is no taking when the landowner consents. In this case, it is undisputed the prior owner voluntarily abandoned the non-conforming commercial laundry use in the center suites on the Property. Plaintiffs could not have acquired any rights to a takings claim from the prior owners related to the termination of the non-conforming use. It is also undisputed many property uses are allowed on a semi-commercial zoned Property. Further, Plaintiffs have not been denied the right to use the center suites for commercial uses because as Plaintiffs admit, the City granted Plaintiffs' requests for Special Use Permits for the barber shop/hair salon uses requested. There has been no legally recognized taking in this case and Plaintiffs failed to invoke the waiver of immunity provided for a takings violation.

22. Defendant has established Appellants lack of standing to sue for a regulatory taking for the same reasons discussed above. Additionally, Plaintiffs failed to exhaust their administrative remedies as required for a takings claim because they did not appeal the City staff interpretations of the zoning ordinance of which Plaintiffs complain to the Zoning Board of Adjustment. For this same

8

reason, Plaintiffs' causes of action are not ripe for adjudication. Plaintiffs have not raised a question of material fact on any of these defenses established by Defendant.

23. Appellants have addressed the defenses of subject matter jurisdiction, immunity, standing and ripeness in Article 1 of their Brief which appears to correspond with their Issue 1. Appellants fail to fully state the burden of proof on these claims. Once Defendant establishes the elements of these defenses, which Defendant has accomplished, the burden of proof shifts to Plaintiffs to raise a genuine issue of material fact on these elements.

24. In its Motion for Summary Judgment Defendant established Plaintiffs have failed to provide any evidence to create a genuine issue of material fact as to the jurisdictional claims of Defendant and this Court of Appeals should uphold the Trial Court's judgment on the grounds of lack of jurisdiction without need to examine Appellants' arguments further.

*C. Appellee's Objections to Appellant's Issues 2, 3, and 4 Which Were not Argued in Plaintiffs' Response to Defendant's Motion for Summary Judgment*

25. Defendant objects to three of Appellants' issues which were not argued in Plaintiffs' Response to Defendant's Motion for Summary Judgment: 1)(Appellants' "Issue 2") how the City's regulation affects the balance between the public and private interests; 2) (Appellants' Issue 3") whether the zoning of the

Property (as opposed to the previously argued denial of change in zoning) serves a substantial public interest; and 3) (from Appellant's "Issue 4") whether Plaintiffs were denied all economically viable use of the Property (although this was mentioned in the pleading, no argument on this issue was presented in Plaintiffs' Response to Defendant's Motion for Summary Judgment). Appellee objects to the three new issues because they were not raised in Plaintiffs' Response to Defendant's Motion for Summary Judgment and for other reasons discussed further below.

26. In Appellants' "Issue 2," discussed in Article II, Section C, and Article IV of Appellants' Brief, Appellants assert a fact issue exists regarding how the City's regulation of the Property affects the balance between public and private interests. This is being raised for the first time and is not a valid issue for appeal.

27. In Appellants' "Issue 3," discussed in Article II, Section D, 2, Appellants' claim Defendant's zoning of the Property does not serve a substantial public interest. Plaintiffs' Response to Defendant's Motion for Summary Judgment only addressed the substantial public interest test with respect to the City's decision to deny Plaintiffs' request to up-zone the Property to commercial. That is a different issue than a challenge to the substantial public interest in the City's decision in the 1960s to zone the property semi-commercial. If Plaintiffs intended to argue this point on the 1960s zoning ordinance in Plaintiffs' Response,

Defendant would have argued the statute of limitations argument raised in the City's Original Answer. Further, the City would have raised the issue previously raised in the City's Plea to the Jurisdiction that the Texas Attorney General's Office must be provided notice of the challenge to an existing law (such as the zoning ordinance) before jurisdiction may attach. Further, the United States Supreme Court in *Lingle* has backed away from the use of the substantial public interest test in inverse condemnation cases, except in certain circumstances which do not apply here. *Lingle v. Chevron USA, Inc.*, 544 U.S. 528 (2005).

28.     It would make more sense not to apply the substantial public interest test in a case such as the present case where Plaintiffs have stated one of the elements they need to prove for their takings claim is that the taking was for a public purpose. By not arguing the substantial public interest test with regard to the semi-commercial zoning of the Property in their Response Appellants have waived this issue.

D. *Summary Judgment Proper; No Fact Issue on Elements of Plaintiffs' Claims and Defendant Entitled to Judgment as a Matter of Law*

29.     In the alternative, if same be needed, and subject to the foregoing objections, Defendant's Motion for Summary Judgment asserts grounds that there is no genuine issue of fact as to the negation of one or more of the elements of each

11

of Plaintiffs' claims for which Plaintiffs would have the burden of proof at trial and the City is entitled to judgment as a matter of law.

30. Appellants have failed to completely state the burden of proof on summary judgment. In the event summary judgment is not upheld on the no-evidence grounds or on the jurisdictional defenses raised by Defendant, it may still be granted on the grounds that there is no genuine issue of fact as to the negation of one or more elements of Plaintiffs' causes of action and Defendant is entitled to judgment as a matter of law. The burden of proof then shifts to Plaintiffs to provide evidence sufficient to create a genuine issue of fact as to the elements negated.

31. Defendant has established there is no genuine question of material fact as to one or more of the essential elements of Plaintiffs' causes of action (inverse condemnation/regulatory taking and declaratory judgment) and Defendant is entitled to summary judgment on Plaintiffs' causes of action as a matter of law. In particular, the City did not act intentionally with reasonable certainty of the denial of Plaintiff's property rights. In fact, the City attempted to accommodate Plaintiffs' needs by granting Plaintiff's Special Use Permits for the uses requested.

32. Further, there has been no taking of a property right because there has been no denial of all economically viable use of the Property and no unreasonable interference with use of the Property based on reasonable investment backed expectations. Plaintiffs are still free to use the Property for semi-commercial uses

12

and for commercial uses by obtaining Special Use Permits from the City. There is no property right and no reasonable expectation to change the long-standing zoning of a property, which in this case has been semi-commercial for over forty years, which existed long before the purchase of the Property by Electro Sales and Service. CR 612 to 616. There is no taking under the law when there is consent which has been shown due to the voluntary abandonment and termination of a non-conforming commercial use by the prior owners of the Property.

33. Plaintiffs have raised an issue based on the substantial advancement of a public purpose test.

34. Subject to the foregoing objections, Appellants argument that the City has not provided a rationale to show the semi-commercial zoning of Plaintiffs' property and the refusal to rezone the Property to its prior commercial designation or reinstate the former non-conforming use exception "effectuates a substantial public purpose" is a red herring. *See* Appellants' Brief at page 4. Plaintiffs Original Petition does not include the element of substantial advancement of a legitimate public purpose in Plaintiffs' cause of action for taking, and instead, only indicates Plaintiffs are basing their claim on alleged denial of economic viability and unreasonable interference with use of the Property. *See* CR 170. In its Motion for Summary Judgment the City discussed the change in the application of the substantial advancement issue found in the *Lingle* case, but also provided argument

13

in the alternative regarding the presumption applied by the Courts in the favor of finding a zoning ordinance substantially advances a legitimate government purpose. CR 595 to 598. The City also attached the minutes of the City Council meeting at which the transitional purpose of protecting abutting properties was discussed. Because of the presumption in favor of a municipal zoning ordinance on this issue, it is Plaintiffs' burden to show conclusive evidence the ordinance is arbitrary. *See City of University Park v. Benners*, 485 S.W.2d 773, 779 (Tex. 1972).

35.    Appellants' statement on page 4 of Appellants' Brief that the City refuses to allow commercial tenants in the center suites is contrary to the undisputed facts admitted by Plaintiffs that the City has granted Special Use Permits for the center suites for the commercial uses requested by Plaintiffs. As seen in the minutes of the City Council attached to Defendant's Motion for Summary Judgment, the City Council has a legitimate concern regarding not having any control over the types of commercial businesses which would be placed in this transition zone if the zoning of the Property were to be changed to commercial. The Special Use Permit process remedies this issue while still allowing the uses requested by the landowner.

36.    It is undisputed the City's decision to zone the Property semi-commercial occurred in the 1960s, long before the acquisition of the Property by

14

Electro Sales and Service. The prior commercial designation has not been in effect since the 1960s. Any challenge to the decision in the 1960s would be barred by limitations and waiver.

37.     Further, the record reflects Plaintiffs have not met the prerequisite to making a challenge to the zoning ordinance of notifying the Texas Attorney General. For further argument, the City incorporates its discussion of this issue from its Motion for Summary Judgment into this Brief as if set forth in full from CR 595 to 598.

38.     There is no dispute that in the 1960s when the zoning change occurred the non-conforming use exception was allowed for particular uses which had legally existed prior to the zoning change. CR 612 to 616. There is no dispute that under the City's ordinances the non-conforming use exception for each particular use (in this case a laundromat) was to terminate whenever the use was abandoned for six months. It is also undisputed that the non-conforming use in question was voluntarily abandoned by the Engs before they sold the Property to Electro Sales and Service. CR 612 -616.

39.     The non-conforming use exception would have allowed the landowners at the time of the zoning change in the 1960s to recoup their investment backed expectations over time. In this case Plaintiffs have no right to restart recoupment of the original landowner's investment backed expectations

15

which would have already run. Plaintiffs can show no evidence of reasonable investment backed expectations from their own purchase. Nothing has changed in the zoning of the Property or the non-conforming use status of the center suites in the Property since the date of the purchase by Electro Sales and Service. They can still use the Property in the exact same manner as the date on which the purchase was made. As purchasers of real estate Plaintiffs, not the public, should bear the risk inherent in their own failure to investigate the zoning of the Property prior to making their purchase.

40. Defendant has shown that the United States Supreme Court has moved away from the use of a substantial relationship test except in certain cases which do not apply here. CR 596. *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 539 (2005).

41. If this Court of Appeals does determine the substantial relationship test should apply here, Defendant has met its burden to show the relationship of the City's denial of up-zoning to the public purpose of maintaining the orderly development of the City and providing transition zones between residential and commercial areas to protect from the consequences of traffic congestion and parking issues, and to insure orderly development of the City. The City has provided evidence in the form of City Council hearing and meeting minutes that this semi-commercial zone serves the purpose of a transition zone protecting

16

residential areas abutting the Property. CR 621 and 622. The Property has never been zoned commercial and changing the zoning to commercial would mean that rather than having a semi-commercial zone next to a residential area, the residential zone would back up directly to a commercial zone. This would negate what the City was trying to do in the 1960s when it created the semi-commercial zone.

42.    Plaintiffs now bear the burden to establish a question of fact on this issue and they have not met that burden.

43.    Page 4 and 5 of Appellants' Brief contain factual statements which are not supported by the only summary judgment evidence provided by Plaintiffs, Mr. Merchant's affidavit, and to which Appellee has objected elsewhere in this Brief. Appellants argue the center suite is flanked by commercial businesses on either side and throughout the entire area surrounding the Property. They conveniently omit the residential neighbors backing up to the Property. Plaintiffs allege changes in the area since the original zoning has passed, but provide no evidentiary support for their arguments.

44.    Appellants make a blanket statement that the center space has lost any economic viability, but Plaintiffs have provided no evidence of this. Plaintiffs have not mentioned, even in Merchant's affidavit, any efforts to lease the space for any of the numerous uses allowed in semi-commercial zoning. In fact, Mr. Eng

17

testified that he let the Laundromat out of their lease because they were no longer making it financially and that he believed he could lease the space for a semi-commercial office use.

45. Although it is not mentioned in Appellants' list of issues, in Article II, D and Article III of their Brief, Appellants also discuss their claim of unreasonable interference with use and enjoyment of the Property. This issue was addressed in Plaintiffs' Response to Defendant's Motion for Summary Judgment. However, Plaintiffs failed to provide any evidence to support their claims and failed to raise a genuine issue of fact to defeat Defendant' summary judgment motion on this issue. The Courts determine whether or not unreasonable interference has occurred based primarily on investment backed expectations. Defendant has demonstrated Plaintiffs could not have had reasonable investment backed expectations that the center suites of the Property could be used for commercial uses where, as here, the zoning of the Property had been changed to semi-commercial in the 1960s to serve as a transition zone and the previous owner, Mr. Eng testified in deposition he told Merchant the non-conforming use had terminated for the center suites. CR 615.

46. The only alleged evidence provided by Plaintiffs was the self-serving and conclusory Affidavit of Salim Merchant (CR 682 to 895) to which Defendant filed objections. Subject to this objection, the Affidavit failed to provide any evidence demonstrating unreasonable interference with property rights or

18

reasonable investment backed expectations. Merchant provided no evidence as to the relationship of the price of the Property to the semi-commercial zoning of the Property and the previous termination of the non-conforming use of the laundromat in the center suites.

47.     Appellants have failed to address Defendant's summary judgment argument regarding Plaintiffs' declaratory judgment claims and the Trial Court's decision to grant summary judgment for the Defendant should be upheld with respect to these claims.

48.     The Trial Court's decision in favor of Defendant should stand.

## OBJECTION TO CERTAIN OF APPELLANTS' FACTUAL ALLEGATIONS

49.     Appellee objects to statements in Appellants' Statement of Facts ("Appellants' Facts") which are being raised for the first time on appeal or otherwise differ from the facts as presented in Plaintiffs' Response to Defendant's Motion for Summary Judgment ("Plaintiffs' Summary Judgment Response"). (CR 654 – 656) Defendant further asserts there is no support in the summary judgment evidence for these factual allegations and they should be stricken. (See Appellant's Brief at pg. 1).

50.     In particular, Appellee objects to Appellants statement on page 1 that the non-conforming use allowed the Property to be used by commercial enterprises

so long as it did not remain vacant for more than six months. Appellants have not provided a citation to the record for this statement which revises earlier allegations by Plaintiffs in a manner which fails to acknowledge the individual nature of the non-conforming use allowance for each of the uses operated in the suites in the Property.

51. Appellee further objects to Appellants' statement on page 2 of Appellants' Brief without citation to any support that they made a request for reinstatement of non-conforming use (in addition to the re-zoning request) which came before Council on October 1, 2012, and was denied. This allegation was not previously raised by Plaintiffs in their Response to Defendant's Summary Judgment Motion and should be stricken.

52. Appellee further objects to Appellants' unsupported statement on page 2 in which Appellants state they were informed a barber shop violated the prohibition against using the space for display or sale of merchandise. This allegation was not previously raised by Plaintiffs in their Response to Defendant's Summary Judgment Motion and should be stricken.

53. Appellee further objects to the entire paragraph at the end of page 2 and the top of page 3 of Appellants' Brief and requests that it be stricken. Appellants make factual allegations not previously raised that neither permit request was approved in a timely fashion, that one took six months, and the other

took over a year, and that Merchant lost two prospective tenants. Although Plaintiffs do note pages in the Court Record for certain of these allegations, the cited pages do not support these new factual allegations. It is impossible from the cited references to determine the dates on which completed paperwork was actually received by the City or even to connect the items referenced by Plaintiffs in time. Further, there is no evidence in the summary judgment record of these two alleged potential tenants, the timing of their submissions to the City of all required paperwork, Plaintiffs' alleged loss of two tenants, or any connection to the reasons for any actions given. These objectionable facts as well as objectionable issues raised for the first time on appeal are restated by Appellants in their Summary of the Argument on pages 4 and 5 of Appellants' Brief and Defendant requests these two pages of Appellants' Brief also be stricken.

54. Defendant renews its objection to the conclusory and self-serving Affidavit of Salim Merchant originally stated in Defendant's Reply in Support of its Motion for Summary Judgment and incorporates herein for all purposes the reasons for the objection set out therein. CR 688. Subject to this objection, Appellee asserts the Affidavit does not provide any evidence sufficient to support the statements alleged above by Plaintiffs.

55. Plaintiffs/Appellants refer to CR 227 on page 10 of Appellants' Brief. This page is a self-serving letter written by Plaintiff which is not supported by an

21

affidavit and is not proper summary judgment evidence. Plaintiffs did not refer to this document in their Response to Defendant's Motion for Summary Judgment and have only referred to it now for the first time on appeal. For these reasons, Appellee objects to Plaintiffs' reference to CR 227 and requests any reference to these documents by Plaintiffs/Appellants be stricken from the record.

## ARGUMENT

I. *The Trial Court's Summary Judgment for the City should be upheld because Plaintiffs/Appellants have not raised any issue on the City's No-Evidence grounds, and, alternatively, the Trial Court's judgment should be upheld based on defensive grounds of immunity, lack of standing, and lack of ripeness/exhaustion of remedies. (Responds to Appellants' Brief at pg. 6; ref. Issue 1)*

56. "When a trial court's order granting summary judgment does not specify the grounds relied upon," as here, "the reviewing court must affirm summary judgment if any of the summary judgment grounds are meritorious." *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 439 (Tex. 2016); *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872(Tex. 2000). The Trial Court's decision should be upheld if any one of Defendant's grounds for summary judgment was meritorious.

57. The City's Traditional and No-Evidence Motion for Summary Judgment filed August 16, 2016 (CR 581 to 651), alleges the following grounds:

a. There is no property right to a change in zoning in this case, and there can be no taking when the City allowed the Plaintiffs a special use permit for the requested use; as a result, Plaintiffs have failed to plead a claim which would waive the City's immunity. Plaintiffs have also failed to establish standing to sue since the semi-commercial zoning classification occurred in the 1960s and the previous property owners intentionally allowed the non-conforming commercial use of the center suites to terminate;

b. Alternatively, Plaintiffs failed to exhaust administrative remedies available because they did not appeal administrative decisions of City staff to the Zoning Board of Adjustment;

c. Alternatively, Plaintiffs' claims are not ripe;

d. Alternatively, Plaintiff has failed to provide evidence to create a genuine issue of material fact to defeat summary judgment for the City on the grounds that the denial to up-zone the Property does not deny Plaintiff all economically viable use of the Property or unreasonably interfere with Plaintiff's right to use and enjoy the Property and is not a regulatory taking as a matter of law (there should be no substantial advancement of public interest test; however, if the Court looks at whether the City's decisions substantially advanced legitimate city interests, Plaintiffs have also failed to produce any evidence to raise a question of fact on this issue);

e. Plaintiffs' declaratory judgment action is filed only to seek attorney's fees, will not resolve ripe justiciable issues between the parties, and should be dismissed as a matter of law; and

f. Alternatively, Plaintiffs have provided no evidence of one or more of the material elements of their claims; no evidence of property right that was taken by the City, no evidence of deprivation of economically viable use of the Property or of investment backed expectations, and no evidence any action of the City was the proximate cause of damages.

CR 583 to 585.

23

58.     To the extent Plaintiffs attempt to seek remedy for the zoning decision of the City made in the 1960s, Defendant has also raised the defense of limitations in its Original Answer.

*I-1. Appellants have failed to raise an issue on appeal regarding the no evidence portion of Defendant's Motion for Summary Judgment and on the declaratory judgment grounds and summary judgment should be upheld on these grounds.*

59.     Appellants have not raised an issue on appeal related to Defendant's no-evidence grounds for summary judgment and the grounds related to declaratory judgment. *See* Appellant's Brief at page x. For this reason, Appellants have waived any argument on appeal related to these issues and the judgment of the Trial Court in favor of Defendant should be upheld on these grounds without the need for further analysis of Appellants' Issues. Only in the event this Court of Appeals considers further argument on this issue Appellee offers the following:

> For a no-evidence summary judgment, as alleged in paragraph 31 of Defendant's Motion for Summary Judgment, the movant can move for summary judgment even with no evidence on the grounds that there is no evidence of one or more essential elements of a claim or defense on which the non-movant has the burden of proof. The burden then shifts to the non-movant to present evidence raising an issue of material fact. *King Ranch Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *EPGT Tex. Pipeline, L.P.* 176 S.W.3d at 334-335; s*ee* TEX. R. CIV. P. 166a(i); *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 834 (Tex. App.--Houston [1st Dist.] 1999, no pet.).

24

60. A trial court must grant a no-evidence summary judgment motion unless the non-movant produces summary judgment evidence that raises a genuine issue of material fact. *See* TEX. R. CIV. P. 166a(i) cmt.; *Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex. App.--San Antonio 1998, pet. denied); *Jackson v. Fiesta Mart, Inc.,* 979 S.W.2d 68, 71 (Tex. App.--Austin 1998, no pet.); *Foster v. Denton Indep. Sch. Dist*., 73 S.W.3d 454, 464-465.

61. Article I, Section 17 of the Texas Constitution ("the inverse condemnation clause") provides, in part: "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I, § 17. To demonstrate a constitutional inverse condemnation, the landowner must show: (1) the State intentionally performed certain acts in the exercise of its lawful authority (intent); (2) that resulted in the taking, damaging, or destroying of property (causation); and (3) for public use (public use). *Gen'l Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001); *Steele*, 603 S.W.2d at 791.

62. Inverse condemnation occurs when property is taken, damaged, or destroyed for public use without process or without proper condemnation proceedings, and the property owner attempts to recover compensation. *City of Abilene v. Burk Royalty Co*., 470 S.W.2d 643, 646, 14 Tex. Sup. Ct. J. 489 (Tex. 1971); *Allen v. City of Texas City*, 775 S.W.2d 863, 864 (Tex. App.--Houston [1st

25

Dist.] 1989, writ denied); *EPGT Tex. Pipeline, L.P. v. Harris County Flood Control Dist.*, 176 S.W.3d 330, 341-342.

63.     Plaintiffs have failed to produce any evidence to support the elements of a claim for inverse condemnation/regulatory taking. A regulatory taking occurs when the government imposes restrictions that either deprive the owner of all economically viable use of the property or unreasonably interfere with his right to use and enjoy the property (a substantial advancement test may also be applied in certain circumstances). *See, Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933-935 (Tex. 1998). Whether particular facts are sufficient to allege a constitutional taking is a question of law. *City of Dallas v. Blanton*, 200 S.W.3d 266, 271 (Tex. App.--Dallas 2006, no pet.).

64.     A compensable regulatory taking occurs when a governmental agency imposes restrictions that unreasonably interfere with a landowner's right to use and enjoy his property, such as denying a permit for development. *See Mayhew*, 964 S.W.2d at 933. In the present case, the undisputed facts show that the Property was developed decades ago, the center suites on the Property may still be used as zoned for semi-commercial use, and the City has granted Plaintiffs Special Use Permits for commercial uses of the center suites on the Property.

65.     In its Motion for Summary Judgment, Defendant asserted that Plaintiffs provided no evidence of one or more of the material elements of their

claims, specifically: that a property right was intentionally taken by the City for public use; that they were deprived of all economically viable use of the Property or that any action of the City unreasonably deprived them of the use of the Property based on reasonable investment backed expectations (or, if considered by the Court, that the City's regulations were not substantially related to a public purpose); or that any action of the City was the proximate cause of any damages to Plaintiffs.

66. Plaintiffs have failed to provide any evidence to demonstrate the existence of a property right which was taken by the City's regulations. Plaintiff, Salim Merchant has also provided no evidence of his personal ownership interest in the Property.

67. There is no protected property right to have the zoning of a property changed in a manner inconsistent with the local governing authority's long-established zoning classification of a property. There is no property right to have a non-conforming use privilege reinstated after the use has been abandoned by the previous owners. Appellants would be unable to provide any case law demonstrating such a right.

68. Subject to Defendant's objection to Appellants' failure to make any argument as to economic viability in its Response to Defendant's Motion for Summary Judgment, Appellee asserts Plaintiffs have provided no evidence despite

extensive discovery in the case and could not provide evidence of the denial of all economically viable use of the Property, or even of any unreasonable interference with Plaintiffs' use of the Property.

69. It is undisputed the Property has been zoned semi-commercial since the 1960s and that this zoning allows the use of the center suites for a number of semi-commercial uses, such as offices. Plaintiffs have failed to provide any evidence of any failed attempts to operate an office or other semi-commercial use at the site. It is undisputed the City has granted Plaintiffs Special Use Permits allowing the uses requested by Plaintiffs. Plaintiffs have failed to provide any evidence to support their claims.

70. Appellants claim the City has failed to establish it acted in accordance with a substantial public interest. Subject to Defendant's assertion that the substantial advancement test should not be applied in this case after *Lingle*, Plaintiffs have failed to demonstrate the City's denial of their zoning change request did not support the City's substantial public interest in having transition zoning such as semi-commercial zoning between commercial areas and residential areas as reflected in related City Council minutes, and the recognized zoning benefits of protecting neighbors from traffic congestion and parking issues, and providing for the orderly development and growth of the City.

71. Because Appellants did not raise an issue on appeal as to the no-evidence argument, they have waived any claim that the Trial Court should not have granted summary judgment on the no-evidence grounds. The Trial Court's judgment was correct on these grounds.

72. Additionally, Plaintiffs have failed to raise an issue on appeal as to the declaratory judgment cause of action and the Trial Court's decision on that claim should be upheld.

### A. Standard and scope of review for subject matter jurisdiction (Responds to Appellants' Brief at pg. 6)

73. Alternatively, if same be necessary, the Trial Court was correct in granting summary judgment for Defendant on all of its jurisdictional grounds, including immunity, lack of standing, ripeness and failure to exhaust administrative remedies. Appellee's response to Appellants' issues related to the defenses follow. For further argument related to Defendant's entitlement to summary judgment on these defenses, Defendant incorporates herein as set forth in full its related arguments from its Summary Judgment Motion at CR 590 to 594, its Reply in Support of its Summary Judgment Motion at CR 689 to 692, and Plea to Jurisdiction, CR 184 to 187.

74. Appellants have recognized on page 7 of Appellants' Brief that they have a burden to show that there is a disputed material fact regarding the

29

jurisdictional issue. Plaintiffs failed to meet that burden for any of the jurisdictional issues.

75.   Summary judgment for a defendant is proper if the defendant negates at least one element of each of the plaintiff's theories of recovery, or pleads and conclusively establishes each element of an affirmative defense. *EPGT Tex. Pipeline, L.P. v. Harris County Flood Control Dist.*, 176 S.W.3d 330, 334-335 (Tex. App.—Houston, 2004, pet'n dismissed); *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911, 40 Tex. Sup. Ct. J. 438 (Tex. 1997).

76.   A motion for summary judgment may raise a challenge to a trial court's subject-matter jurisdiction. *City of Hedwig Village Planning & Zoning Comm'n v. Howeth Invs., Inc.*, 73 S.W.3d 389, 391 (Tex. App.--Houston [1st Dist.] 2002, no pet.). A plaintiff then bears the burden of alleging facts affirmatively showing the trial court has subject-matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226, 47 Tex. Sup. Ct. J. 386 (Tex. 2004); *Bland ISD v. Blue*, 34 S.W.3d 547, 554, 44 Tex. Sup. Ct. J. 125 (Tex. 2000); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446, 36 Tex. Sup. Ct. J. 607 (Tex. 1993); *see also*, *McMahon Contracting, L.P. v. City of Carrollton*, 277 S.W.3d 458, 464 (Tex. App.-Dallas 2009, pet. denied).

77.   The question of whether a trial court has subject-matter jurisdiction over a claim is one of law, and is reviewed de novo. *Miranda*, 133 S.W.3d at 226.

**B. Plaintiffs Failed to Raise Valid Regulatory Takings Claim; City Entitled to Sovereign Immunity (Responds to Appellants' Brief at pg. 7)**

78. Under the common-law doctrine of sovereign immunity, a unit of government cannot be sued without its consent. *State v. Terrell*, 588 S.W.2d 784, 785, 22 Tex. Sup. Ct. J. 543 (Tex. 1979); *Dillard v. Austin Indep. Sch. Dist.*, 806 S.W.2d 589, 592 (Tex. App.--Austin 1991, writ denied).

79. Governmental immunity protects a city from suit when it exercises its governmental functions unless that immunity is clearly waived. *See City of Dallas v. Blanton*, 200 S.W.3d 266, 271 (Tex. App.--Dallas 2006, no pet.). Although the Texas Constitution waives immunity for a validly pled inverse condemnation claim, when a plaintiff does not allege a valid inverse condemnation claim, governmental immunity applies. *Id*.

80. On pages 7 and 8 of Appellants' Brief Appellants have incorrectly provided a standard based on a review of a denial of a plea to the jurisdiction based solely on a plaintiff's pleadings. In the present case, the jurisdictional issues, including immunity are raised in a summary judgment motion and the Court may consider evidence to resolve the jurisdictional issues.

81. To defeat a government entity's jurisdictional immunity claim, a landowner must provide evidence to establish a fact issue with regard to the waiver of immunity. Therefore, if a plaintiff cannot raise a fact issue with regard to its

31

inverse condemnation cause of action, there is no waiver of immunity, and the trial court lacks subject-matter jurisdiction. *Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013). To satisfy this burden, the landowner must raise a fact issue as to one of the elements of inverse condemnation: intent, causation, *or* public use. *See Miranda*, 133 S.W.3d at 226-228 (holding pleas to the jurisdiction generally follow summary judgment burden of proof); *but see City of San Antonio v. El Dorado Amusement Co., Inc.*, 195 S.W.3d 238, 244 (Tex. App.--San Antonio 2006, pet. denied) (a public use is not a necessary component of a regulatory taking).

82.     In an inverse condemnation case, once the movant has demonstrated it is a government entity entitled to immunity and presented its defense that the Court lacks jurisdiction, the burden of proof shifts to the non-movant to show a material fact issue exists regarding the jurisdictional issue, that is, waiver of movant's immunity. *See Miranda*, 133 S.W.3d at 228; *City of San Antonio v. Rogers Shavano Ranch, Ltd.*, 383 S.W.3d at 241; see also, *EPGT Tex. Pipeline, L.P.* 176 S.W.3d at 334-335; *Medrano v. City of Pearsall*, 989 S.W.2d 141, 144 (Tex. App.--San Antonio 1999, no pet.); *Ager v. Wichita Gen. Hosp.*, 977 S.W.2d 658, 660 (Tex. App.--Fort Worth 1998, no pet.); *See also*, *EPGT Tex. Pipeline, L.P.* 176 S.W.3d at 334-335.

83.     In the present case the City is a governmental entity and has met its initial burden to demonstrate it is a governmental entity entitled to immunity unless Plaintiff can show a valid waiver of immunity. As discussed further below, Defendant has demonstrated there has been no taking of a valid property right in this case to support waiver of immunity under an inverse condemnation claim because the Property has been zoned semi-commercial for over 40 years, the cessation of the non-conforming commercial use in the center suites was consensual and prior to Plaintiffs' ownership of the Property, and the City has allowed Plaintiffs the uses they requested by Special Use Permits.

84.     Plaintiffs have failed to meet their burden to show a material fact issue exists regarding the jurisdictional issue. On pages 8 and 9 of Appellants' Brief Plaintiffs rely entirely on their own statements in their pleadings to support their jurisdictional argument and provide no evidence to create a material fact issue.

85.     Further, Defendant is entitled to dismissal of Plaintiffs' claims as a matter of law because Plaintiff's own facts as plead show Defendant granted Plaintiffs the uses they requested in the form of Special Use Permits, a fact which negates the takings element Plaintiffs would need to demonstrate in order to invoke waiver of immunity under takings law.

86.     Additionally, City Council minutes attached to the City's Summary Judgment Motion reflect this area is a transition zone abutting up to residential

33

property. CR 622. This type of zoning serves the purpose of protecting residential areas from increased traffic, parking congestion, and provides for orderly development of the City. Plaintiffs failed to provide any evidence to demonstrate facts which would support the elements of a valid inverse condemnation claim by regulatory taking. As a result, Plaintiffs have failed to meet their burden of demonstrating facts to establish a genuine issue of fact regarding the City's entitlement to immunity.

87.    In the present case, Plaintiffs can show no valid claim for inverse condemnation, and therefore, the City's immunity to suit and liability are not waived as to Plaintiffs' claims. Plaintiffs have not demonstrated a legal claim for taking of a property right and have failed to present any evidence of their claims despite extensive time for discovery in the case.

88.    There can be no taking where, as here, there has been no action by the City to take any property right. There is no legally protected property right to a change in zoning as requested by Plaintiffs. A landowner's use of the land is subject to police power regulations of the relevant city, including zoning regulations passed in accordance with regulations in the Texas Local Government Code.

89.    There also can be no taking where, as here, there is consent. The previous property owner intentionally abandoned and therefore, consented to the

34

termination of the non-conforming use status of the laundromat in the center suites because the laundromat was failing and he intended to lease the suites for "Semi-Commercial" office uses.

90. Further, there can be no taking where, as here, Plaintiffs have been free to use the Property for the use they requested. It is undisputed the City granted Plaintiffs Special Use Permits on more than one occasion to allow Plaintiffs to lease the Property for the uses requested. CR 655.

91. On pages 8 and 9 of Appellants Brief Appellants appear to be basing their response to Defendant's immunity grounds on Plaintiffs' pleading allegations and on unsupported factual allegations raised for the first time on appeal to which Appellee has objected. These allegations and unsupported facts are not sufficient to raise a question of fact to defeat Defendant's immunity.

92. Plaintiffs list factors related to a "viable allegation" from *City of Dallas* v. VSC, LLC, 347 S.W.3d at 236. The facts in the present case do not rise to the level contemplated in these factors. There can be no credible allegation of ouster, unreasonable restrictions, or overly burdensome standards when Plaintiffs are simply subject to the zoning that existed on the Property when they bought the Property and have by their own admission been given special use permits for the uses he requested, including a barber shop use. CR 655. If Plaintiff's claims constitute a taking, then landowners all over the land could claim a taking simply

35

because they are subject to zoning classifications set by cities. There is no legal precedent for any such claim to rise to a valid takings case. Plaintiffs do not provide evidence of factual elements to support these legal conclusions.

93. Because Plaintiffs have failed to demonstrate a viable regulatory takings claim, the City retains its immunity. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012). The Trial Court's judgment for Defendant should be upheld on immunity grounds.

**C. Plaintiffs have not provided evidence to create a fact issue to demonstrate they have standing to sue. (Responds to Appellants, Brief at pg. 9).**

94. Standing is not an affirmative defense but is a legal question regarding subject-matter jurisdiction. *See Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 1993 Tex. LEXIS 22, 36 Tex. Sup. J. 607 (Tex. 1993) . Plaintiffs have no standing to sue for the cessation of the non-conforming use in the middle suite. Plaintiffs were not personally aggrieved because the non-conforming use was voluntarily abandoned prior to the purchase of the Property. The right to sue for the injury is a personal right belonging to the person owning the property at the time of the injury. *Denman v. Citgo Pipeline Co.*, 123 S.W.3d 728 (Tex. App. Texarkana 2003) relying on *Abbott v. City of Princeton*, 721 S.W.2d 872, 875 (Tex. App.-- Dallas 1986, writ ref'd n.r.e.); *Lay v. Aetna Ins. Co.,* 599 S.W.2d 684, 686 (Tex.

Civ. App.--Austin 1980, writ ref'd n.r.e.). Therefore, without express provision, the right does not pass to a subsequent purchaser of the property. *Denman, supra; Abbott*, 721 S.W.2d at 875; *Lay*, 599 S.W.2d at 686. "A mere subsequent purchaser cannot recover for an injury committed before his or her purchase." *Denman, supra*; *Lay*, 599 S.W.2d at 686.

95.     Here, it is undisputed that Electro Sales and Service bought the Property from the Eng Defendants after the non-conforming use expired and that the regulatory zoning classification of the Property was put in place over 40 years prior to the purchase. CR 613 to 615 and 696. Therefore, Plaintiffs' unsupported assertion that standing was somehow acquired when the Property was purchased fails to raise a genuine issue of material fact.

96.     Plaintiffs' allegations on pages 9 and 10 of Appellants' Brief are not supported by summary judgment evidence. Plaintiffs further lack standing because their claims are not ripe as discussed further below. Merchant also lacks standing because he has not provided any evidence of individual ownership in the Property.

97.     For these reasons the Trial Court's summary judgment should be upheld on grounds of lack of standing.

**D.** **Plaintiffs' claims are not ripe because Plaintiffs failed to establish futility of other options available (Responds to Appellants' Brief at pg.10)**

98. Appellants fail to raise an issue of fact and they are barred as a matter of law from litigating a regulatory takings claim based on 1) the cessation of the nonconforming use in the middle suite of the Property and 2) the denial of a barber shop in a semi-commercial district because they failed to exhaust administrative remedies to appeal those administrative enforcement decisions to the Board of Adjustment. See Tex. Loc. Gov't Code Ann §§211.009(a), 211.010 and 211.011. Appellants have failed to address the lack of appeal to the Board of Adjustment on either a ripeness or exhaustion of administrative remedies argument and have failed to provide any evidence that such an appeal would be futile.

99. Plaintiffs base their takings claim and declaratory judgment claim in large measure on the City staff's interpretation and enforcement of the zoning ordinances, specifically that prior to purchase of the Property the nonconforming use in the middle suite on the Property ceased, and that a barber shop was not an allowable use in the middle suite after the cessation of the nonconforming use and its reversion back to semi-commercial zoning. However, there is no evidence that Plaintiffs timely appealed these administrative decisions to the Board of Adjustment as required by Section XV of the City's Zoning Code. City of Terrell Hills Code of Ordinances Ch14, Sec. XV

38

100. Under Chapter 14, Section XV of the Zoning Code, appeals to the Board of Adjustment may be taken by any person aggrieved or by any officer, department, board or bureau of the municipality affected by any decision of the administrative officer. *See* CR 646 to 648 – Zoning Code, Ch. 14 Sec. XV (2)(b)(1). Chapter 14 of the Zoning Code further defines what a "reasonable time" is for the purposes of appealing a decision of a City administrative officer to the Terrell Hills Board of Adjustment. *Id.* Such appeal shall be taken with ten (10) days from the date of any such ruling, by filing with the officer from whom the appeal is taken and with the Board of Adjustment a notice of appeal specifying the grounds thereof. *Id.*

101. Here, Plaintiffs failed to obtain a final ruling from the City through the appellate process set out in TEX. LOC. GOV'T CODE § 211.010(b) and the Zoning Code, Ch. 14 Sec. XV (2)(b)(1). Plaintiff's failure to timely appeal the decisions of the City staff in compliance with the City's appellate process bars Plaintiff from litigating both the decision relating to the cessation of the nonconforming use for the middle suite of the Property and the decision that the barber shop was not an allowed semi-commercial use in the middle suite. As a result, the City is entitled to dismissal of Plaintiff's claims related to these decision.

102. Plaintiffs' statement on pages 10 and 11 of Appellants' Brief that "Appealing to some review board for which the City Council is the convening

39

authority would have been futile since the City Council has the final say" defies the entire due process system which the Board of Adjustment Procedures set out in the Texas Local Government Code. Appellants did not even try to appeal to the Board and base their argument on one decision by City Council, which simply is not enough to demonstrate futility of appeal to the Board of Adjustment

103. In addition, Plaintiffs' assertion that they obtained a final decision denying the request to up-zone the Property to commercial fails to satisfy a ripeness inquiry on the takings claim. The facts are undisputed that the City granted Plaintiffs' applications for a Special Use Permit allowing additional permitted uses for the Property, including a barber shop/hair salon. There is no final decision and the City has not closed the door to continued future uses for the middle suite of the Property. *See Hamilton Bank Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186 (1985*).*

104. Ripeness is an element of subject matter jurisdiction. *State Bar of Texas v. Gomez,* 891 S.W.2d 243, 245 (Tex. 1994). As such, ripeness is a legal question. *Texas Ass'n of Business v. Texas Air Control Bd*., 852 S.W.2d 440, 444-45 (Tex. 1993). A takings claim is not ripe for court action until a final decision about what level of use will be permitted on the property. *See Public Util. Comm'n v. Houston Lighting & Power Co.,* 748 S.W.2d 439 (Tex. 1987) ("A court has no jurisdiction to render an advisory opinion on a controversy that is not yet ripe.").

"[T]he ripeness doctrine conserves judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes. *Browning-Ferris, Inc. v. Brazoria County,* 742 S.W.2d 43, 49 (Tex. App.--Austin 1987, no writ). In order for a regulatory takings claim to be ripe, there must be a final decision regarding the application of the regulations to the property at issue. *Hamilton Bank* at 186.

105.    Here, the undisputed facts clearly demonstrate that the City *granted* Plaintiffs' applications for a Special Use Permit allowing additional permitted uses for the Property, including a barber shop/hair salon. Plaintiffs cannot demonstrate that the City ever shut its door to continued future uses for the middle suite of the Property. Since the possibility remains that Plaintiffs' future use requests would be granted by the City, there can be no taking.

106.    The existing zoning of the middle suite of the Property when Plaintiffs acquired the Property was semi-commercial, and the City is allowing Plaintiffs uses greater than the stated semi-commercial zoning for the Property. It would be premature to request a court or jury to make a determination whether a compensable taking has occurred under such circumstances when the undisputed facts demonstrate that the City is likely to continue approving uses for the Property above the stated semi-commercial zoning for the Property. As such, Plaintiffs'

claim is premature, and the Trial Court's summary judgment in favor of the City should be upheld on these grounds.

*II.    No inverse condemnation/taking can be demonstrated because there is no intentional taking and no property right in having one's zoning changed to commercial or in reinstating a non-conforming use abandoned by a predecessor in interest (Responds to Appellants' Brief at pg. 11; ref. issues 2, 3 and 4).*

107.    Alternatively, if same be necessary, the Trial Court was correct in granting summary judgment because Defendant has established there is no genuine issue of material fact on one or more elements of Plaintiffs' causes of action and that Defendant is entitled to judgment as a matter of law. Plaintiffs failed to present evidence to raise a genuine issue of material fact as to whether or not a taking of a valid property right occurred or to demonstrate any unreasonable interference with the property rights of Plaintiffs, and other issues related to declaratory judgment and attorneys' fees claims.

**A.    Traditional summary judgment standards of review (Responds to Appellants' Brief at pg. 11)**

108.    Summary judgment for a defendant is proper if the defendant negates at least one element of each of the plaintiff's theories of recovery, or pleads and conclusively establishes each element of an affirmative defense. *EPGT Tex. Pipeline, L.P. v. Harris County Flood Control Dist.*, 176 S.W.3d 330, 334-335

42

(Tex. App.—Houston, 2004, pet'n dismissed); *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911, 40 Tex. Sup. Ct. J. 438 (Tex. 1997).

109. However, Appellants have failed to include the complete standards for the traditional summary judgment as raised by Defendant. For a traditional motion, as stated in Paragraph 30 of Defendant's Motion for Summary Judgment (CR 589), once the movant establishes the right to judgment as a matter of law, the burden shifts to the non-movant who must then set forth sufficient evidence to create an issue of material fact. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2nd 671, 678 (Tex. 1979).

110. Since Defendant has met its burden, Plaintiffs would need to produce facts to demonstrate a genuine issue of fact on each of the elements of Plaintiffs' claims in order to defeat summary judgment. In the case of the inverse condemnation/regulatory taking claim, Appellants would need to demonstrate an ownership interest in the property, an intentional action by the City (for which the City knew with reasonable certainty would have the result of taking Plaintiffs' Property), that the action either denied them of all economically viable use of their property or unreasonably interfered with their right to use and enjoyment of the property based on reasonable investment backed expectations (or failed to substantially advance a legitimate public interest, if the Court applies this test).

**B.     Appellee Objects to Appellants' "Issue 2" (Balance Between Public and Private Interests) Raised for First Time on Appeal and Not a Relevant Issue (Responds to Appellants' Brief at pg. 11 and pg. 21; ref. Issue 2)**

111.   Appellants' "Issue 2" argues there is a fact issue regarding how the City's regulation affects the balance between the public interest and that of the private landowner. See Appellants' Brief at pg. x. Defendant objects to this Issue 2 because Plaintiffs are raising this argument for the first time on appeal. Plaintiffs failed to raise this issue in their response to Defendant's Motion for Summary Judgment. See CR 658 to 680. Defendant requests that this Court of Appeals strike "Issue 2" and related argument at II, C and IV from Appellants' Brief.

112.   Subject to and without waiving the foregoing objection Defendant asserts this issue is not material to the summary judgment issues because it is not one of the elements of Plaintiffs' cause of action for inverse condemnation or of the City's defenses. As stated by the Supreme Court in *Lingle*, the primary factors are the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with investment backed expectations. *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 538-40 (2005). A question of fact as to a non-material issue will not defeat a summary judgment motion.

**C.     Subject to the foregoing objection, Defendant City not required to prove that public interest in its zoning restrictions outweighs the private burden on Plaintiffs, property, Plaintiffs failed to present any evidence**

on this issue or raise question of fact (Responds to Appellants' Brief at pg. 13 ref. Issue 2)

    **1.    Subject to the foregoing objection, Appellee further objects to Appellants argument because Appellants are challenging the zoning ordinance on these grounds for the first time on appeal. If the Summary judgment burden on City is to establish conditions support passage and/or maintenance of the zoning ordinance or make the issue arguable, which Appellee does not admit, the City has met its burden and Plaintiff has the burden to raise a genuine issue of material fact (Responds to Appellants' Brief at pg. 13).**

113. Subject to and without waiving the foregoing objection, Appellee responds to this argument in the following paragraphs in the event the Court determines it should consider this argument. At page 11 of their Brief, Appellants cite to the Texas Supreme Court decision in *Sheffield* for their proposition that the Court is required to balance the public's interest against that of the landowners. The *Sheffield* case differs from the present case because *Sheffield* involved an actual downzoning of undeveloped property by the City of Glenn Heights reducing the number of residences that the owner/developer could build on the property. *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 663 (Tex. 2002). In *Sheffield* the Texas Supreme Court reversed the Appellate Court's decision and rendered a take nothing judgment in favor of the City on the developer's takings claim, finding that the down-zoning did not go too far and was not a taking. *Sheffield,* 140 S.W.3d at 679.

45

114. In making its decision in *Sheffield,* the Texas Supreme Court noted that the City's zoning decisions, apart from the faulty way they were reached, were not materially different from zoning decisions made by cities every day. *Id.* The Court also stated the down-zoning in *Sheffield* differed from the refusal to up-zone found in the *Mayhew* decision where the City was maintaining the status quo in any area which had a particular zoning classification for many years. *Id; see also, Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 936 (Tex. 1998)

115. The Texas Supreme Court discussed in *Sheffield* that the takings clause does not charge the government with guaranteeing the profitability of every piece of land subject to its authority. *Sheffield,* 140 S.W.3d at 677. Purchasing and developing real estate carries with it certain financial risks, and it is not the government's duty to underwrite this risk as an extension of obligations under the takings clause. *Id.* [87]

116. Similarly, in the present case, Merchant was an experienced purchaser of property for his leasing business and undertook his own risk in not researching the zoning of the Property before he made his purchase. Applying the Texas Supreme Court's analysis in *Sheffield*, the City of Terrell Hills' action, not to down-zone a property as in *Sheffield*, but to deny an up-zoning of the Property in

---

[87] *Taub v. City of Deer Park,* 882 S.W.2d 824, 826 (Tex. 1994).

46

order to maintain the long-standing zoning of the Property as in *Mayhew*, does not rise to the level of a taking.

117. With regard to the substantial advancement test, the Texas Supreme Court stated in *Sheffield* that the Supreme Court appears to have equivocated somewhat on its statement in *Agins* (that a substantial advancement test is appropriate) outside the context of cases involving required dedications or exactions. *See, Id*. at 673. However, the Court in *Sheffield* went on to apply the test in this case. *Sheffield,* 140 S.W.3d at 674. They did not think it must be proved to a certainty and stated that the actual effects of the City's rezoning are for the future and can only be projected and estimated. *Id.* at 676. They supported the court of appeals conclusion that the City's rezoning substantially advanced its interests in avoiding the ill effects of urbanization and preserving the rate and character of community growth. *Id.*

118. In the present case, Defendant demonstrated the public interest in not up-zoning the Property because it is currently transition zoning, which protects neighboring properties. Defendant's Summary Judgment Motion asserted such zoning accomplishes the public purposes of protection from traffic congestion and to provide for the orderly development of the community. Minutes of the City Council of the City of Terrell Hills of August 8, 2011 show that the City Council discussed a request by Merchant to re-zone the Property to "Commercial", but City

Council denied the request, discussing the fact that this area is a transition zone and there are immediate neighbors who would be directly affected. CR 622.

119. Because Defendant has met its burden for summary judgment, the burden shifted to Plaintiffs to provide evidence to establish a genuine issue of material fact. Plaintiffs failed to provide evidence of the alleged economic impact and alleged degree of interference with legitimate property interests. These issues are not strictly within the City's knowledge and purview as argued by Plaintiffs. The decision of the Trial Court should be upheld on these grounds.

120. Generally, a property owner has no vested right to use its property in a certain way without restriction. *See Azadpour v. City of Grapevine*, No. 02-13-00323- CV, 2014 WL 2566024, at *4 (Tex. App.—Fort Worth June 5, 2014, pet. denied) (mem. op.); *Mr. W. Fireworks, Inc. v. Comal Cty.*, No. 03-06-00638-CV, 2010 WL 1253931, at *8 (Tex. App.—Austin Mar. 31, 2010, no pet.) (mem. op.). In addition, it is well settled in Texas that "property owners do not acquire a constitutionally protected vested right . . . in zoning classifications once made." *City of University Park v. Benners,* 485 S.W.2d 773, 778 (Tex. 1972). The City retains its legislative authority to re-zone at any time as public necessity demands. *City of Pharr v. Tippitt*, 616 S.W.2d 173, 176 (Tex. 1981). These principles apply to an even greater extent in the present case where the City did not rezone the Property, but only denied Plaintiff's request to up-zone the Property.

121. The Supreme Court in *Lingle* concluded that the substantial advancement test is a due process inquiry and not a takings inquiry. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005). For this reason, even if Plaintiffs were to defeat the City's immunity, standing, ripeness, and other grounds for summary judgment, Plaintiffs could not defeat the City's summary judgment motion in this case, unless Plaintiffs provide evidence sufficient to create a genuine fact issue as to whether or not the City's denial of Plaintiffs' upzoning request has denied Plaintiffs all economically viable use of their property or whether the City unreasonably interfered with their right to use and enjoy the property. A regulatory taking is a condition of use "so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle.*, 544 U.S. 528 at 537. A court in deciding a zoning issue cannot assume the role of "super zoning board." *Mayhew* at 933.

**2. Subject to the foregoing objections the City carried its summary judgment burden and Plaintiffs failed to meet their burden to present evidence or raise question of fact (Responds to Appellants' Brief at pg. 14)**

122. In this case, the zoning of the Property has remained semi-commercial for fifty years, not commercial. On pages 14 and 15 of Appellants' Brief, Appellants attempt to equate a non-conforming use exception with effective zoning of the Property. These two terms do not have the same meaning or effect. Zoning is

49

the use which is allowed for an area. The very term, "non-conforming use" means that the use does not comply with the zoning of the area. A non-conforming use exception only allows a particular use (in this case a laundromat use) to continue for a period of time until it is abandoned. This gives landowners a chance to recoup investment backed expectations after a zoning change, but still does not allow other unrestricted businesses into the area in the manner that an upzoning would allow.

123. Plaintiffs propose the City should offer proof related to the justification of the City's zoning decision in 1962. Any claim for that time period would be barred by the statute of limitations.

124. Here, the undisputed facts are that the City's 1962 zoning ordinance established zoning for the Property as semi-commercial with nonconforming uses of the Property to continue until a nonuse of six months occurred whereupon the nonconforming use would cease and revert to semi-commercial zoning. Plaintiffs cannot demonstrate that the City's denial of the up-zoning request was anything but a decision to advance the City's legitimate government concern to protect residents from the ill effects of increased traffic, parking congestion and to control the rate and character of community growth. As a result, the City is entitled to summary judgment on Plaintiff's taking claim.

125. Without waiving the City's position that substantial advancement of legitimate government interest is not applicable to this analysis, the City provides the following argument in the event the Court finds this element does apply.

126. The City Council minutes attached to Defendant's summary judgment motion discuss the fact that the semi-commercial zoning is a transition zone that protects neighbors. The Texas Supreme Court has determined that there are a broad range of governmental purposes that will satisfy the substantially advance requirement. *Id.* Legitimate state interests include protecting residents from the ill effects of traffic congestion, parking congestion, enhancing the quality of life, and controlling the rate and character of community growth. *Id.* at 934. Such zoning benefits the public and serves the City's interest in assuring careful and orderly development of business uses. *See Agins v. City of Tiburon,* 447 U.S. 255, 260 (1980); *see also Lingle,* 544 U.S. at 539.

127. A zoning ordinance, duly adopted is presumed to be valid, and the burden is on the one seeking to prevent its enforcement to prove that the ordinance is arbitrary or unreasonable. *City of Fort Worth*, 388 S.W.2d 400, 402 (Tex. 1964). Further, zoning is a legislative function of municipal government. *City of Pharr v. Tippitt*, 616 S.W.2d 173, 175 (Tex. 1981). The courts must give deference to a city's action such that, "if reasonable minds may differ as to whether or not a particular zoning ordinance has a substantial relationship to the public health,

51

safety, morals or general welfare, no clear abuse of discretion is shown and the ordinance must stand as a valid exercise of the city's police power." *Id*. at 176. "Courts may not interfere unless a challenged ordinance is shown to represent a clear abuse of municipal discretion or unless there is conclusive evidence that a zoning ordinance is arbitrary either generally or as to particular property." *Benners* at 779. A plaintiff cannot ask the Court to review the wisdom of the City's denial of Plaintiff's zoning request.

128.    Further, the Texas Supreme Court has stated that "We are in accord with the principle that municipal zoning ordinances requiring the termination of nonconforming uses under reasonable conditions are within the scope of municipal police power; and that property owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classifications once made. *Benners* at 778. "A nonconforming use of land or buildings is a use that existed legally when the zoning restriction became effective and has continued to exist." *Id*

129.    The City has met its burden and Plaintiff has failed to create a fact issue.

> **D**.    **Appellee Objects to Appellants' "Issue 4" (Stripped Economic Viability) Raised for the First Time on Appeal. Subject thereto, Plaintiffs failed to provide evidence or raise an issue of fact to support their argument that the City's zoning deprived Plaintiffs of the economically viable use of their property or unreasonably interfered with their use of**

**the property (Responds to Appellants' Brief at pg. 16; ref. Issue 4)**

130.   In "Issue 4", discussed in Article II, Section D, 1 and 3, and Article III of Appellants' Brief, Appellants have included a discussion not previously made in their Response to Defendant's Motion for Summary Judgment. They assert for the first time on appeal that the center strip was stripped of all economically viable use. Defendant objects to this argument being raised for the first time on appeal. Although Plaintiffs mentioned in their Response to Defendant's Motion for Summary Judgment that this element was plead in the petition, Plaintiffs failed to make any argument or provide any evidence related to this element in their Response. See CR 658 to 680. Defendant requests this Court strike Appellants' "Issue 4" and related argument at II, D, 1 and 3, and III of Appellants' Brief.

131.   Subject to the foregoing objection, Defendant has demonstrated Plaintiffs still have economically viable uses in the form of semi-commercial uses for the center suites in the Property and have been granted Special Use Permits even for the specific commercial uses requested by Plaintiffs.

132.   Subject to and without waiving the foregoing objection, the City asserts Plaintiffs failed to provide any evidence in support of this argument. The City has shown that the prior owner, Eng, allowed the non-conforming laundromat use to be abandoned because it was not performing financially and that he believed he could lease the Property for semi-commercial office uses. Plaintiffs have

53

admitted the City granted them Special Use permits for the uses they requested. Plaintiff has failed to provide any evidence that the Property has been stripped of economic viability because of any action by the City.

**1.      Standard for showing regulatory taking requires more than unsupported statements that zoning regulations unreasonably interfere with use of property and affect the economic viability of the property; must be evidence that unreasonable restriction (Responds to Appellants' Brief at pg. 16)**

133.   Defendant has provided evidence that the denial of the upzoning request was not unreasonable. The denial simply maintained the status quo which existed at the time Plaintiffs purchased the Property. There can be no reasonable investment backed expectation to have a property's zoning changed to commercial after it is acquired.

134.   It is undisputed the City has granted Plaintiffs Special Use Permits for the Property. The former owner Billy Eng testified that the laundromat operated in the middle suite under the nonconforming commercial use and his business failed. CR 696. Mr. Eng allowed the non-conforming use to be abandoned because he believed he could lease the suites for office space. CR 696.

135.   Plaintiffs have failed to provide any evidence that they tried to utilize the space for office space or any other use allowed under the semi-commercial

54

zoning of the Property. All Plaintiffs have offered is their personal opinions that having the middle suite zoned commercial would somehow be more economically viable. Plaintiff's self-serving and unsupported statements are not summary judgment evidence sufficient to raise an issue of fact regarding the reasonableness of the City's actions. There can be no genuine dispute that the City has never denied Plaintiff full economic use of the Property. Plaintiff's desire not to need to apply for a new special use permit for the middle suite when he changes tenants is not a property right to which he is entitled under the law. It is not unreasonably restrictive for the City to require a permit to use property in a manner which would not otherwise have been allowed in that zoning district, particularly, as here, where the City granted the permit

136. Defendant provides the following argument subject to its objection above. "A restriction denies the landowner all economically viable use of the property or totally destroys the value of the property if the restriction renders the property valueless." *Mayhew* at 935. While the semi-commercial zoning classification for the middle suite of the Property does not permit Plaintiff to lease to certain types of businesses, there are numerous economically viable businesses which are permitted under the existing zoning. Any number of professional offices for doctors, lawyers, real estate professionals are permitted. The undisputed facts here clearly demonstrate that Plaintiff acquired several barber shops and nail salons

who were interested in the Property and requested Special Use Permits for them. The City approved Special Use Permits on more than one occasion at Plaintiff's request for barber shop/nail salon uses, but Plaintiff, although authorized, never filled the vacancy in the middle suite of the Property.

137.   It is clear that the City has not "destroyed all value of the property" by denying the Plaintiff's zoning request. To the contrary, the City approved the Plaintiff's requests for Special Use Permits on more than one occasion. Plaintiff operates two leased business suites on the property, that of a convenient grocery store and a bar, that remain in use. Because Plaintiff cannot demonstrate that he has been denied all economic uses of the Property, the City is entitled to summary judgment on Plaintiff's takings claim.

> **2.      The zoning had been in effect for 50 years; allowing a property owner to continue a non-conforming use subject to termination of the use on certain conditions does not constitute a zoning change, but a benefit to the landowner; no evidence was shown of an unreasonable restriction on the property and City not required to show serving a substantial public purpose (Responds to Appellants' Brief at pg. 18; ref. Issue 3)**

**Appellees Object to Appellants' "Issue 3" on Substantial Public Purpose of the City's "Zoning" (as opposed to denial) Raised for the First Time on Appeal and Not a Relevant Issue**

138. Appellants' "Issue 3" and related argument at II, D, 2 of Appellants' Brief argues there is a regulatory taking because the City's zoning does not effectuate a substantial public purpose. Appellant objects to Plaintiffs raising the issue of whether or not there is a substantial public purpose to the City's zoning for the first time on appeal. Plaintiffs' Response to Defendant's Motion for Summary Judgment only raised the issue of whether or not the City had established a substantial public purpose for its decision not to up-zone the Property from long-standing "Semi-Commercial" zoning to "Commercial" zoning. CR 668 to 675. Appellee requests Appellants' Issue 3 and related argument at II, D, 3 of Appellants' Brief be stricken.

139. Subject to and without waiving the foregoing objection, Appellant asserts the City is not required to show a substantial public purpose in order to succeed on its summary judgment motion for an inverse condemnation claim. In its Motion for Summary Judgment, the City relied on the Supreme Court's statement in the *Lingle* decision that there is no substantial purpose test in a regulatory takings claim because this is a due process factor. CR 596.

140. Nonetheless, Defendant did make an argument in its Motion for Summary Judgment related to Plaintiffs' failure to demonstrate the denial of zoning did not advance a substantial state interest. This argument was made subject

to and without waiving the City's position that the substantial advancement test is not a valid issue in this inverse condemnation case. CR 596 to 598.

141. On page 18 of Appellants' Brief, Appellants again attempt to confuse "zoning" with "non-conforming use." The Property has been zoned semi-commercial for over fifty years. There can be no unreasonable burden on Plaintiffs property where the zoning has remained as it was when Plaintiffs purchased the Property and the City has granted Special Use permits for the uses requested.

142. Subject to the foregoing objection, in the event this Court of Appeals does consider the substantial advancement test, Defendant has demonstrated the substantial relationship between the City's denial of the up-zone request and a legitimate public purpose. The semi-commercial zone is a transition zone which protects residents of residential areas from increased traffic and parking congestion in commercial areas and allows the City to control the rate and character of community growth. CR 596 to 598. The City has provided evidence of a substantial public purpose in the form of minutes of a City Council meeting at which the up-zoning request was discussed. The discussion included statements regarding the fact that this area is a transition zone between "Commercial" and "Residential" zones, and that there is a residential property backing directly up to the Property and neighboring properties which would be negatively affected by unrestricted commercial zoning of the Property. CR 621 and 622.

143. Because the City has met its burden to demonstrate a substantial public purpose, the burden shifts to Appellants to provide evidence to create a fact question as to this element. Defendant's evidence demonstrates a substantial public purpose and Plaintiffs' only alleged evidence, the Affidavit of Salim Merchant, fails to provide any evidence sufficient to create a question of fact on whether or not the denial of the up-zone request substantially advanced a legitimate government interest. CR 682 to 685.

144. Merchant's reliance on a list of businesses he claims are allowed to operate within one mile of the Property fails to demonstrate that the City's zoning decision regarding the Property does not substantially advance a legitimate City interest. A bare list of business names without providing their specific location, the location relative to residential homes, the availability of parking spaces, the impact on traffic, the signage, the zoning for each, and the impact on the City's development fails to carry Plaintiffs' burden to prove that the 50 year old zoning ordinance in this case is somehow arbitrary or unreasonable. At a minimum, Merchant's affidavit does not even substantiate the list of business names contained in the Response. Plaintiffs do not, at a minimum, produce evidence that the businesses listed are even located within the City of Terrell Hills. In addition, Merchant's personal opinion that it is arbitrary or irrational for the City's zoning to allow for the middle suite not to be zoned commercial when the end suites are

zoned commercial is inaccurate and insufficient for the Court to overturn a presumptively valid zoning ordinance. *See City of Fort Worth,* 388 S.W.2d 400, 402 (Tex. 1964). There is no dispute that the underlying zoning of all of the spaces on the Property has been "Semi-Commercial" since the 1960's although the non-conforming commercial uses were allowed to continue provided they were not abandoned.

145. Determining whether the government has unreasonably interfered with a landowner's right to use and enjoy property requires consideration of two factors: 1) the economic impact of the regulation, and 2) the extent to which the regulation interferes with distinct investment-backed expectations. *Mayhew,* 964 S.W.2d at 935. The existing zoning of the property at the time the Property is acquired is to be considered in determining whether the regulation interferes with investment-backed expectations. *Mayhew* at 937-38. The party claiming privilege to continue a nonconforming use, in this case Plaintiff, bears the burden of proving its preexisting status. *See City of Pharr v. Pena*, 853 S.W.2d 56, 63 (Tex. App.—Corpus Christi 1993, writ denied). Here, it is undisputed that Plaintiff acquired the Property after the nonconforming use made of the middle suite on the Property had been abandoned by the prior owner. The abandonment of only the non-conforming use on the center suites and not the two outer suites of the Property was a decision

made by the former owner, Eng, not by the City. For this reason, it cannot be considered an arbitrary action by the City.

146. For further argument the City incorporates the City's argument from CR 596 to 698 herein as if set forth in full for the purpose of demonstrating that Plaintiffs have not met their burden on this test.

> **3.** **Plaintiffs presented no evidence City's restriction was unreasonable, or that any City restriction or any failure to act timely made the center space un-leasable (Responds to Appellants' Brief at pg. 19; ref. Issue 4)**

147. Plaintiff's assertion that the semi-commercial status makes it impossible to lease is a completely unsupported personal opinion, especially when Plaintiff has testified that he had several potential barbershop and hair salon tenants for the middle suite for which the City provided Plaintiff special use permits. The decision to leave the non-conforming uses on the end suites, not the center one was made by former owner, Eng, not by the City. It cannot be attributed to the City.

III.    *Defendant objects to Appellants issue on the character of governmental action which was not raised by Plaintiffs in their Response to Defendant's summary judgment motion. Subject thereto, the summary judgment evidence shows no zoning intransigence and there is no regulatory taking as a matter of law (Responds to Appellants' Brief at pg. 20; ref. Issue 4)*

61

148. Defendant objects to Appellants issue on the character of governmental action which was not raised by Plaintiffs in their Response to Defendant's summary judgment motion. Subject thereto, the summary judgment evidence shows no zoning intransigence and there is no regulatory taking as a matter of law. The character of the City's action in this case has been demonstrated to be a typical zoning action to preserve the status quo of having a transition zone to protect neighboring properties. Plaintiffs have failed to raise a question of fact to defeat summary judgment.

IV. *Appellee has objected above to Appellants' "Issue 2" (Balance Between Public and Private Interests) Raised for First Time on Appeal and Not a Relevant Issue (Responds to Appellants' Brief at pg. 21; ref. Issue 2)*

149. Already above - Appellants' "Issue 2" argues there is a fact issue regarding how the City's regulation affects the balance between the public interest and that of the private landowner. See Appellants' Brief at pg. x. Defendant objects to Plaintiff raising this argument for the first time on appeal. Plaintiffs failed to raise this issue in their response to Defendant's Motion for Summary Judgment. See CR 658 to 680. Defendant requests that this Court of Appeals strike "Issue 2" and related argument at II, C and IV from Appellants' Brief. Subject to and without waiving the foregoing objection Defendant asserts this issue is not material

to the summary judgment issues because it is not one of the elements of Plaintiffs' cause of action for inverse condemnation or of the City's defenses.

150. Subject to the foregoing objection, in the event the Court does look to the balancing test, Defendant asserts there is nothing to balance because Plaintiffs have failed to provide evidence of burdens to them which could outweigh the public interest demonstrated by Defendant of having a transition zone, protecting neighbors from traffic congestion and parking issues, and providing for orderly development of the City. A question of fact as to a non-material issue will not defeat a summary judgment motion. The Trial Court's Judgment should be upheld.

## V.    CONCLUSION

151. As shown above Plaintiffs/Appellants have failed to show any evidence to support at least one of the elements of their cause of action, alternatively, have failed to show waiver of immunity and otherwise establish jurisdiction, and, alternatively, have failed to raise a question of material fact as to the elements of their causes of action. Plaintiffs simply bought a piece of property without researching its zoning and tried to make the public pay for their mistake. The City's actions in denying an upzoning merely maintained the long-standing semi-commercial zoning of the Property. Plaintiffs' self-serving statements that he has been denied all use of the property simply don't hold weight given that the City has granted Special Use Permits for the uses requested by Plaintiffs. For the

reasons cited above Defendant/Appellee asserts the judgment of the District Court granting Defendant's Summary Judgment should be upheld.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Defendant/Appellee, City of Terrell Hills, prays this Court of Appeals finds the final judgment of the District Court in favor of the City of Terrell Hills' Motion for Summary Judgment should stand and enters a decision upholding the decision of the District Court and order that Plaintiffs take nothing, and for such other and further relief, both general and special, at law and in equity, to which the Defendant/Appellee may show itself to be justly entitled.

Respectfully submitted,

/s/ *Barbara L. Quirk*
Barbara L. Quirk
State Bar No. 16436750
MCKAMIE KRUEGER, LLP
941 Proton Road
San Antonio, Texas 78258
210.546.2122
210.546.2130 (Fax)
barbara@mckamiekrueger.com

Adolfo Ruiz
State Bar No. 17385600

MCKAMIE KRUEGER, LLP
941 Proton Road
San Antonio, Texas 78258
210.546.2122
210.546.2130 (Fax)
adolfo@mckamiekrueger.com

**ATTORNEYS FOR APPELLEE,
CITY OF TERRELL HILLS**

## CERTIFICATE OF SERVICE

As required by Texas Rule of Appellate Procedure 6.3 and 9.5(b), (d), (e), I certify that I have served the foregoing Appellee's Brief on all other parties which are listed below by e-filing on September 25, 2017 as follows:

R. Carlo Garcia
OLIVA, SAKS, GARCIA & CURIEL
14255 Blanco Road
San Antonio, Texas 78216
(210) 308-6600
(210) 308-6939 (fax)
cglaw@osgclaw.com

Jeff Small
LAW OFFICE OF JEFF SMALL
12451 Starcrest Drive, Suite 100
San Antonio, Texas 78216-2988
(210) 496-0611
(210) 579.-399 (fax)
jdslaw@satx.rr.com

Attorneys for Appellants Electro Sales and Service
And Salim Merchant

/s/ *Barbara L. Quirk*
Barbara L. Quirk

# CERTIFICATE OF COMPLIANCE

I certify that this document is in compliance with Tex. R. App. P. 9.4 (e) and (i). It contains 14,993(LESS THAN 15,000) words excluding the exempted parts of the document. The body text is in 14 point font, and the footnote text is in 12 point font.

/s/ Barbara L. Quirk
Barbara L. Quirk

September 25, 2017
Date

_____

## APPENDIX

_____

TO THE HONORABLE JUDGE OF SAID COURT:

The following exhibits are incorporated by reference into the Appellee City of Terrell Hills' Brief:

A.    City of Terrell Hill's Motion for Summary Judgment filed August 16, 2016

B.    City of Terrell Hill's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment filed September 28, 2016

C.    Clerk's Record Excerpt pp. 621 – 622 City Council Minutes

C-2.  Clerk's Record Excerpt p. 628 City Council Minutes

D.    Clerk's Record Excerpt pp. 636 – 639  Ordinances 1349 and 1386 granting Special Use Permits to Plaintiff

D-2.  Clerk's Record Excerpt pp. 646 – 648 Section XV of the City of Terrell Hills Zoning Ordinance, Board of Adjustment Procedures

E.    *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660

E-2.  Tex. Loc. Gov't Code Section 211.010 Appeal to Board of Adjustment

# EXHIBIT A

FILED
8/16/2016 12:25:00 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Marissa Ugarte

CAUSE NO. 2013-CI-00447

| | | |
|---|---|---|
| SALIM MERCHANT & ELECTRO | § | IN THE DISTRICT COURT |
| SALES AND SERVICES, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 57th JUDICIAL DISTRICT |
| | § | |
| THE CITY OF TERRELL HILLS AND | § | |
| BILLY W. ENG AND GIN WEI ENG, | § | |
| Defendants. | § | BEXAR COUNTY, TEXAS |

## CITY OF TERRELL HILLS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the City of Terrell Hills, Texas (hereinafter the "City"), Defendant in the above-entitled and numbered cause, and files this Motion for Summary Judgment and in support thereof, would respectfully show the Court as follows:

### I. BACKGROUND

1. This case began with the purchase by Plaintiff[1] on June 7, 2011, of 2111 to 2117 Harry Wurzbach ("the Property"), located in the City of Terrell Hills from Billy W. Eng and Gin Wei Eng ("the Eng Defendants"). The lawsuit arose from Plaintiff's own failure to investigate the semi-commercial zoning status of the property prior to purchasing the property, his misconception regarding the abandonment by the previous owner of one of the commercial uses which had existed previously on the property, and his subsequent efforts to force the City to change the zoning of the property from semi-commercial to commercial in a manner not consistent with the City's plans for the area.

---

[1] Plaintiff's Original Petition names two plaintiff entities, Salim Merchant and Electro Sales and Services Inc., but defines them as one "Plaintiff." The City will likewise refer to both named plaintiff entities as a singular Plaintiff.

1

**EXHIBIT A**

2. Plaintiff's misconceptions about the City's ordinances are not relevant against the City. A landowner has no right to a change in zoning in cases such as this and the City is entitled to judgment as a matter of law dismissing all claims against the City in this lawsuit.

3. On January 10, 2013, Plaintiff filed this case against the Eng Defendants and the City. Plaintiff's primary case against the Eng Defendants can be summarized as alleged misrepresentations in the sales transaction. As Plaintiff states on page 3 of Plaintiff's Original Petition (the "Petition"), Plaintiff alleges he was unaware of the semi-commercial (rather than commercial) zoning of the Property prior to the purchase. Plaintiff states he was also unaware the Engs had abandoned one of the non-conforming commercial uses previously operated at the middle suite on the Property.[2] Plaintiff's lack of knowledge does not create any duty on the City's part to give him the zoning he wants for the Property.

4. Plaintiff's case against the City asserts a regulatory taking[3] without adequate compensation having been made in violation of Section 17 of Article I of the Constitution of the State of Texas. In the Petition Plaintiff disagrees with the City's interpretation of its non-conforming use ordinance prior to his purchase of the Property related to the cessation of one of the commercial nonconforming uses which had been abandoned by the previous owner. The discontinuance of this non-conforming use occurred before Plaintiff's purchase of the Property and Plaintiff has no standing for claims against the City related to this matter. Plaintiff further challenges the City's denial in October of 2012 of his request to up-zone the Property from semi-commercial to commercial. Further, despite the fact that the City created a special use permit for the purpose of

---

[2] The City's Zoning Ordinance provides that a non-conforming use will be lost if the use is discontinued for six months. In this case, the other non-conforming commercial uses on the Property purchased by Plaintiff which had not been abandoned by the previous owner continue to this day.

[3] In the fact section of the Petition on page 4 Plaintiff states the interpretation of the ordinance is regulatory condemnation, and the enforcement of the ordinance is regulatory taking. However, the causes of action portion of the pleading only asserts regulatory taking.

2

582

**EXHIBIT A**

allowing Plaintiff to use the middle suite location for the use he requested, Plaintiff complains of the City's interpretation of its zoning ordinance as not permitting a barber shop use in a semi-commercial zoning district (without the special use permit) and asserts he should not be required to make a new request for a special use permit whenever his tenant changes. *See* the Petition at pages 3 and 4.

5.      Plaintiff also seeks a judicial declaration as to the City's interpretation of specific ordinance provisions relating to permitted uses of the Property. It is difficult to interpret Plaintiff's meaning in the declarations language, but the overall intent of the declarations sought appears to be: 1) whether Section VIII of the City's comprehensive zoning ordinance ("Zoning Code") forbids the placement of a barbershop in the suite in question; 2) whether Section X of the City's Zoning Code allows one non-conforming use at a particular address in a larger tract to cease while other non-conforming uses at different addresses in the same building continue; and 3) whether the City's Zoning Code prevents Plaintiff from placing a service-oriented business in the suite in question.

6.      Pursuant to Texas Rules of Civil Procedure 166a(c) and 166a(i) the City requests summary judgment in favor of the City on all of Plaintiff's claims against the City.

## II. SUMMARY OF THE ARGUMENT

7.      The City is entitled to summary judgment on the following grounds:

        a.      Plaintiff cannot overcome the City's assertion of immunity from this suit where Plaintiff has not plead a viable regulatory takings claim. Plaintiff's allegations do not set forth the taking of any property right and no waiver of immunity is triggered. There was no taking, in part because there is no property right in a zoning change for property from semi-commercial to commercial. There also can be no taking where the City granted Plaintiff's request for a special use permit for the suite in question. Plaintiff also cannot establish standing to sue.

3

583

b. Plaintiff is barred as a matter of law from litigating a regulatory takings claim based on 1) the cessation of the nonconforming use in the middle suite of the Property and 2) the denial of a barber shop in a semi-commercial district because he failed to exhaust his administrative remedies to appeal those administrative enforcement decisions to the Board of Adjustment.

c. Plaintiff is barred as a matter of law from pursuing his claims because of lack of ripeness.

d. Plaintiff cannot demonstrate that the City's denial to up-zone the Property constitutes a regulatory taking because 1) it substantially advances legitimate City interests; 2) it does not deny Plaintiff all economically viable uses of the Property; 3) it does not unreasonably interfere with Plaintiff's right to use and enjoy the Property. There is no genuine issue of material fact to defeat summary judgment for the City on these issues.

e. Plaintiff's declaratory judgment action is an impermissibly duplication of his takings claims for purposes of obtaining attorney's fees.

f. Alternatively, Plaintiff has provided no evidence of the material elements of his claims; that a property right was taken by the City; that he was deprived of any economically viable use of the Property or of any investment backed expectations; or that any action of the City was the proximate cause of any damages to him.

8. In addition, the City is entitled to summary judgment on Plaintiff's claim for declaratory judgment where the claim impermissibly duplicates the issues already before the trial court. In addition, because Plaintiff's claim for declaratory judgment is based on administrative decisions relating to the cessation of the nonconforming use of the middle suite of the Property and the denial of a barber shop use in a semi-commercial district, Plaintiff is barred from litigating those decisions because he failed to exhaust his administrative remedies to the Board of Adjustment. Because there

4

**EXHIBIT A**

is no viable basis for the declaratory judgment action, Plaintiff's claim is an improper request for judicial opinion and is nothing more than a veiled request for attorney's fees. Furthermore, because Plaintiff cannot overcome the City's assertion of immunity to the regulatory takings claim, the request for declaratory relief will not resolve a live controversy as to the rights of the parties. The City is entitled to judgment as a matter of law on all of Plaintiff's claims against the City.

9. Alternatively, the City is entitled to judgment as a matter of law because Plaintiff has provided no evidence to support his claims against the City. An adequate time for discovery has passed since this suit was filed. Written discovery and depositions of Plaintiff and Co-Defendant Mr. Eng have occurred. Plaintiff has produced no evidence of a taking of a property right, whether it be because he allegedly has been denied all economically viable uses of the suite in question, or that any action of the City unreasonably interfered with Plaintiff's right to use and enjoy the Property. In fact, Plaintiff admits on page 5 of the Petition that the City passed a special use permit provision which would allow him to rent the middle suite as a barber shop. Plaintiff could not claim he has been denied any reasonable investment backed expectations because the zoning status of which he complains existed prior to his purchase of the Property. It would not be reasonable for a purchaser of property to have expectations of uses in a zoning classification which do not apply to the property at the time of the purchase. Further, Plaintiff has produced no evidence of any damages he sustained which were proximately caused by any action on the City's part.

10. Plaintiff has provided no evidence to support his takings claim against the City and has provided no genuine issue of material fact to defeat summary judgment. The City is entitled to judgment on all of Plaintiff's claims against the City as a matter of law.

5

**EXHIBIT A**

## III. SUMMARY JUDGMENT FACTS

11.     All averments in the paragraphs above are incorporated herein as if set forth in full.

12.     Defendant, City of Terrell Hills is a Home Rule municipality, organized, operating and existing under Art. 11, Sec. 5, Constitution of the State of Texas.

13.     Since the mid-1960s the zoning for the property located at 2111-2117 Harry Wurzbach within the City of Terrell Hills (hereinafter "Property") was semi-commercial. *See* Exhibit 1 – Excerpts of Billy Eng's Deposition, page 28:9-11; 33:12-17.

14.     From 1962 to 2011, the previous owners of the Property continuously maintained three separately leased suites of business on the Property. *See* Exhibit 1 – Excerpts of Billy Eng's Deposition, page 18:4-25; 19:1-21; 20:4-8.

15.     Prior to Plaintiff buying the Property, the middle suite of the Property became vacant for over six months and lost its grandfathered non-conforming commercial use status.  *See* Exhibit 1 – Excerpts of Billy Eng's Deposition, page 65:14-18.

16.     The previous owner of the Property, the Eng Defendants, prior to selling the Property, intended to let the grandfathered non-conforming use status lapse and follow the zoning rules regarding the use of the middle suite as an office space. *See* Exhibit 1 – Excerpts of Billy Eng's Deposition, page 94:18-25; 95:1-18. He felt confident there were sufficient uses available to him to lease the suite. *See* Exhibit 1 – Excerpts of Billy Eng's Deposition, page 94:21; 95:10.

17.     On June 7, 2011, Plaintiff purchased the Property. *See* Plaintiff's Original Petition, page 3.

18.     On June 13, 2011, Plaintiff applied to the City of Terrell Hills Planning and Zoning Commission ("Zoning Commission") to rezone the Property from semi-commercial to commercial. *See* Exhibit 2 – Plaintiff's June 13, 2011 Plaintiff's Application for Rezoning.

6

586

**EXHIBIT A**

19.    On August 8, 2011, the Terrell Hills City Council ("City Council") held a public hearing on Plaintiff's application for rezoning. Following the conclusion of the public hearing, the City Council denied the application for rezoning. *See* Exhibit 3 – City Records, August 8, 2011 City Council Minutes Denying Rezoning.

20.    On July 10, 2012, Plaintiff through his attorney, applied to the Zoning Commission to re-zone the middle suite of the Property for a Cricket Communication store. *See* Exhibit 4 – July 10, 2012 Plaintiff's Application for Rezoning Middle Space for Cricket.

21.    On or about October 1, 2012, the City Council, following public hearing, denied the application to rezone the middle suite of the Property. *See* Exhibit 3 – City Records, October 1, 2012 City Council Denial of Rezoning.

22.    On December 10, 2012, the City Council adopted Ordinance 1347, amending the Zoning Code adding Section VIII, Section D by providing for a Special Use Permit in the Semi-Commercial Zoning District that will allow certain uses in more restrictive districts under special conditions of design with the approval of the Planning and Zoning Commission and the City Council. *See* Exhibit 3 – City Records, December 10, 2012 Ordinance 1347 Creating Special Use Permit. [4]

23.    On December 12, 2012, Plaintiff applied to the Zoning Commission for a Special Use Permit for the middle suite of the Property to be used as a Barber Shop and Beauty Parlor. *See* Exhibit 5 – December 12, 2012 Plaintiff's Application for Special Use Permit Hair Salon.

24.    On or about January 10, 2013, Plaintiff filed a lawsuit against the Eng Defendants and the City in Cause No. 2013-CI-00447, in the 57th Judicial District Court of Bexar County, Texas. The Petition stated causes of action against the City for a Regulatory Taking and Declaratory Judgment.

---

[4] The City requests that the Court take judicial notice of all of the provisions of the City's Zoning Code relied upon herein.

7

**EXHIBIT A**

25. On May 13, 2013, the City Council accepted and approved the site plan for the Property located at 2115 Harry Wurzbach, Terrell Hills and passed Ordinance 1349 approving a Special Use Permit for 2115 Harry Wurzbach, the suite at issue in this lawsuit, for use as a hair and nail salon. *See* Exhibit 3 – May 13, 2013 Ordinance 1349 Approving Special Use Permit Hair Salon. Under Section 2 (f) of Ordinance 1349, the Special Use Permit zoning classification will expire six (6) months after the Property is no longer used for at least one (1) of the Permitted Uses. *Id.*

26. Plaintiff failed to open the hair and nail salon before the May 2013 Special Use Permit had expired. As a result, Plaintiff again requested that the Zoning Commission grant a Special Use Permit for a barber shop as soon as possible. *See* Exhibit 6 – February 5, 2014, Plaintiff's Application for Special Use Permit Hair Salon.

27. On April 13, 2015, the City Council again approved a site plan for the Property located at 2115 Harry Wurzbach, Terrell Hills, and adopted Ordinance 1386 approving a Special Use Permit for 2115 Harry Wurzbach, the suite at issue in this lawsuit, for use as a hair and nail salon. *See* Exhibit 3 – City Records, April 13, 2015, Ordinance 1386 Approving Special Use Permit Hair Salon. Under Section 2 (f) of Ordinance 1386, the Special Use Permit zoning classification will expire six (6) months after the Property is no longer used for at least one (1) of the Permitted Uses. *Id.*

28. Even though authorized to do so, Plaintiff never used the middle suite located at 2115 Harry Wurzbach on the Property for a permitted use allowed under the Specific Use Permits within six months of being granted by the Zoning Commission and the City.

## IV. SUMMARY JUDGMENT EVIDENCE

29. The City relies upon the following undisputed summary judgment evidence either on file with the Court or appended to this motion:

8

588

Exhibit 1 – Excerpts of Billy Eng's Deposition

Exhibit 2 – Plaintiff's June 13, 2011 Plaintiff's Application for Rezoning Property

Exhibit 3 – City of Terrell Hills' Records, including:  August 8, 2011 City Council Minutes; October 1, 2012 City Council Minutes; December 10, 2012 Ordinance 1347; May 13, 2013 Ordinance 1349; April 13, 2015 Ordinance 1386

Exhibit 4 – July 10, 2012 Plaintiff's Application for Rezoning Middle Space for Cricket

Exhibit 5 – December 12, 2012 Plaintiff's Application for Special Use Permit Hair Salon

Exhibit 6 – February 5, 2014 Plaintiff's Application for Special Use Permit Hair Salon

Exhibit 7 – City of Terrell Hills Comprehensive Zoning Ordinance, Chapter 14

## V. SUMMARY JUDGMENT STANDARDS

30.     Tex. R. Civ. P. 166a(c) sets forth the standard for traditional summary judgment. The movant for summary judgment has the burden of showing there is no genuine issue of material fact and is entitled to summary judgment as a matter of law. *Nixon v. Mr. Property Management*, 690 S.W.2d 546, 548-49 (Tex. 1985). In deciding whether there is an issue of material fact, evidence favorable to the non-movant will be taken as true and every reasonable inference indulged in its favor. *Id.* Once the movant establishes the right to judgment as a matter of law, the burden shifts to the non-movant who must then set forth sufficient evidence to create an issue of material fact in order to avoid summary judgment. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex. 1979).

31.     Tex. R. Civ. P. 166a(i) sets forth the standard for a no-evidence summary judgment. After adequate time for discovery, a movant may move for summary judgment without evidence on the ground that there is no evidence of one or more essential elements of a claim or defense on which the non-movant has the burden at trial. The burden shifts to the non-movant to present evidence raising an issue of material fact. The no-evidence motion for summary judgment should be granted

9

**EXHIBIT A**

when there is a complete absence of evidence of a vital fact. *King Ranch Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003).

## VI. ARGUMENT

32.     All assertions in the foregoing paragraphs are incorporated into this Article as if set forth in full herein.

33.     The City is entitled to summary judgment because no genuine issue of material fact exists as to any element of Plaintiff's claims against the City and the City is entitled to judgment as a matter of law.

### A.     Immunity and Lack of Standing

34.     All relevant assertions stated elsewhere in this Motion are incorporated into this section as if set forth in full herein.

35.     The City, as a municipal government, is entitled to governmental immunity from a suit for money damages unless its immunity has been waived. *City of Houston v. Carlson*, 451 S.W.3d 828, 830 (Tex. 2014). Without this waiver, courts have no jurisdiction to adjudicate any claim against the City. *See id.* It is Plaintiff's burden to establish the City's consent to be sued through a waiver of immunity. *Id.* Because Plaintiff cannot demonstrate a viable regulatory takings claim as discussed further below, the City retains its immunity. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012). As a result, the City is entitled to dismissal of Plaintiff's claims against the City.

36.     Further, Plaintiff has no standing to raise a takings claim against the City. The regulatory zoning classification of which Plaintiff complains was put in place many years prior to Plaintiff's purchase of the Property. The discontinuance of the non-conforming use in question occurred prior to Plaintiff's purchase of the Property. Since Plaintiff purchased the Property, the City has not

10

**EXHIBIT A**

taken any action to restrict Plaintiff's ability to use the Property. Instead the City has increased Plaintiff's ability to use the Property by allowing for a special use permit for the use Plaintiff requested.

## B. Failure to Exhaust Administrative Remedies

37. All relevant assertions stated elsewhere in this Motion are incorporated in this section as if set forth in full.

38. Plaintiff bases his takings claim and declaratory judgment claim in large measure on the City staff's interpretation and enforcement of the zoning ordinances, specifically that prior to Plaintiff's ownership of the Property the nonconforming use in the middle suite on the Property ceased, and that a barber shop was not an allowable use in the middle suite after the cessation of the nonconforming use and its reversion back to semi-commercial zoning. However, there is no evidence that Plaintiff timely appealed these administrative decisions to the Board of Adjustment as required by Section XV of the City's Zoning Code.

39. Federal case law provides that a takings claim is not ripe until (1) the relevant governmental unit has reached a final decision as to what will be done with the property and (2) the plaintiff has sought compensation through whatever adequate procedures the state provides. See *Sandy Creek Investors, Ltd. v. City of Jonestown*, 325 F.3d 623, 626 (5th Cir. 2003); *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194-95 (1985); *Hidden Oaks Ltd. v. The City of Austin*, 138 F.3d 1036, 1041 (5th Cir. 1998); *Samaad v. City of Dallas*, 940 F.2d 925, 933-34 (5th Cir. 1991). This law is applicable to the present case with respect to the first element, that the relevant governmental unit must have reached a final decision as to what will be done with the property before a plaintiff may pursue a takings claim. In the present case, Plaintiff failed to appeal the decisions of staff for a decision by the Board of Adjustment. As a result of Plaintiff's failure

11

591

**EXHIBIT A**

to exhaust his administrative remedies, the Plaintiff is barred from litigating these administrative decisions, and the City is entitled to summary judgment on his takings claim and request for declaratory judgment based on those decisions.

40. In the present case, challenges to a zoning decision of an administrative official or staff personnel should first have been brought to the Board of Adjustment. *See* TEX. LOC. GOV'T CODE § 211.009(a). A Board of Adjustment may hear and decide an appeal that alleges error in an order, requirement, decision, or determination made by an administrative official in the enforcement of this subchapter. TEX. LOC. GOV'T CODE § 211.009(a)(1). A person aggrieved by the decision of an administrative official or any officer, department, board or bureau of the municipality may appeal. TX. LOC. GOV'T CODE § 211.010(b). The appellant must file with the Board of Adjustment and the official from whom the appeal is taken a notice of appeal specifying the grounds for the appeal within a reasonable time as determined by the rules of the board. TEX. LOC. GOV'T CODE § 211.010(b). The City has created a Board of Adjustment pursuant to this statutory authority.

41. Under Chapter 14, Section XV of the Zoning Code, appeals to the Board of Adjustment may be taken by any person aggrieved or by any officer, department, board or bureau of the municipality affected by any decision of the administrative officer. *See* Exhibit 7 – Zoning Code, Ch. 14 Sec. XV (2)(b)(1). Chapter 14 of the Zoning Code further defines what a "reasonable time" is for the purposes of appealing a decision of a City administrative officer to the Terrell Hills Board of Adjustment. *Id.* Such appeal shall be taken with ten (10) days from the date of any such ruling, by filing with the officer from whom the appeal is taken and with the Board of Adjustment a notice of appeal specifying the grounds thereof. *Id.*

12

592

**EXHIBIT A**

42.     Here, Plaintiff failed to obtain a final ruling from the City through the appellate process set out in TEX. LOC. GOV'T CODE § 211.010(b) and the Zoning Code, Ch. 14 Sec. XV (2)(b)(1). Plaintiff's failure to timely appeal the decisions of the City staff in compliance with the City's appellate process bars Plaintiff from litigating both the decision relating to the cessation of the nonconforming use for the middle suite of the Property and the decision that the barber shop was not an allowed semi-commercial use in the middle suite. As a result, the City is entitled to dismissal of Plaintiff's claims related to these decisions.

## C.     Ripeness

43.     All relevant assertions made elsewhere in this Motion are incorporated in this section as if set forth in full.

44.     Ripeness is an element of subject matter jurisdiction. *State Bar of Texas v. Gomez,* 891 S.W.2d 243, 245 (Tex. 1994). As such, ripeness is a legal question. *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 444-45 (Tex. 1993). A takings claim is not ripe for court action until a final decision about what level of use will be permitted on the property. *See Williamson Planning Comm'n* at 173; *see also Public Util. Comm'n v. Houston Lighting & Power Co.,* 748 S.W.2d 439 (Tex. 1987)("A court has no jurisdiction to render an advisory opinion on a controversy that is not yet ripe."). "[T]he ripeness doctrine conserves judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes. *Browning-Ferris, Inc. v. Brazoria County,* 742 S.W.2d 43, 49 (Tex. App.--Austin 1987, no writ). In order for a regulatory takings claim to be ripe, there must be a final decision regarding the application of the regulations to the property at issue. *Hamilton Bank* at 186. A "final decision" usually requires both a rejected development plan and the denial of any variances from the controlling regulations. *Id.* at 187-88.

593

**EXHIBIT A**

45. Here, to the extent that Plaintiff's regulatory taking claim is based on the use of the middle suite of the Property, the undisputed facts clearly demonstrate that the City *granted* Plaintiff's applications for a Special Use Permit allowing additional permitted uses for the Property, including a barber shop/hair salon. Plaintiff cannot demonstrate that the City ever shut its door to continued future uses for the middle suite of the Property. Plaintiff specifically requested to put a barber shop in the middle suite on the Property, and the City granted a Special Use Permit for that use. Since the possibility remains open that Plaintiff's requested uses would be permitted on the Property by the City, a jury could not reach a decision on whether the Property had been "taken." The application history makes it clear that the City is allowing the uses of the Property as requested by Plaintiff. The existing zoning of the middle suite of the Property when Plaintiff acquired the Property was semi-commercial, and the City is allowing Plaintiff uses greater than the stated semi-commercial zoning for the Property. It would be premature to request a court or jury to make a determination whether a compensable taking has occurred under such circumstances when the undisputed facts demonstrate that the City is likely to continue approving uses for the Property above the stated semi-commercial zoning for the Property. As such, Plaintiff's claim is premature, and the City is entitled to summary judgment on the claims against them.

**D.     City Entitled to Judgment as Matter of Law on Regulatory Takings Claim**

46. All relevant assertions made elsewhere in this Motion are incorporated in this section D and its subparts as if set forth herein.

47. Plaintiff's petition alleges that the City's decisions related to his Property constitute a regulatory taking without adequate compensation having been made, in violation of Section 17 of Article I of the Constitution of the State of Texas. The decisions discussed in the factual summary in the Petition include:  the cessation of the previous nonconforming use on the middle suite of the

14

**EXHIBIT A**

Property prior to Plaintiff's purchase of the property; a denial to up-zone the Property from semi-commercial to commercial; staff's interpretation that a barber shop/salon was not an allowable use in a semi-commercial zone; and the City's requirement for Special Use Permits for uses determined not to be allowed in the zone.

48.     The Texas Constitution provides, in pertinent part, that no "person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made...." Tex. Const. art. I, § 17.

49.     Generally, a property owner has no vested right to use its property in a certain way without restriction. *See Azadpour v. City of Grapevine*, No. 02-13-00323- CV, 2014 WL 2566024, at *4 (Tex. App.—Fort Worth June 5, 2014, pet. denied) (mem. op.); *Mr. W. Fireworks, Inc. v. Comal Cty.*, No. 03-06-00638-CV, 2010 WL 1253931, at *8 (Tex. App.—Austin Mar. 31, 2010, no pet.) (mem. op.). In addition, it is well settled in Texas that "property owners do not acquire a constitutionally protected vested right . . . in zoning classifications once made." *City of University Park v. Benners,* 485 S.W.2d 773, 778 (Tex. 1972). The City retains its legislative authority to re-zone at any time as public necessity demands. *City of Pharr v. Tippitt*, 616 S.W.2d 173, 176 (Tex. 1981). These principles apply to an even greater extent in the present case where the City did not rezone the Property, but only denied Plaintiff's request to up-zone the Property.

50.     In order to succeed on a compensatory regulatory takings claim, Plaintiff must demonstrate that a zoning regulation (1) does not substantially advance a legitimate state interest, (2) denies the landowner of all economically viable use of their property, or (3) unreasonably interferes with a landowners' rights to use and enjoy their property. *Mayhew v. Town of Sunnyvale*, 964 S.W. 2d 922, 932-33, 935 (Tex. 1998)(citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015-19 & n.8 (1992)); *see also Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980) and *Lingle v.*

15

*Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005). Because the Supreme Court in *Lingle* concluded that the substantial advancement test is a due process inquiry and not a takings inquiry, the City asserts in this case Plaintiff would need to demonstrate either that he has been denied all economically viable use of his property or that the City unreasonably interfered with his right to use and enjoy the property. A regulatory taking is a condition of use "so onerous that its effect is tantamount to a direct appropriation or ouster." *Id.* at 537. (citation omitted). A court in deciding a zoning issue cannot assume the role of "super zoning board." *Mayhew* at 933. Whether a zoning ordinance constitutes a compensable taking is a question of law, not fact. *Id.*

1. **City Entitled to Judgment as Matter of Law because Plaintiff Cannot Demonstrate City's Zoning Decisions Do Not Substantially Advance Legitimate Government Interests.**

51. Without waiving the City's position that substantial advancement of legitimate government interest is not applicable to this analysis, the City provides the following argument in the event the Court finds this element does apply.

52. Plaintiff cannot demonstrate that the City's zoning decisions regarding the Property do not substantially advance a legitimate City interest.

53. The substantial advancement requirement to demonstrate a regulatory takings claim looks at the nexus between the effect of the ordinance and the legitimate state interest it is supposed to advance. *Mayhew* at 934. "The standard requires that the ordinance 'substantially advance' the legitimate state interest sought to be achieved rather than merely analyzing whether the government could rationally have decided that the measure achieved a legitimate objective. *Id.* Moreover, the "wisdom of the [City's] decision" is not under review. *Id.* The Court must only be concerned with whether the decision satisfies constitutional standards. The Texas Supreme Court has determined that there are a broad range of governmental purposes that will satisfy the

16

596

substantially advance requirement. *Id.* Legitimate state interests include protecting residents from the ill effects of traffic congestion, parking congestion, enhancing the quality of life, and controlling the rate and character of community growth. *Id.* at 934. Such zoning benefits the public and serves the City's interest in assuring careful and orderly development of business uses. *See Agins v. City of Tiburon,* 447 U.S. 255, 260 (1980); *see also Lingle,* 544 U.S. at 539.

54.     A zoning ordinance, duly adopted is presumed to be valid, and the burden is on the one seeking to prevent its enforcement to prove that the ordinance is arbitrary or unreasonable. *City of Fort Worth*, 388 S.W.2d 400, 402 (Tex. 1964). Further, zoning is a legislative function of municipal government. *City of Pharr v. Tippitt*, 616 S.W.2d 173, 175 (Tex. 1981). The courts must give deference to a city's action such that, "if reasonable minds may differ as to whether or not a particular zoning ordinance has a substantial relationship to the public health, safety, morals or general welfare, no clear abuse of discretion is shown and the ordinance must stand as a valid exercise of the city's police power."    *Id*. at 176. "Courts may not interfere unless a challenged ordinance is shown to represent a clear abuse of municipal discretion or unless there is conclusive evidence that a zoning ordinance is arbitrary either generally or as to particular property." *Benners* at 779. A plaintiff cannot ask the Court to review the wisdom of the City's denial of Plaintiff's zoning request.

55.     Further, the Texas Supreme Court has stated that "We are in accord with the principle that municipal zoning ordinances requiring the termination of nonconforming uses under reasonable conditions are within the scope of municipal police power; and that property owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classifications once made. *Benners* at 778. "A nonconforming use of land or buildings is a use that existed legally when the zoning restriction became effective and has continued to exist." *Id.*

17

597

56.     Here, the undisputed facts are that the City's 1962 zoning ordinance established zoning for the Property as semi-commercial with nonconforming uses of the Property to continue until a nonuse of six months occurred whereupon the nonconforming use would cease and revert to semi-commercial zoning. *See* Exhibit 1 – Excerpts of Billy Eng's Deposition, page 28:9-11; 33:12-17. In addition, at the time that Plaintiff acquired this Property, the nonconforming use of the Property had ceased on the middle suite and reverted to a semi-commercial use. *See* the Petition at pages 3 and 4. Almost 40 years after the semi-commercial zoning was assigned, Plaintiff requested an up-zoning of the Property to commercial. See Exhibit 2 – June 13, 2011 Plaintiff's Application for Rezoning. Plaintiff cannot demonstrate that the City's denial of the up-zoning request was anything but a decision to advance the City's legitimate government concern to protect residents from the ill effects of increased traffic, parking congestion and to control the rate and character of community growth. As a result, the City is entitled to summary judgment on Plaintiff's taking claim.

**2.      The City is Entitled to Summary Judgment because Plaintiff has Not Been Denied All Economic Uses of the Property.**

57.     Plaintiff alleges the City's zoning decisions constitute a "taking." However, the undisputed evidence clearly demonstrates Plaintiff has not been denied all economically viable uses of the middle address suite or of the Property as a whole. Plaintiff has been allowed to continue non-conforming uses in all suites on the Property except the middle suite for which the non-conforming use had previously been discontinued. Plaintiff was provided a special use permit for the middle suite on the Property so that Plaintiff could rent that suite for the use Plaintiff requested. Thus, there can be no genuine dispute that the City has never denied Plaintiff full economic use of the Property. Plaintiff's desire not to need to apply for a new special use permit for the middle suite when he changes tenants is not a property right to which he is entitled under the law. It is not

18

**EXHIBIT A**

unreasonably restrictive for the City to require a permit to use property in a manner which would not otherwise have been allowed in that zoning district, particularly, as here, where the City granted the permit.

58.     "A restriction denies the landowner all economically viable use of the property or totally destroys the value of the property if the restriction renders the property valueless." *Mayhew* at 935. While the semi-commercial zoning classification for the middle suite of the Property does not permit Plaintiff to lease to certain types of businesses, there are numerous economically viable businesses which are permitted under the existing zoning. Any number of professional offices for doctors, lawyers, real estate professionals are permitted. The undisputed facts here clearly demonstrate that Plaintiff acquired several barber shops and nail salons who were interested in the Property and requested Special Use Permits for them. The City approved Special Use Permits on more than one occasion at Plaintiff's request for barber shop/nail salon uses, but Plaintiff, although authorized, never filled the vacancy in the middle suite of the Property. See, Exhibit 3 – City Records, December 10, 2012 Ordinance 1347 Creating Special Use Permit and May 13, 2013 Ordinance 1349 Approving Special Use Permit Hair Salon.

59.     It would appear from Plaintiff's allegations and actions that Plaintiff is only interested in having the Property rezoned from semi-commercial to commercial. He is essentially asserting that *commercial* uses are the only economically viable uses of the Property and anything less than the City changing the zoning classification would deny the only economically viable uses of his Property and constitute a constitutional taking. Such an argument fails to satisfy the standard for demonstrating a constitutional taking. The former owner, Defendant Billy Eng, testified that he was intending, after the nonconforming use ceased, to put a business office in the middle suite in conformity with the semi-commercial zoning. *See* Exhibit 1 – Excerpts of Billy Eng's Deposition,

19

**EXHIBIT A**

page 94:18-25; 95:1-18. He felt confident there were sufficient uses available to him to lease the suite. *See* Exhibit 1 – Excerpts of Billy Eng's Deposition, page 94:21-25; 95:1-10.

60.     It is clear that the City has not "destroyed all value of the property" by denying the Plaintiff's zoning request. To the contrary, the City approved the Plaintiff's requests for Special Use Permits on more than one occasion. Plaintiff operates two leased business suites on the property, that of a convenient grocery store and a bar, that remain in use.  Because Plaintiff cannot demonstrate that he has been denied all economic uses of the Property, the City is entitled to summary judgment on Plaintiff's takings claim.

> **3.     The City Did Not Unreasonably Interfere with Plaintiff's Right to Use and Enjoy Property.**

61.     Determining whether the government has unreasonably interfered with a landowner's right to use and enjoy property requires consideration of two factors: 1) the economic impact of the regulation, and 2) the extent to which the regulation interferes with distinct investment-backed expectations. *Hearts Bluff Game Ranch*, 381 S.W.3d at 476; *Mayhew,* 964 S.W.2d at 935 (citing *Lucas,* 505 U.S. at 1019, n. 8, 112 S.Ct. 2886; *Penn Cent. Transp. Co.,* 438 U.S. at 124, 98 S. Ct. 2646). In the present case Plaintiff will be unable to demonstrate that the City's zoning decisions have interfered with Plaintiff's right to use and enjoy his property when the zoning on the Property has remained semi-commercial for many years prior to Plaintiff's ownership of the Property and the previous nonconforming use of the middle suite of the Property had been discontinued before Plaintiff ever acquired the Property.

62.     The existing zoning of the property at the time the Property is acquired is to be considered in determining whether the regulation interferes with investment-backed expectations. *Mayhew* at 937-38. The party claiming privilege to continue a nonconforming use, in this case Plaintiff, bears the burden of proving its preexisting status. *See City of Pharr v. Pena*, 853 S.W.2d 56, 63 (Tex.

600

App.—Corpus Christi 1993, writ denied). Here, it is undisputed that Plaintiff acquired the Property after the nonconforming use made of the middle suite on the Property had ceased and the use of that suite had reverted back to semi-commercial use. The facts are undisputed that the Eng Defendants allowed the middle suite to remain vacant for longer than six months. Pursuant to the City's zoning ordinance, when a use is discontinued, it loses its special use status and reverts back to the established zoning of the Property, in this case, semi-commercial. The previous owner, Mr. Eng, understood that the non-conforming use ceased prior to Plaintiff purchasing the Property due to the vacancy of the middle suite for over six months. *See* Exhibit 1 – Excerpts of Billy Eng's Deposition, page 65:14-18. As a result, at the time of the sale to Plaintiff in 2011, the lawful use of the middle suite was limited to semi-commercial uses based on the 1962 zoning ordinance classifications. Once the non-conforming use had been abandoned, Plaintiff's request after he purchased the property to expand the use of the middle suite beyond semi-commercial purposes was not consistent with the semi-commercial zoning of the Property. Because the nonconforming use had ceased prior to Plaintiff acquiring the Property, Plaintiff cannot demonstrate that he had a reasonable investment-backed expectation to a discontinued nonconforming use in the middle suite of the Property and cannot demonstrate that the City unreasonably interfered with Plaintiff's right to use and enjoy the Property by denying his zoning request.

63.     To the extent Plaintiff is complaining that the procedural requirement for a Special Use Permit is "so onerous that its effect is tantamount to a direct appropriation or ouster," Plaintiff cannot demonstrate that such a procedural requirement somehow constitutes a regulatory taking in Texas. Essentially, Plaintiff does not wish to follow the City's process for application for a Special Use Permit if there is a change in tenant for the middle suite of the Property. Plaintiff cannot demonstrate that requiring a Special Use Permit somehow interferes with his right to enjoy

21

601

the Property, especially, where the City has granted his several requests for Special Use Permits. As a result, the City is entitled to summary judgment on Plaintiff's takings claim against them.

**E.    Declaratory Judgment**

64.    Plaintiff seeks declaratory judgment and to recover attorney's fees under the Uniform Declaratory Judgments Act (the "Act"). *See* Tex. Civ. Prac. & Rem. Code § 37.003. Plaintiff requests declarations as to: 1) whether Section VIII of the City's Zoning Code allows the use of a barbershop in a semi-commercial zoning district; 2) whether Section X of the City's Zoning Code allows the non-conforming use at one suite in a larger tract to be discontinued when other non-conforming uses at other suites in the same building on the Property continue to operate; and 3) whether the City's Zoning Code prevents Plaintiff from placing a service-oriented business in the middle suite of the Property.

65.    A party cannot use the Act to obtain an otherwise impermissible attorney's fee. *MBM Fin. Corp. v. Woodlands Operating Co.,* 292 S.W.3d 660, 669 (Tex. 2009). The Act provides that a person whose rights, status, or other legal relations are affected by a statute or ordinance "may have determined any question of construction or validity arising under" the statute or ordinance and obtain a declaration of his rights, status, or other legal relations thereunder. Tex. Civ. Prac. & Rem. Code § 37.004(a). The Act waives governmental immunity against claims that a statute or ordinance is invalid. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 n.6 (Tex. 2009). However, it does not waive immunity against claims seeking a declaration of the claimant's statutory rights. *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011)(per curiam). When declaratory relief would resolve a controversy as to the rights and status of the parties, a trial court may award relief under the Act when deciding cases "already within [its] jurisdiction." *Chenault v. Phillips*, 914 S.W.2d 140, 141 (Tex. 1996). However, relief should not be awarded where the declaratory

EXHIBIT A

action has no greater ramifications than a plaintiff's cause of action for a compensable taking and is merely duplicating the issues already before the trial court. *See City of Carrollton v. RIHR Inc.*, 308 S.W.3d 444, 2010 (Tex. App. Dallas 2010).

66. Here, other than attorney's fees, Plaintiff is seeking no relief under the declaratory judgment pleading not associated with its cause of action alleging a compensable taking. The Plaintiff's declaratory action claims are subsumed within its cause of action for the regulatory taking, i.e., the legitimate right of the City to regulate the uses on the Property, the legitimate right of the City to allow nonconforming uses to cease on the Property, and the legitimate right of the City to disallow a use that does not meet the zoning ordinance requirements and the City's plans. In addition, as stated above, Plaintiff is barred from litigating the staff decisions on nonconforming use and the barber shop use because he did not timely appeal those decisions to the Board of Adjustment as required by the Zoning Code. Moreover, the City has permitted the special use of a barber shop to Plaintiff in the middle suite of the Property on more than one occasion. As such, Plaintiff's use of the Act is really an improper vehicle for obtaining attorney's fees.

67. Furthermore, as stated in the regulatory takings section above, the City is entitled to summary judgment on immunity grounds on Plaintiff's taking claim. Because Plaintiff has failed to overcome the City's assertion of immunity, the request for declaratory relief would not resolve a controversy as to the rights of the parties. As a result, the City is entitled to summary judgment and all of Plaintiff's requests for declaratory relief should be dismissed.

**F.     No Evidence**

68. Alternatively, Plaintiff has provided no evidence of the material elements of his claims despite the fact that ample time for discovery has passed. As discussed above, to establish a takings claim Plaintiff must demonstrate that a property right was taken by the City. He has provided no

23

603

**EXHIBIT A**

evidence of the taking of any zoning use from him since the time of his purchase of the Property. Further, Plaintiff has failed to provide any evidence of either of the two elements discussed above from *Mayhew* and *Lindle*: that the City regulation either (1) denies the landowner of all economically viable use of their property, or (2) unreasonably interferes with a landowners' rights to use and enjoy their property. The latter can be shown by denial of reasonable investment backed expectations. However, Plaintiff cannot show that he was deprived of all economically viable use of the Property because he was granted a special use permit by the City. Further, Plaintiff has failed to provide any evidence of any legitimate investment backed expectations which were taken. Plaintiff would be unable to produce such evidence because there could be reasonable expectation of use of the Property for zoning which did not exist at the time of his purchase.

69.     Proximate cause is an essential element of a takings case. "[W]ithout causation, there is no 'taking.'" *Tarrant Reg'l Water Dist. v. Gragg,* 43 S.W.3d 609, 615 (Tex.App.—Waco 2001), *aff'd,*151 S.W.3d 546 (Tex.2004). Plaintiff has failed to produce any evidence that any action of the City proximately caused damages to Plaintiff.

### G.     Texas Business and Commerce Code, Chapter 27

70.     Plaintiff generally alleges a violation of Chapter 27 of the Texas Business and Commerce Code against all defendants. However, the original petition does not allege any factual references against the City under the Texas Business and Commerce Code. The only factual references relate to the real estate transaction and contract, none of which include any actions by the City. To the extent Plaintiff is alleging some claim against the City under the Texas Business and Commerce Code, the City is entitled for summary judgment on immunity grounds.

### VII. CONCLUSION

The summary judgment evidence shows there is no genuine issue of material fact on Plaintiff's claims against the City and the City is entitled to judgment as a matter of law on all of

604

**EXHIBIT A**

Plaintiff's claims against the City. Alternatively, Plaintiff has provided no evidence to support the main elements of his cause of action against the City, that there was a taking of a property right. Plaintiff has failed to provide any evidence that he has no economically viable use of the Property in question in this lawsuit or even that any action of the City unreasonably interfered with his use of the Property. In fact, the City granted Plaintiff's request for a special use permit so that he could rent out the suite in question for the use he requested. Further, Plaintiff's request for declaratory judgment is an impermissibly duplicitous claim designed only for the purpose of seeking attorney's fees. Plaintiff has failed to establish any grounds for proceeding against the City and the City is entitled to summary judgment on all of Plaintiff's claims against the City.

**WHEREFORE, PREMISES CONSIDERED**, Defendant City of Terrell Hills prays this Court grant its Motion for Summary Judgment and dismiss all claims against it, that Plaintiffs, Salim Merchant and Electro Sales and Services, Inc. take nothing by their suit against the City, and that the City have and recover such other relief, both general and specific, at law or in equity, to which the City may be justly entitled.

Respectfully submitted,

**MCKAMIE KRUEGER, LLP**
941 Proton Road
San Antonio, Texas 78258
(210) 546-2122
(210) 546-2130 Fax


/s/: Barbara L. Quirk
WILLIAM M. McKAMIE
State Bar No. 13686800
mick@mckamiekrueger.com

BARBARA L. QUIRK
State Bar No. 16436750
barbara@mckamiekrueger.com

EXHIBIT A

ADOLFO RUIZ
State Bar No. 17385600
adolfo@mckamiekrueger.com

SUE ANN GREGORY
State Bar No. 00795392
sue@mckamiekrueger.com

**ATTORNEYS FOR DEFENDANT CITY
OF TERRELL HILLS**

26

**EXHIBIT A**

**STATE OF TEXAS** §

**COUNTY OF BEXAR** §

## VERIFICATION

Before me, the undersigned authority, on this day, personally appeared Sue Ann Gregory, known to me, who upon being duly sworn by me, affirmed, "I certify that each of the exhibits attached to this Motion are true copies of the originals or of documents provided by Plaintiff or the Eng Defendants in this proceeding."

_____
Sue Ann Gregory

SUBSCRIBED AND SWORN BEFORE ME on ___Aug. 15th___, 2016.

BRENDA HEIMANN
My Notary ID # 130419536
Expires January 29, 2020

_____
Notary Public of the State of Texas

27

**EXHIBIT A**

| | | |
|---|---|---|
| **SALIM MERCHANT & ELECTRO** | § | **IN THE DISTRICT COURT** |
| **SALES AND SERVICES, INC.,** | § | |
| Plaintiff, | § | |
| | § | |
| **v.** | § | **57th JUDICIAL DISTRICT** |
| | § | |
| **THE CITY OF TERRELL HILLS AND** | § | |
| **BILLY W. ENG AND GIN WEI ENG,** | § | |
| Defendants. | § | **BEXAR COUNTY, TEXAS** |

## FIAT

Hearing on the above Defendant City of Terrell Hills' Motion for Summary Judgment is

hereby set for hearing on the 6TH day of SEPTEMBER, 2016, at 8:30 A.m. in the

Presiding District Court of Bexar County, Room 1.09.

Richard E. Price
Presiding Judge
285th District Court
PRESIDING JUDGE

28

EXHIBIT A

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of ***City of Terrell Hills' Motion for Summary Judgment*** was served according to the Texas Rules of Civil Procedure on all counsel of record in the manner specified below on August 16, 2016 as follows:

Carlo Garcia                                              Via E-Serve
OLIVA, SAKS, GARCIA AND CURIEL, LLP
14255 Blanco Road
San Antonio, Texas 78216
Fax: 210.308.6939
cglaw@osglaw.com

Jay Moritz                                                Via E-Serve
THE LAW OFFICES OF JAY MORITZ
2600 SW Military Drive, Suite 118
San Antonio, Texas 78224
Fax: 210.928.9118
JayLaw5@aol.com

                                    /s/: Barbara L. Quirk
                                    Barbara L. Quirk

609

**EXHIBIT A**

CAUSE NO. 2013-CI-00447

| | | |
|---|---|---|
| SALIM MERCHANT AND ELECTRO | * | IN THE DISTRICT COURT |
| SALES & SERVICE, INC. | * | |
| | * | |
| VS. | * | BEXAR COUNTY, TEXAS |
| | * | |
| THE CITY OF TERRELL HILLS, | * | |
| BILLY W. ENG AND GIN WEI ENG | * | 57TH JUDICIAL DISTRICT |

------------------------------------------------------------

ORAL DEPOSITION OF BILLY W. ENG

JUNE 22, 2016

------------------------------------------------------------

ORAL DEPOSITION of BILLY W. ENG, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on June 22, 2016, from 9:49 a.m. to 12:00 p.m., before Darlene Zuehl, Certified Shorthand Reporter in and for the State of Texas, reported by method of machine shorthand, at the Law Offices of Oliva Saks Garcia & Curiel, LLP, 14255 Blanco Road, San Antonio, Bexar County, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

* * * * * *

610

**EXHIBIT 1**

**EXHIBIT A**

when you acquired the property at your mother's death in 1981, that you were -- that it was being operated as a bar. How long even before that can you recall that it was operating as a bar?

A   Since the 1960s when my father bought it.

Q   Okay.  And I don't believe I asked you this question with respect to the grocery store.  How long do you recall even prior to your acquiring the property that 2111 was being operated as a convenience store?

A   Since my father acquired it.

Q   Okay.  Let's talk about the middle space 2115.  At the time that you sold the property -- and when I say "you," I'm going to refer to you and your brother, of course, owned it, but at the time that you and your brother owned this property and sold it to Mr. Merchant, that property was vacant; is that correct?

A   That's correct.

Q   Okay.  Going back to when you acquired that property in 1981, how was that space being operated?

A   As a Laundromat or dry cleaning.

Q   Okay.  Do you recall the name of the Laundromat?

A   Terrell Hills Cleaners.

Q   Okay.  So that property always remained occupied since you acquired it.  That's 2111.  Let's move to the furthest space being the bar, 2117 Harry Wurzbach.  When you acquired that in 1981, how was 2117 being operated?

A   As a bar.

Q   Okay.  And I'll ask you the same question.  Did it ever become vacant during the time that you've owned it since you sold it to -- up until the time you sold it to Mr. Merchant?

A   No.

Q   Have tenants actually changed in terms of who the actual owner --

A   Ownership?

Q   Yes, sir.

A   Yes.

Q   Okay.  How many different times approximately?

A   Maybe three.

Q   Okay.  What was the name of the bar at the time that it was sold to Mr. Merchant?

A   Ebb Tide Lounge.

Q   Can you spell that?  I'm sorry.

A   E-B-B then Tide, T-I-D-E, Lounge.

Q   And how long was that bar operated -- I understand that

Q   And how long, to your knowledge, did that space operate as a Laundromat prior to you acquiring it in 1981?

A   Pretty much all the way through.  I think we became vacant a year -- I'm not exactly sure of the timeline, but I think it was vacant for maybe seven months to a year.

611

EXHIBIT 1
EXHIBIT A

Electronically signed by darlene zuehl (101-167-628-1166)
Electronically signed by darlene zuehl (101-167-628-1166)

542cc23b-f1f3-430c-92aa-7b88e3f8d262

Q   Do you know what date that property became designated as semicommercial?

A   Back in the 1960s.

612

**EXHIBIT 1**

**EXHIBIT A**

Electronically signed by darlene zuehl (101-167-628-1166)
Electronically signed by darlene zuehl (101-167-628-1166)

542cc23b-f1f3-430c-92aa-7b88e3f8d262

Q   Okay.  Well, that space was never zoned semicommercial, the -- and I -- well, let me ask it this way.  Was -- was the grocery store ever zoned semicommercial?
A   It's been semicommercial all the way back in the '60s.
Q   Okay.  All three spaces were always semicommercial?
A   Yes.

613

**EXHIBIT 1**
**EXHIBIT A**

Electronically signed by darlene zuehl (101-167-628-1166)
Electronically signed by darlene zuehl (101-167-628-1166)

542cc23b-f1f3-430c-92aa-7b88e3f8d262

Q   Okay.  Would you agree that at the time that that property was sold to Mr. Merchant, that the middle space already had lost its grandfather status for being able to be operated as a Laundromat?

A   Yes.

614

EXHIBIT 1

EXHIBIT A

Electronically signed by darlene zuehl (101-167-628-1166)
Electronically signed by darlene zuehl (101-167-628-1166)

542cc23b-f1f3-430c-92aa-7b88e3f8d262

Q   Okay.  So it's your testimony that you didn't care to operate that as a Laundromat anymore, that you only wanted to operate that as an office space; correct?

A   At that time?

Q   Yes.

A   Yes.

Q   Okay.  And what type of office space were you going to -- were you going intend to market it as?

A   Not exactly sure, possibly insurance, or something of that nature.

Q   Okay.  Did you tell Mr. Merchant that he could only use that middle space as office space?

A   I did tell him it was office space or grandfathered in as a Laundromat.

Q   Well, it wasn't grandfathered in as a Laundromat, because at the time you sold it to him, it had lost that protection and designation, didn't it?

A   And I let him know about it.

Q   Because eventually it would no longer have its grandfather designation; correct?

A   Correct.

Q   So can you explain why you let more than six months lapse without putting another Laundromat in that space?

A   I had intentions of not doing a Laundromat anymore, and just follow the zoning rules and possibly sell it as office space.

s.

24 (Pages 93 to 96)

615

EXHIBIT 1
EXHIBIT A

Electronically signed by darlene zuehl (101-167-628-1166)
Electronically signed by darlene zuehl (101-167-628-1166)
542cc23b-f1f3-430c-92aa-7b88e3f8d262

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition transcript with corrections ( ) was ( ) was not returned pursuant to the Rules, and the ( ) original transcript ( ) copy of nonsignature certificate to be attached to attorney's copy of the deposition was mailed by UPS to the custodial attorney, Carlo Garcia, for safekeeping and use at trial.

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

That $_____ is the deposition officer's charges to Carlo Garcia for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified by me this ___ day of _____, 20___.

_____
DARLENE ZUEHL, Texas CSR #7505
Expiration Date: December 31, 20__
San Antonio Court Reporting
555 E. Basse Road, Suite 205
San Antonio, Texas 78209
(210) 227-1525   Firm Reg. #175

ORIGINAL NOT VALID
UNLESS SIGNED BY REPORTER

EXHIBIT 1

EXHIBIT A

**ELECTRO SALES & SERVICE INC**
**3941 EISENHAUER ROAD**
**SAN ANTONIO, TX 78218**
**TEL (210) 497 8969**
**FAX (210) 655 9505**
**EMAIL : SALIMMERCHANT04@AOL.COM**

*RECEIVED JUN 13 2011 BY: ___*

June 13, 2011

*August 1, 2010 5:00*

The Planning & Zoning Commission
City of Terrell Hills
5100 N. New Braunfels Ave
San Antonio, TX 78209

RE:   2111 - 2117 HARRY WURZBACH ROAD, SAN ANTONIO, TX 78209

Dear Sir,

I bought the above-mention property and would like to apply for re-zoning of the entire property.

2111 & 2117 Harry Wurzbach Road, San Antonio, TX 78209 are classified as commercial zoning, per grand father clause.

2115 Harry Wurzbach Road, San Antonio, TX 78209 is classified as semi- commercial zoning.  This was previously classified as commercial zoning.

I have a tenant who wants to open CRICKET COMMUNICATION at 2115 Harry Wurzbach Road, San Antonio, TX 78209.

I would appreciate it if you kindly approve the commercial zoning for the entire property at your earliest.

Thank you for your co-operation.

SALIM MERCHANT
PRESIDENT

**CITY OF TERRELL HILLS**

KRISTINE SANCHEZ
EXECUTIVE SECRETARY

5100 N. NEW BRAUNFELS          OFFICE 210-824-7401
SAN ANTONIO. TX 78209          FAX     210-822-2297

DEPOSITION EXHIBIT
1
PENGAD 800-631-9988

617

EXHIBIT 2
EXHIBIT A

## CUSTODIAN OF RECORDS AFFIDAVIT
## CITY OF TERRELL HILLS

STATE OF TEXAS        §

                       §

COUNTY OF BEXAR    §

Records pertaining to: **CITY OF TERRELL HILLS**

Before me, the undersigned, personally appeared COLUMBUS STUTES, who is by me duly, deposed as follows:

I, the undersigned, am over 18 years of age, competent to make this affidavit, and am personally acquainted with the facts herein stated.

I am the **CUSTODIAN OF RECORDS** for:

**THE CITY OF TERRELL HILLS**

Attached hereto are 21 pages of records. These said records are kept by the CITY OF TERRELL HILLS in the regular course of business. It is the regular course of business for employees to make these records, with the knowledge of the act or event, and the records are made at or near the time or reasonably soon thereafter. The records are true and correct copies of the original documents on file with the CITY OF TERRELL HILLS.

_____

COLUMBUS STUTES, Secretary-Manager
CITY OF TERRELL HILLS

SUBSCRIBED AND SWORN to before me by the said COLUMBUS STUTES on the 15th day of August, 2016 to certify which witness my hand and seal of office.

_____

NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My Commission Expires: November 4, 2019

AMY M. BUCKERT
Notary Public, State of Texas
Comm Expires 11-04-2019
Notary ID 13043198-7

**EXHIBIT 3**
**EXHIBIT A**

## AGENDA

1. Call to Order and Recording of Quorum

2. Review/action of Minutes of the July 11, 2011 regular Council Meeting.

3. Employee of the Quarter

4. Public Hearing on the request from Mr. Salim Merchant for the rezoning of the property located at 2115 Harry Wurzbach Road from semi-commercial to commercial zoning.

5. Discussion/Action on the request from Mr. Salim Merchant for the rezoning of the property located at 2115 Harry Wurzbach Road from semi-commercial to commercial zoning.

6. Discussion/ Action approving the specifications for the 2011 Bond Road projects and authorizing the bid process.

7. Discussion/Action authorizing the disposal of surplus equipment

8. Discussion / Action on request for Special Activity Permit for the Texas Campaign for the Environment to conduct a door-to-door canvass of Terrell Hills on September 7, 2011.

9. Ordinances and Resolutions

   a. Resolution # 1324 A Resolution approving the relocation of an easement granted to San Antonio Water System (SAWS) by the City of Terrell Hills and setting an effective date.

10. Reports

   a. City Manager Report: General Fund, Debt Service and Capital Funds reports, Update on the Ad Valorem Tax Rolls.

   b. Deputy Fire Chiefs' Report: Recent Fire Department Activity

   c. Police Chief Report: Recent Activity

11. Comments by citizens

1

619

EXHIBIT 3 EXHIBIT A

12. Adjournment

## CALL TO ORDER AND RECORDING OF QUORUM

Mayor Camp declared a quorum present and called the regular Council meeting to order at 5:00 p.m. at City Hall, 5100 North New Braunfels Avenue, on August 8, 2011.

There were present:

Mayor J. Bradford Camp
Mayor Pro tem Michelle Brady
Councilmember William Ochse, III
Councilmember Anne Ballantyne
Councilmember Charles Parish, Jr

Also present were:

Interim City Manager, Columbus Stutes
Police Chief, Greg Whitlock
Deputy Fire Chief, William Knupp
Deputy Fire Chief, Justin Seibert
Executive Secretary, Kristine Sanchez
City Attorney, Frank Garza
Buddy & Kay Rosene, 348 Lilac Lane
Salim Merchant, 2111 Harry Wurzbach
John Colquhoun, Freese & Nichols
Richard Kelley, Freese & Nichols
Mr. & Mrs. James Flagg, 1433 Wiltshire
David Balmer, 347 Garraty
Mr. & Mrs. George Ryan, 1437 Wiltshire
Halina Siemek, 139 Bryker
Ross Taylor, 140 Bryker

## REVIEW/ACTION OF MINUTES OF THE JULY 11, 2011 REGULAR COUNCIL MEETING

Upon motion by Councilmember Ballantyne, and second by Mayor Pro tem Brady, the minutes of the July 11, 2011 regular Council Meeting were unanimously approved.

## EMPLOYEE OF THE QUARTER

Mayor Camp recognized Alan Swanson as Employee of the Quarter, for the second quarter of 2011. Deputy Chief Seibert spoke of Firefighter Swanson's accomplishments over the last quarter stating that he had completed his paramedic classes with an A average, played a

2

620

**EXHIBIT 3** **EXHIBIT A**

significant role in the new computer generated Pre-Plans for the department, and continued his duties with his shift.

## PUBLIC HEARING ON THE REQUEST FROM MR. SALIM MERCHANT FOR THE REZONING OF THE PROPERTY LOCATED AT 2115 HARRY WURZBACH ROAD FROM SEMI-COMMERCIAL TO COMMERCIAL ZONING

Mayor Camp opened the public hearing at 5:05 pm on Mr. Merchant's request. The City Manager explained that this request had been submitted to the Planning and Zoning Commission and the recommendation of the commission was against the request for re-zoning. The property in question is located between the Fort Sam Grocery and Ebbtide Lounge.

Mr. Merchant addressed Council explaining that when he purchased the property he thought the entire strip was commercial and that without the re-zoning he cannot lease the property as he had intended and in addition this will decrease the property value. Mr. Merchant said that he has a similar property on Eisenhauer which is all commercial. There is a sports bar, convenience store as well as his office located there and he has encountered no problems with the neighbors during the past ten years.

Mr. Flagg spoke to Council saying that there was a reason the properties had been re-zoned. The Laundromat that was located there previously has been closed for more than six months and therefore is zoned semi-commercial and it should be kept this way. He said he agreed with the recommendation of the P&Z Commission.

Mrs. Ryan said that her concern is that once the property is zoned commercial there will be no way of controlling what type of business opens there. She said she believed Mr. Merchant's intentions were good but that does not mean if he sells the property the new owner's would be. She explained that their property backs directly up to that one and they have had problems over the years with disturbances from the "drunks and derelicts" that hang out in the parking lot. Mr. Ryan agreed stating that at one time it was such a problem they requested and received a variance to put in a higher fence.

Councilmember Ochse verified with the City Manager that all of those properties are zoned semi-commercial; the store and bar are grandfathered in because they were in existence prior to the re-zoning. The City Manager confirmed this saying they are not zoned commercial. Councilmember Ochse asked what types of businesses were allowed in commercial zoned properties and the City Manager said the descriptions were very broad ranging from retail stores, restaurants, and bakeries to service businesses, car dealerships, and daycares.

Mr. Merchant again told Council that he owned and operated a similar strip center on Eisenhauer and has never brought in a tenant that would go against the neighborhoods wishes. He said the calls he has received regarding the property in question have been for a restaurant, a Cricket store, and a retail store.

There being no further comments or discussion Mayor Camp closed the public hearing at 5:15 pm.

3

621

**EXHIBIT 3**
**EXHIBIT A**

## DISCUSSION/ACTION ON THE REQUEST FROM MR. SALIM MERCHANT FOR THE REZONING OF THE PROPERTY LOCATED AT 2115 HARRY WURZBACH ROAD FROM SEMI-COMMERCIAL TO COMMERCIAL ZONING

The City Attorney said it would take a majority vote from Council to grant Mr. Merchant's request; four out of five. Councilmember Ochse stated that the problem here is that this is a transition area and there are immediate neighbors that are directly affected by whatever business could possibly open at this location. He then verified with the City Manager that Mr. Merchant could make the same request one year from now, and the City Manager confirmed. Mr. Merchant stated that he could also go to court and the City Manager and City Attorney confirmed. Councilmember Ochse made the motion, which was seconded by Councilmember Parish, to deny Mr. Merchant's request for re-zoning. All voted in favor and the motion passed.

## DISCUSSION/ ACTION APPROVING THE SPECIFICATIONS FOR THE 2011 BOND ROAD PROJECTS AND AUTHORIZING THE BID PROCESS

Mr. Kelley said the project is coming along on schedule and the plans have been submitted for review. The letting portion of the project is underway. The advertisement to solicit bids will be in the Sunday edition of the Express News for the next two weeks; opening date for the bids is September 1st and there will be a recommendation to Council on September 12th. September 26th is the estimated start date for construction. Mr. Kelley said that the construction cost estimates are down for the original submittal to $4.178M.

Mr. Colquhoun explained to Council the process that will be used in scoring the sealed proposals and distributed a handout detailing the criteria that will be used. He said that once submitted the proposals will be reviewed by the committee and a selection made. Councilmember Ochse commented that this will allow the City to avoid the issues we are experiencing with the Garraty Road project. Mr. Colquhoun said that the project will be broken up as follows: Newbury Terrace- one phase, Garraty Road-two phases, and Terrell Road- three phases. He went on to explain the liquidated damages saying these are not a "penalty" but rather "administrative costs" that would be passed on to the contractor if the project goes over; in the amount of $1,000 per day.

Mayor Camp asked if this meant the project would be completely done on schedule and Mr. Colquhoun said there is "substantially complete" and "final completion". Each will have specific dates and will carry the same recovery cost amount. Councilmember Parish made the motion to approve the specifications for the 2011 bond road projects and to authorize the bid process. Councilmember Ballantyne seconded, all voted in favor, and the motion passed.

## DISCUSSION/ACTION AUTHORIZING THE DISPOSAL OF SURPLUS EQUIPMENT

The City Manager said that after moving out of City Hall there are several items no longer utilized. The City would like to take sealed bids on those to dispose of them; the list includes two cubicle work stations, five window a/c units, and four Dell laptops from the Police Department. In addition to these items staff would also like to take the oldest brush truck and tractor to public auction. Upon motion from Councilmember Ochse and second by Mayor Pro tem Brady council unanimously approved the disposal of surplus equipment.

4

622

**EXHIBIT 3** **EXHIBIT A**

## DISCUSSION / ACTION ON REQUEST FOR SPECIAL ACTIVITY PERMIT FOR THE TEXAS CAMPAIGN FOR THE ENVIRONMENT TO CONDUCT A DOOR-TO-DOOR CANVASS OF TERRELL HILLS ON SEPTEMBER 7, 2011

The City Manager said this is the same organization that council approved the special activities permit for a few months ago, but they had never done the canvass. He said that copies of the request were in their books along with the letter stating that they believed the restrictions previously placed on the hours by Council were too restrictive and unlawful. The City Attorney said that his research shows that Council is within their rights to put reasonable restrictions on the permit. The organization has stated that they are not soliciting simply providing information. Mayor Camp asked if limiting the hours to 1-6 pm were reasonable and the City Attorney said he believed these restrictions are; but if Council were so inclined they could perhaps expand the evening hour to 7 pm. Councilmember Parish said he thought the hours of 2-7 pm were reasonable and asked how many would be doing the canvass. Mayor Camp said the names were included in the information in the books. Councilmember Parish made the motion to grant the Special Activities Permit for the date of September 7, 2011 during the hours of 2-7 pm. Mayor Pro tem Brady seconded the motion, all voted in favor, and the motion passed.

## RESOLUTION # 1324 APPROVING THE RELOCATION OF AN EASEMENT GRANTED TO SAN ANTONIO WATER SYSTEM (SAWS) BY THE CITY OF TERRELL HILLS AND SETTING AN EFFECTIVE DATE

The City Manager said this easement is required as part of the City Hall Renovation. Mayor Pro tem Brady made the motion, which was seconded by Councilmember Ballantyne to approve Resolution #1324. All voted in favor and the motion passed.

## CITY MANAGER REPORTS

The City Manager reported that the budget is right where it should be for this time of year. He said that expenses are 85% of budget and income is 100% of budget. The combined cash on hand is $11,357,468 and all departments are operating within their budgets. The Capital outlays at this point are minimal, but will begin to increase as the projects progress.

The ad valorem tax rate shows a 1.8% reduction in valuations. This means that in order to set the effective tax rate to bring in the same collections we would have to increase taxes by .02; however staff has found savings in other areas of the budget to avoid a tax increase.

## DEPUTY FIRE CHIEFS' REPORTS

Deputy Chief Seibert reported that the department responded to 51 calls in July, most of which were emergency medical calls. There were no fire calls and response time is good at just over three minutes.

Deputy Chief Knupp reported that there were two new Firefighters starting next week and the department has made conditional offers to two additional candidates as Lt. Wingate and Firefighter Fennel have turned in their resignations. Mayor Camp asked if the department has been taking extra precautions because of the heat and Chief Knupp said that they have adjusted

5

623

EXHIBIT 3 EXHIBIT A

their training schedule to earlier in the day. The City Manager said that if there were a structure fire all personnel would be activated so that they could be rotated quickly during this time of extreme heat.

## POLICE CHIEF REPORTS

Chief Whitlock said that the most activity has been out-of-town patrols, over 200 last month. He reported that for the year we have had only five home burglaries and four car burglaries. He also said that the officers in the department want to do a "Blue Santa" program this year and he has given the okay for this.

## CITIZEN COMMENTS

Mr. Taylor addressed Council saying that he lives on the corner of Bryker and is concerned about the dangerous blind corner there. Children riding there bikes or walking from the school bus cannot be seen until you round the corner which could be very dangerous. He suggested putting signs, speed bumps, or lowering the speed limit in this area. He also offered to donate 10ft of his land for a sidewalk if the city would provide him a privacy fence in return and asked how he should proceed. Chief Whitlock said he would investigate and come back to council with his recommendation. He also said he would speak with the school district about relocation of where the school bus drops off/picks up the children.

Ms. Siemek voiced complaints to Council regarding the police department and how she felt they have not investigated her complaints. She alleged that her ex-husband has broken into her house numerous times and stolen items that were then taken to resale shops where she has found them. She also accused her ex-husband of not paying the taxes so the judge found her in contempt of court and she spent a week in jail. During this time Ms. Siemek claims the police department changed the locks on her home and gave the keys to her daughter and said she abandoned her daughter. Ms. Siemek made several accusations regarding the legal system and said she had written a letter to the bar association. She went on to say that her ex-husband is mentally ill and goes through her home when she is not there and she wants the police to investigate. She said the police department will not help her and her child's safety is at risk. She asked for advice from Council on what to do. Mayor Camp explained to several of the issues she has mentioned were not relevant to Terrell Hills. He went on to say the City would look into the complaint against the police department.

Mr. Merchant also voiced a complaint against the police department; stating that the department has not responded to his complaint about a burglary at Fort Sam Grocery. He said it has been three weeks and he has gotten no response from Lt. Foley. Mayor Camp said this would be looked into as well.

Mr. Balmer asked how an item gets placed on the agenda, and the Mayor said by request to the City Manager.

624

EXHIBIT 3 EXHIBIT A

## ADJOURNMENT

There being no further business, Mayor Camp adjourned the meeting at 6:25 p.m.

J Bradford Camp
MAYOR

ATTEST:

Columbus Studds
INTERIM CITY MANAGER

625

EXHIBIT 3 EXHIBIT A

AGENDA

1. Call to Order and Recording of Quorum

2. Review/action of Minutes of the September 10, 2012 regular Council Meeting and September 18, 2012 City Council Workshop.

3. Comments by citizens

4. Public Hearing on the request from Mr. Salim Merchant for the rezoning of the property located at 2115 Harry Wurzbach Road from semi-commercial to commercial zoning.

5. Discussion/Action on the request from Mr. Salim Merchant for the rezoning of the property located at 2115 Harry Wurzbach Road from semi-commercial to commercial zoning.

6. Discussion/ Action to authorize the City Manager to enter into an Inter-local Cooperation Contract with the Department of Public Safety to continue participation in the Failure to appear program.

7. Update on City Hall Project

   a. Discussion/ Approval of Specifications for furnishings for the New City Hall.

   b. Discussion/ Approval, accepting or rejecting bids for a new phone system.

   c. Discussion/ Approval of Change Orders
      1. to relocate Mechanical System equipment.
      2. to replace asphalt in Street Department Yard with Concrete.
   d. Update on progress and schedule.

8. Ordinances and Resolutions

   a. Resolution #1343
      A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF TERRELL HILLS ELECTING NOT TO REQUIRE THE REIMITTANCE OF A PEG FEE BY HOLDERS OF A STATE ISSUED CERTIFICATE OF FRANCHISE AUTHORITY

9. Reports

1

**EXHIBIT 3** **EXHIBIT A**

a. City Manager Report: General Fund, Debt Service and Capital Funds reports. Update on Road Project progress.

b. Police Chief/ Assistant City Manager Report: Recent Activity.

c.. Fire Chief Report: Recent Fire Department Activity

10. Adjournment

## CALL TO ORDER AND RECORDING OF QUORUM

Mayor Camp declared a quorum present and called the regular Council meeting to order at 4:00 p.m. at City Hall, 5100 North New Braunfels Avenue, on October 8, 2012.

There were present:

Mayor J. Bradford Camp
Mayor Pro tem Michelle Brady
Councilmember Anne Ballantyne
Councilmember Charles Parish, Jr
Councilmember William Ochse, III

Also Present were:

City Manager, Columbus Stutes
Police Chief, Greg Whitlock
Lt. Gail Baham
Fire Chief, William Knupp
Assistant Fire Chief, Justin Seibert
Executive Secretary, Kristine Sanchez
Robert Hanley
Bill Mitchell, GW Mitchell
Frank Garza, City Attorney
Buddy & Kay Rosene, 348 Lilac Lane
Salim Merchant, 2115 Harry Wurzbach
Marcial Rodriguez, 325 Ienwick

## REVIEW/ACTION OF MINUTES OF THE SEPTEMBER 10, 2012 REGULAR COUNCIL MEETING AND THE SEPTEMBER 18, 2012 COUNCIL BUDGET WORKSHOP

Upon motion by Councilmember Ballantyne, and second by Councilmember Ochse, the minutes of the September 10, 2012 regular Council Meeting and September 18, 2012 Council Budget Workshop were unanimously approved.

627

2

**EXHIBIT 3**
**EXHIBIT A**

## CITIZEN COMMENTS

There were no citizen comments.

## PUBLIC HEARING ON THE REQUEST FROM MR. SALIM MERCHANT FOR THE REZONING OF THE PROPERTY LOCATED AT 2115 HARRY WURZBACH ROAD FROM SEMI-COMMERCIAL TO COMMERCIAL ZONING

Mayor Camp opened the Public Hearing at 4:03 pm. The City Manager explained that Mr. Merchant had come before council a little over a year ago with this request and it was denied. He reminded Council that this is the property that had formerly been a Laundromat and was closed before Mr. Merchant purchased the property and had reverted to semi-commercial. The Planning and Zoning Commission has heard the requests and is recommending that Council deny the request.

Mayor Camp asked Mr. Merchant if he would like to speak and Mr. Merchant said he would appreciate the opportunity to lease the property to a tenant that plans to open a barber shop. Mayor Camp closed the Public Hearing at 4:06 pm.

## DISCUSSION/ACTION ON THE REQUEST FROM MR. SALIM MERCHANT FOR THE REZONING OF THE PROPERTY LOCATED AT 2115 HARRY WURZBACH ROAD FROM SEMI-COMMERCIAL TO COMMERCIAL ZONING

The City Attorney told Council that if they vote to rezone the property it can be used for any business listed as commercial under our ordinance. He said the P&Z had asked if the City could restrict the use; our ordinance does not cover Special Use Permits, if it did the Council could grant the SUP and restrict the use to a barber shop. Mr. Garza went on to say that the only options are deny the request, approve the request, or change the ordinance to allow for the issuance of SUPs.

Mayor Camp asked if this request was for the entire parcel that Mr. Merchant owns and the City Attorney confirmed. Councilmember Ballantyne asked if we could amend the ordinance at a later time to include the SUP and Mr. Garza said that would be possible; the City Manager said that would require a recommendation from the P&Z. It was the consensus of Council to schedule a meeting of the P&Z to discuss amending the ordinance to allow for the issuance of Special Use Permits. There was not motion to approve the request from Mr. Salim Merchant for the rezoning of the property located at 2115 Harry Wurzbach road from semi-commercial to commercial zoning; the request was denied.

## DISCUSSION/ ACTION TO AUTHORIZE THE CITY MANAGER TO ENTER INTO AN INTER-LOCAL COOPERATION CONTRACT WITH THE DEPARTMENT OF PUBLIC SAFETY TO CONTINUE PARTICIPATION IN THE FAILURE TO APPEAR PROGRAM

3

628

EXHIBIT 3 EXHIBIT A

Chief Whitlock explained that this is a renewal of the current agreement with the DPS allowing the City to enter failure to appear information in their database. Once this information is in the system an individual cannot renew their Driver's License until the fines are taken care of with Terrell Hills. Upon motion by Mayor Pro tem Brady and second by Councilmember Parish council unanimously voted to authorize the City Manager to enter into an inter-local cooperation contract with the Department of Public Safety to continue participation in the failure to appear program.

## UPDATE ON CITY HALL PROJECT

### DISCUSSION/ APPROVAL OF SPECIFICATIONS FOR FURNISHINGS FOR THE NEW CITY HALL

The City Manager said the most recent copy of the specs at each council member's place is what would be going out for bid. Mayor Camp asked what had changed from the first set and the City Manager said it was just formatting that had changed. Councilmember Ballantyne commented that she had hoped to have some demos of some of the chairs at this meeting and Mr. Hanley said he would check into getting those here. The City Manager said that the Council table is not included in this package; should have some ideas to present at the Budget Workshop. Upon motion by Councilmember Ballantyne and second by Councilmember Ochse Council unanimously voted to approve the specifications for the furnishings for the New City Hall.

### DISCUSSION/ APPROVAL, ACCEPTING OR REJECTING BIDS FOR A NEW PHONE SYSTEM

The City Manager informed Council that no bids were received by the 10:00 am deadline. He said that three vendors had received packages and he contacted them and gave them until 3:00 to submit their bids; two out of the three did. Mr. Stutes said that staff's recommendation is to reject the bids because of the missed deadline; explaining that this would be the best solution since there is always the possibility that an unknown vendor may have wanted to submit a bid but didn't have the knowledge of the time extension given the others.

Mr. Stutes said that the bids received were well under the $50,000 limit so it is not required that we put it out for bid. He proposed that Council authorize him to negotiate with the vendors to get the best price. Mayor Pro tem Brady asked if the price included wiring and installation and the City Manager said that we have already paid for the wiring; installation is included in the price. Upon motion by Councilmember Ochse and second by Councilmember Parish council unanimously voted to reject the phone system bids. The direction of Council was to allow the City Manager to negotiate with the vendors for installation of the new phone system.

**EXHIBIT 3**
**EXHIBIT A**

## DISCUSSION/ APPROVAL OF CHANGE ORDERS

### To Relocate Mechanical System Equipment

The City Manager said that the current location of the A/C equipment is centralized on the roof; no one realized this was going to be quite so visible. This change order is to relocate the system to the ground next to the Fire Department. Mr. Mitchell has the estimate at around $17,000 and OCO has agreed to reduce a portion of their fee by $8,300 which will come off of that number. Councilmember Parish asked if the noise level would increase with it on the ground and Mr. Mitchell said it would not. Mayor Pro tem Brady asked how the move would affect the Fire Department Living Quarters and Mr. Mitchell said the FD system is separate from this one. Councilmember Parish made the motion to approve the change order, not to exceed $17,000, and Councilmember Ochse seconded. All voted in favor and the motion passed.

### To Replace Asphalt in Street Department Yard with Concrete

Mr. Mitchell said that in his opinion it would be a good long term investment to replace the asphalt in the street department with 6" concrete because it would hold up better over time. Mayor Camp said he there are some intersections that have been redone in concrete and they don't seem to be performing too well. Mr. Mitchell said there were other options such as going to 8" concrete; he added that the contract calls for a simple overlay and he didn't think that was sufficient. The City Manager agreed it would be a good investment and told Council we have 30 days before the decision has to be made.

## UPDATE ON PROGRESS AND SCHEDULE

Mr. Mitchell said the completion date has been moved to the middle of December due to the AC's being moved. After move in there will still be an additional two-three weeks left on the project during which time the PD house will be demolished and the parking lots completed.

The City Manager said the budget is performing very well. He said that even if we have to spend the entire $17,000 on moving the AC units we are still under $40,000 in contingencies which is less than 1%.

## RESOLUTION # 1343 A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF TERRELL HILLS ELECTING NOT TO REQUIRE THE REIMITTANCE OF A PEG FEE BY HOLDERS OF A STATE ISSUED CERTIFICATE OF FRANCHISE AUTHORITY

The City Attorney explained that we currently get a 1% PEG Fee from Time Warner Cable which can only be spent for Public Access Educational Governmental Programming. Many smaller cities have opted to reject this payment because the cost of such programming is greater than the PEG Fee received. Time Warner Cable has said that cities that pass the resolution before the end of the year will not be required to return the 1% and in addition this will reduce the resident's bill by this 1%. Upon motion by

5

630

EXHIBIT 3 EXHIBIT A

Councilmember Ballantyne and second by Councilmember Ochse, Council unanimously voted to pass Resolution # 1343.

## CITY MANAGER REPORTS

Mr. Stutes reported that the fund balance has shown a significant decrease because of large payments on the City Hall and Street projects. The budget is performing as it should. The Capital Projects Fund shows both the City Hall and Street Projects have paid $3.1M in expenses to date.

The Street project is progressing: all of the signs have been collected that were left on Newbury by the contractor. The work on Geneseo will move to the other side of the esplanade within the next week. Mayor Camp mentioned that he has seen some failure at the corner of Eldon and Terrell and the City Manager said staff is aware and is in the process of reviewing the engineers testing log.

## POLICE CHIEF REPORTS

Chief Whitlock said that during National Night Out their were two neighborhood gatherings; one in the 1200 block of Wiltshire and one in the 800 block of Terrell. Police and Fire personnel attended and spent some time mingling with the residents. The Fall Festival at St. David's will take place on the 19th of October and the PD will attend this as well.

Chief said that property crimes are very low; Lt. Foley is in Quantico and Sgt. Baham is working CID.

## FIRE CHIEF REPORTS

Chief Knupp reported 47 incidents for the month of September and response time was 3 min and 6 seconds. He said that at National Night Out the FD had a Fire Extinguisher Demo and it was a hit with the residents. The Alamo Area Chiefs Association has formed a committee to develop a "best practices" which is similar to what the PD just did, and Chief Knupp said he will be serving on that committee. Shift Officers attended a symposium on October 4th put on by the LA Fire County Department. The officers said it went very well and was very educational.

## ADJOURNMENT

There being no further business, Mayor Camp adjourned the meeting at 4:59 p.m.

_____
MAYOR

ATTEST:

_____
SECRETARY-MANAGER

631

6

EXHIBIT 3  EXHIBIT A

# ORDINANCE NO. 1347

## AN ORDINANCE

AMENDING THE CITY CODE OF ORDINANCES CHAPTER 14, ADDING SECTION VIII, SECTION (D) BY PROVIDING FOR A SPECIAL USE PERMIT IN THE SEMI-COMMERCIAL DISTRICT THAT WILL ALLOW CERTAIN USES IN MORE RESTRICTIVE DISTRICTS UNDER SPECIAL CONDITIONS OF DESIGN, OPERATION AND APPEARANCE AFTER RECOMMENDATION BY THE PLANNING AND ZONING COMMISSION AND APPROVAL BY THE CITY COUNCIL; PROVIDING FOR SEVERABILITY; PROVIDING AN EFFECTIVE DATE; AND REPEALING ANY ORDINANCE IN CONFLICT.

**WHEREAS,** the City of Terrell Hills has a Zoning Ordinance to comply with its comprehensive plan which his designed to promote health and the general welfare, provide adequate light and air, and prevent overcrowding; and; and

**WHEREAS,** the City of Terrell Hills Planning and Zoning Commission held a public hearing on December 3, 2012 to gather public input on providing for Special Use Permits in the Semi-Commercial Zoning under special conditions of design, operation and appearance and may be permitted when specifically authorized by this section after recommendation by the Planning and Zoning commission and approval by the City Council.

**NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF TERRELL HILLS, TEXAS:**

**Section 1.** The City of Terrell Hills Code of Ordinances, Chapter 14 Zoning, Section VIII, Zone District B, Semi-Commercial District is amended to include Section D as follows:

**D. Special Use Permit (SUP):** Certain uses are considered appropriate in District B, Semi-Commercial District under special conditions of design, operation and appearance and may be permitted when specifically authorized by this section after recommendation by the Planning and Zoning Commission and approval by the City Council. Such special use permits may be granted in order that the City may develop in accordance with the intent and purpose of this chapter, that land may be fully utilized for a lawful purpose and that substantial justice may be done.

1. In reaching a decision on any application for a special use permit, the City shall determine:

   (a) That the requested special use permit will establish only that further the intent and purpose of this chapter.

   (b) That the location of proposed activities and improvements are clearly defined on a site plan filed by the applicant.

   (c) That the special use permit will be wholly compatible with the use and permitted development of adjacent properties either as filed or subject to such requirements as the city council may find necessary to protect and maintain the stability of adjacent properties. The city council may also determine conditions to be met to meet the intent of this chapter. They may include hours of operation.

   (d) Granting of the special use permit will not adversely affect the character and appropriate use of the area or neighborhood in which it is proposed to locate; will not substantially depreciate the value of adjacent and nearby properties for use in accordance with the regulations of the Semi-Commercial district in which they are located; will be in keeping with the spirit and intent of this chapter; will not adversely affect the implementation of the comprehensive plan; and will not adversely affect traffic, public utilities, public health, public safety, and the general

632

EXHIBIT 3 EXHIBIT A

welfare.

(e) No special use permit for the use of buildings or lands shall be approved until a site plan has been submitted and recommended by the planning and zoning commission and approved by the city council. The site plan may be submitted concurrently with the special use permit application or separately following the initial recommendation and approval.

2. **Special Use Permit Application.** SUP Application shall be submitted to the City with the proposed site plan and the same fees required for zoning changes. A site plan, with detail as required below must be submitted upon application for a rezoning for an SUP. The site plan shall be prepared to scale. Such required site plans shall show, at a minimum, the following:

(a) The location of the building or buildings to be constructed or altered;

(b) All parking, loading, and driveways to be constructed or altered;

(c) The location and dimensions of all screening devices, lighting equipment, exterior located equipment such as cooling systems, trash containers, signs, fire hydrants, and sidewalks;

(d) The location and details of all landscaping and plant materials to be installed;

(e) Elevations and floor plans of the buildings showing materials, treatments of exteriors, location of balconies, overhangs, and patios; and

(f) Such other details of the development as the Commission and/or may deem necessary to evaluate the impact of the development on adjoining and surrounding properties.

3. **Procedures.** Granting of an SUP is considered zoning and as such, all the procedures for changing a zoning district apply to an application for an SUP and shall be processed in the same manner.

(a) Approval of an SUP by the City Council shall be evidenced by an ordinance which shall include all special requirements to be included in the SUP, and all agreements or other documents between the City and the applicant shall be incorporated in the ordinance by reference.

(b) If an application is approved and an SUP is granted, all conditions which may have been attached to the approval are binding on the property and shall be complied with before a Certificate of Occupancy may be issued. All subsequent development and use, as shown and described in the approved SUP, of the property, shall be in accordance with the approved plan and conditions.

(c) Any proposed amendment shall be approved in the same manner and under the same procedures as are applicable to the issuance of the original permit.

4. **Revocation of Permit.** The SUP may be considered for revocation for, but not limited to, the following reasons:

(a) A use other than the use approved in the SUP or in the underlying zoning district is developed.

(b) Construction is not begun within one year of the date of approval of the permit.

(c) Failure to satisfy the conditions of the SUP or follow the site plan made part of the SUP. The City Manager or designee shall have the right to periodically examine the operation of the special use to determine compliance with the requirements and any conditions. If the City Manager or designee determines that the requirements have not been met, or the conditions are being violated, a written notice shall be issued to the owner of the property outlining the nature of the violation and giving the owner

633

**EXHIBIT 3**
**EXHIBIT A**

of the property a maximum of thirty (30) days to come into compliance. If after thirty (30) days the violations continue to exist, then the City Manager or designee shall forward a report to the City Council through the Planning and Zoning Commission which may recommend that action be taken to: (a) revoke the SUP from the property, (b) refuse issuance of a Certificate of Occupancy, or (c) revoke the Certificate of Occupancy.

(d) Regardless of the notice requirements in Section 4(c), if a health and safety violation is cited, and there exists an imminent health and safety risk to the public as determined by the City Manager or designee, the Certificate of Occupancy will be temporarily revoked. The revocation of the Certificate of Occupancy will last until the health and safety violation is cured. Failure to cure violation within thirty (30) days, then the City Manager or designee shall forward a report to the City Council through the Planning and Zoning Commission which may recommend that action be taken to revoke the Certificate of Occupancy.

(e) If property owner is in arrears on any taxes owed to the City, that are not being contested, City Manager shall provide a written notice to the property owner of the taxes owed and give the owner of the property a maximum of thirty (30) days to make all necessary payments. If after thirty (30) days the taxes are still owed to the City or no arrangements have been made for repayment, City Manager shall forward a report to the City Council through the Planning and Zoning Commission which will recommend revocation of the SUP from the property.

(f) The revocation process shall be the same as for a zoning district change, with notice to property owners within 200 feet, public hearing and recommendation by the Planning and Zoning Commission, and public hearing and ordinance consideration by the City Council.

(g) The City Council may deny the SUP revocation, approve the revocation, deny the revocation and add additional restrictions to the SUP, suspend the SUP for a period the Council determines, or amend the SUP with probationary requirements and terms the Council determines.

(h) Upon revocation of an SUP the property subject to the SUP may be used for any permitted use within the Semi-Commercial district.

5. **Subsequent Applications**. An application for an SUP may be withdrawn at any time. No application for an SUP pertaining to any lot, parcel or portion thereof which requests the same use and same conditions shall be considered within one (1) year of a final decision denying the application

**Section 2.** The SUP amendment identified in Section 1 of the Ordinance is the only amendment and all other provisions of Chapter 14, Section VIII shall remain as unchanged.

**Section 3.** This ordinance shall take effect immediately upon its passage, approval and publication according to law.

**Section 4.** If any section or part of any section or paragraph of this ordinance is declared invalid or unconstitutional for any reason, it shall not be held to invalidate or impair the validity, force, or effect of any other section or sections or part of a section or paragraph of this Ordinance.

**Section 5.** All ordinances or parts of ordinances, in conflict herewith are to the extent of such conflict hereby repealed. The balance of such ordinance is hereby saved from repeal.

EXHIBIT 3
EXHIBIT A

PASSED AND APPROVED THIS 10th DAY OF DECEMBER 2012.

_J. Bradford Cape_
MAYOR

ATTEST:

_Columbus Stewart_
SECRETARY-MANAGER

**EXHIBIT 3** **EXHIBIT A**

## ORDINANCE NO. 1349

AN ORDINANCE AMENDING ORDINANCE NO. Ord. 929, 1-15-96, THE COMPREHENSIVE ZONING ORDINANCE OF THE CITY OF TERRELL HILLS FOR THE PURPOSE OF ESTABLISHING A SPECIAL USE PERMIT FOR THE PORTION OF CB 5848A BLK 11 LOT E IRRG 122.10 FT OF 11, BEXAR COUNTY, TEXAS WHICH IS ZONED B SEMI-COMMERCIAL. COMMONLY REFERRED TO AS 2115 HARRY WURZBACH, TERRELL HILLS, TEXAS 78209; AND SETTING AN EFFECTIVE DATE.

**WHEREAS,** notice of public hearings before the Planning and Zoning Commission and City Council were published in a newspaper of general circulation; and

**WHEREAS,** notice of public hearings before the Planning and Zoning Commission and City Council was sent to property owners within 200 feet of the proposed special use permit via United States Mail; and

**WHEREAS,** the Planning and Zoning Commission has held a public hearing and considered the special use permit classification and stipulations for the properties hereafter described and made its recommendations to the City Council of the City of Terrell Hills on February 5, 2013; and

**WHEREAS,** the City Council has held a public hearing and considered the special use permit classification and stipulations for the properties hereafter described on March 11, 2013; and

**WHEREAS,** the City Council and Planning and Zoning Commission has duly considered the requirements and safeguards for a special use permit; and

**WHEREAS,** the City Council deems that a special use permit is appropriate for the property with additional stipulations;

**NOW, THERFORE BE IT RESOLVED AND ORDERED BY THE CITY COUNCIL OF THE CITY OF TERRELL HILLS, THAT:**

**Section 1.** Ordinance No. Ord. 929, 1-15-96, the Comprehensive Zoning Ordinance of the City of Terrell Hills, Texas is hereby amended for the purpose of establishing a special use permit for the following property accordingly:

  a. For the portion of CB 5848A BLK 11 LOT E IRRG 122.10 FT OF 11, Bexar County, Texas which is zoned B Semi-Commercial. Commonly referred to as 2115 Harry Wurzbach, Terrell Hills, Texas 78209. (hereafter "Property")

  b. The Property retains its original zoning classification of B Semi-Commercial but Council establishes a special use permit for the property described in Section 1 a.

**Section 2.** The special use permit shall have attached to it the following stipulations that shall run with the land:

  a. The sole permitted use of the Property shall be a hair and nail salon which shall have only the following permitted uses: manicures, pedicures, hair cutting, hair styling, hair coloring, and waxing (collectively, the "Permitted Uses");

  b. The Property, including without limitation, the parking lot and alley, must be maintained in a manner reflective of other first class shopping centers in the area.

  c. Sale of products at the Property shall be limited to shampoo, hair and nail care products, or as otherwise permitted and approved by the City Council;

  d. No parking shall be permitted behind the building located on the Property;

  e. No operation of any business at the Property may occur between midnight and 6 a.m.;

636

EXHIBIT 3 EXHIBIT A

f. The Special Use Permit zoning classification will expire six (6) months after the Property is no longer used for at least one (1) of the Permitted Uses; and

g. The City Council must consider and at their discretion approve a site plan for the Property which shall include proposed parking and signage, which may not be changed except as approved by the City Council.

h. The Property's site plan must include twelve foot (12') high angled lights in the rear of the building on the Property, for the illumination of the rear of the Property, which illumination may not extend to any adjacent lots, the form of the lights, to be approved by the City Council.

Section 3.     The City Council has determined that the proposed use will be harmonious with existing buildings, structures and uses on abutting and nearby properties in the vicinity of the property in accordance with the current zoning regulations of the City. The Council has reviewed the project with the required stipulations regarding permitted uses, maintenance, sale of products, parking, operation ours, expiration, and sight plan requirements. The granting of the special use permit is conditioned on the applicant agreeing to accept and agree to be bound by the terms of the conditions set by the Council.

Section 4. **Effective Date.** This ordinance shall take effect immediately upon its adoption by the City Council.

Section 5. **Severability.** If any section, subsection, sentence, clause or phrase of this ordinance is for any reason held to be unconstitutional or illegal, such decision shall not effect the validity of the remaining sections of this ordinance. The City Council hereby declares that it would have passed this ordinance, and each section, subsection, clause, or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses or phrases be declared void.

**PASSED, APPROVED AND ADOPTED THIS 13th DAY OF MAY, 2013.**

APPROVED:

J. Brad Camp, Mayor

ATTEST:

Columbus Stutes, City Secretary

2

637

EXHIBIT 3
EXHIBIT A

## ORDINANCE NO. 1386

AN ORDINANCE AMENDING ORDINANCE NO. Ord. 929, 1-15-96, THE COMPREHENSIVE ZONING ORDINANCE OF THE CITY OF TERRELL HILLS FOR THE PURPOSE OF ESTABLISHING A SPECIAL USE PERMIT FOR THE PORTION OF CB 5848A BLK 11 LOT E IRRG 122.10 FT OF 11, BEXAR COUNTY, TEXAS WHICH IS ZONED B SEMI-COMMERCIAL. COMMONLY REFERRED TO AS 2113 HARRY WURZBACH, TERRELL HILLS, TEXAS 78209; AND SETTING AN EFFECTIVE DATE.

WHEREAS, notice of public hearings before the Planning and Zoning Commission and City Council were published in a newspaper of general circulation; and

WHEREAS, notice of public hearings before the Planning and Zoning Commission and City Council was sent to property owners within 200 feet of the proposed special use permit via United States Mail; and

WHEREAS, the Planning and Zoning Commission has held a public hearing and considered the special use permit classification and stipulations for the properties hereafter described and made its recommendations to the City Council of the City of Terrell Hills on March 16, 2015; and

WHEREAS, the City Council has held a public hearing and considered the special use permit classification and stipulations for the properties hereafter described on April 13, 2015; and

WHEREAS, the City Council and Planning and Zoning Commission has duly considered the requirements and safeguards for a special use permit; and

WHEREAS, the City Council deems that a special use permit is appropriate for the property with additional stipulations;

NOW, THERFORE BE IT RESOLVED AND ORDERED BY THE CITY COUNCIL OF THE CITY OF TERRELL HILLS, THAT:

Section 1.     Ordinance No. Ord. 929, 1-15-96, the Comprehensive Zoning Ordinance of the City of Terrell Hills, Texas is hereby amended for the purpose of establishing a special use permit for the following property accordingly:

a. For the portion of CB 5848A BLK 11 LOT E IRRG 122.10 FT OF 11, Bexar County, Texas which is zoned B Semi-Commercial. Commonly referred to as 2113 Harry Wurzbach, Terrell Hills, Texas 78209. (hereafter "Property")

b. The Property retains its original zoning classification of B Semi-Commercial but Council establishes a special use permit for the property described in Section 1 a.

Section 2.     The special use permit shall have attached to it the following stipulations that shall run with the land:

a. The sole permitted use of the Property shall be a hair and nail salon which shall have only the following permitted uses: manicures, pedicures, hair cutting, hair styling, hair coloring, and waxing (collectively, the "Permitted Uses");

b. The Property, including without limitation, the parking lot and alley, must be maintained in a manner reflective of other first class shopping centers in the area.

c. Sale of products at the Property shall be limited to shampoo, hair and nail care products, or as otherwise permitted and approved by the City Council;

d. No parking shall be permitted behind the building located on the Property;

e. No operation of any business at the Property may occur between midnight and 6 a.m.;

638

EXHIBIT 3
EXHIBIT A

f.   The Special Use Permit zoning classification will expire six (6) months after the Property is no longer used for at least one (1) of the Permitted Uses; and

g.   The City Council must consider and at their discretion approve a site plan for the Property which shall include proposed parking and signage, which may not be changed except as approved by the City Council.

h.   The Property's site plan must include twelve foot (12') high angled lights in the rear of the building on the Property, for the illumination of the rear of the Property, which illumination may not extend to any adjacent lots, the form of the lights, to be approved by the City Council.

Section 3.     The City Council has determined that the proposed use will be harmonious with existing buildings, structures and uses on abutting and nearby properties in the vicinity of the property in accordance with the current zoning regulations of the City. The Council has reviewed the project with the required stipulations regarding permitted uses, maintenance, sale of products, parking, operation ours, expiration, and sight plan requirements. The granting of the special use permit is conditioned on the applicant agreeing to accept and agree to be bound by the terms of the conditions set by the Council.

Section 4. Effective Date. This ordinance shall take effect immediately upon its adoption by the City Council.

Section 5. Severability. If any section, subsection, sentence, clause or phrase of this ordinance is for any reason held to be unconstitutional or illegal, such decision shall not effect the validity of the remaining sections of this ordinance. The City Council hereby declares that it would have passed this ordinance, and each section, subsection, clause, or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses or phrases be declared void.

PASSED, APPROVED AND ADOPTED THIS 13th DAY OF APRIL, 2015.

APPROVED:

Anne Ballantyne, Mayor

ATTEST:

Columbus Stutes, City Secretary

639

2

EXHIBIT 3 EXHIBIT A

# Law Offices of Kenneth E. Grubbs
## Woodcock Building suite C-120
## 4241 Woodcock Drive
## San Antonio, Texas 78228

Phone (210) 490-1292
Fax    (210) 499-4587

July 10, 2012                                        Via  Regular Mail

The Planning and Zoning Commission
City of Terrell Hills
5100 N. New Braunfels Ave
San Antonio, TX 78209

Re:        211-2117 Harry Wurzbach Road, San Antonio, TX 78209

Dear Board,

        We are writing this letter in hopes that you would consider my clients  request to apply for re-zoning of the property located at 2111-2117 Harry Wurzbach Road, San Antonio, TX 78209. My clients reason for such request is that at the present time he has a tenant that is looking into opening a Cricket Communication store at 2115 Harry Wurzbach Road, San Antonio, TX 78209.

        If you have any question, Please contact us at  (210) 490-1292.

Sincerely yours,

Enedelia Garcia
Legal Assistant to
Kenneth E. Grubbs
Attorney at Law



DEPOSITION
EXHIBIT

EXHIBIT 4
EXHIBIT A



## PLOT PLAN

SCALE 3/32" = 1'-0"

125.0'

137.13'

167.64'

HARRY WURZBACH

EVENTIDE DRIVE

NORTH

I certify that this is a complete and true copy of the Site and Signage Plan of 2115 Harry Wurzbach submitted to City Council for approval.

**Columbus Stutes, City Secretary**

KRISTINE K. SANCHEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 06-01-2017

**EXHIBIT 5**
**EXHIBIT A**







**EXHIBIT 5**
**EXHIBIT A**

**ELECTRO SALES & SERVICE INC**
**3941 EISENHAUER ROAD**
**SAN ANTONIO, TX 78218**
**TEL (210) 497 8969**
**FAX (210) 655 9505**
**EMAIL: SALIMMERCHANT04@AOL.COM**

December 12, 2012

The Planning and Zoning Commission
City of Terrel Hills
5100 N. New Braunfels Ave
San Antonio, TX 78209

RE:   SUP APPLICATION FOR 2115 HARRY WURZBACH ROAD

I like to apply SUP APPLICATION for 2115 Harry Wurzbach Road, San Antonio, TX 78209.

(a)   The location of the building not to constructed and altered. Its an existing location and part of 2111/2117 Harry Wurzbach Road.

(b)   The parking, loading and driveways not to be constructed.

(c)   The location and dimensions of the building is an existence building, no need to make sidewalks, signs, trash containers etc.

(d)   No landscaping and plant materials to be installed.

(e)   Its an existing building, no need to change in the strip center.

(f)   No need to change the existing building including the development on adjoining and surrounding properties.

**EXHIBIT 5**
**EXHIBIT A**

I have a tenant who wants to open Barber Shop and Beauty Parlor.

I would appreciate it if you kindly approve the above mention SUP APPLICATION as soon as possible so I do not loose my tenant.

Thank you for your co-operation.

SALIM MERCHANT

cc:
Law Offices of
Kenneth E. Grubbs
4241 Woodcock Drive
San Antonio, TX 78228

I certify that this is a complete and true copy of Mr. Salim Merchant's SUP Application submitted to the City of Terrell Hills for the property located at 2115 Harry Wurzbach.

Columbus Stutes, City Secretary

KRISTINE K SANCHEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 06-01-2017

**EXHIBIT 5**
**EXHIBIT A**

**SALIM MERCHANT**
**P. O. BOX 790810**
**SAN ANTONIO, TX 78279**
TEL (210) 497 8969
TEL (210) 771 7860
FAX (210) 591 1625
EMAIL: SALIMMERCHANT04@AOL.COM

February 5, 2014

The Planning & Zoning Commission
City of Terrell Hills
5100 N. New Braunfels Ave.
San Antonio, TX 78209
Tel (210) 824 7401
Fax (210) 822 2267

RE:    2113 HARRY WURZBACH ROAD, TERRELL HILLS, TX 78209

Dear Sir,

I like to open Barber Shop dba STEEL CUTS at 2113 Harry Wurzbach Road, Terrell Hills, TX 78209.

I got SUP in May 2013 and failed to open hair and nail saloon because my tenant didn't want to wait so long, and it was expired. I, therefore, request you to kindly issue SUP for barber shop as soon as possible.

Also, can you authorize to CPS so I can get the light.

Thank You.

SALIM MERCHANT

cc:
1.    Mayor Anne Ballantyne       -       aballantyne@terrell-hills.com
2.    Pro Tem William Ochse       -       wochse@terrell-hills.com
3.    Council Person - Charles Parish -   cparish@terrell-hills.com



DEPOSITION
EXHIBIT
6

EXHIBIT 6
EXHIBIT A

645

B. All such applications for building permits shall further be accompanied by a complete set of written plans and specifications covering the proposed construction. Such plans and specifications shall be deemed insufficient unless they bear the seal of either a registered professional engineer or an architect licensed under the laws of the State of Texas. All foundation plans shall be deemed insufficient unless they bear the seal of a registered professional engineer licensed under the laws of the State of Texas. Such set of plans shall be retained by the Building Inspector until a Certificate of Occupancy and Compliance has been issued.

## SECTION XIV: CERTIFICATE OF OCCUPANCY AND COMPLIANCE

A. No building hereafter erected or structurally altered shall be used, occupied or changed in use until a certificate of occupancy and compliance shall have been issued by the Building Inspector, stating that the building or proposed use of a building or premises complies with the building laws and the provisions of these regulations.

B. Certificates of occupancy and compliance shall be applied for coincident with the application for a building permit and shall be issued within ten days after the erection or structural alteration of such buildings shall have been completed in conformity with the building laws and these regulations. A record of all certificates shall be kept on file in the office of the Building Inspector.

## SECTION XV: BOARD OF ADJUSTMENT AND PLANNING AND ZONING COMMISSION

A. Board of Adjustment

1. Organization and Operation of the Board.

a. The Board shall consist of five members and three alternates appointed as required by Section 10 of Article VIII of the City Charter. At the first meeting of the Board following publication of an ordinance appointing members, the Board shall select a Chair and Deputy Chair from its members.

b. A quorum shall consist of four members/alternates. No more than five members/alternates may vote on any issue before the board; the voting alternate(s), if any, shall be designated by the Chair at the start of the meeting.

c. Meetings of the Board shall be held at the call of the Chair. Such Chair, or in his absence the Deputy Chair, may administer oaths and compel the attendance of witnesses. All meetings of the Board shall be open to the public.

d. The Board shall keep minutes of its proceedings, showing the vote of each member upon

**EXHIBIT 7**
**EXHIBIT A**

each question, or, if absent or failing to vote, indicating such fact, and shall keep records of its examinations and other official actions, all of which shall be immediately filed in the office of the City Secretary and shall be a public record.

e. A member/alternate shall not vote or participate as a member in any matter before the Board if the member has any interest in this matter, whether such interest is direct or indirect, financial or otherwise. In any case, where the question of a member's interest is raised, the Chair shall rule on whether the member should be disqualified.

f. Notice - Public notice of hearing before the Board of Adjustment shall be given for each separate appeal thereto by publication two times in a newspaper of general circulation in the City of Terrell Hills, stating the time and place of such hearing, which shall not be earlier than ten (10) days from the first date of such publication, and in addition thereto the Board of Adjustment shall mail notices of such hearings to the petitioner and to the owners of property lying within two hundred feet (200') of any point of the lot or portion thereof on which such variation is desired, and to all other persons deemed by the Board of Adjustment to be affected thereby. Such owners and persons shall be determined according to the current tax rolls of the City. The published notice and the mailed notice may contain notice of a hearing on more than one matter. Substantial compliance with the provisions of this section shall be deemed sufficient, and the depositing of such written notice in the mail by the Board of Adjustment shall be deemed in compliance with the provisions for mailed notices.

g. A fee of one-hundred dollars ($100.00) to cover the administrative costs of such hearing will be filed with the request for hearing.

2. The Board of Adjustment shall have the following powers:

a. To authorize upon appeals in specific cases such variance from the terms of this ordinance as will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the provisions of this ordinance will result in unnecessary hardships, and so that the spirit of this ordinance shall be observed and substantial justice done.

b. To hear and decide appeals where it is alleged there is an error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this ordinance. In exercising this authority, the Board may reverse or affirm, in whole or in part, or modify the administrative official's order, requirement, decision or determination from which an appeal is taken and make the correct order, requirement, decision, or determination, and for this purpose the board has the same authority as the administrative official.

(1). Appeals to the Board of Adjustment may be taken by any person aggrieved or by any officer, department, board or bureau of the municipality affected by any decision of the administrative officer. Such appeal shall be taken with ten (10) days from the date of any

**EXHIBIT 7**
**EXHIBIT A**

such ruling, by filing with the officer from whom the appeal is taken and with the Board of Adjustment a notice of appeal specifying the grounds thereof. The officer from whom the appeal is taken shall forthwith transmit to the Board all papers constituting the record upon which the action appealed from was taken.

(2). An appeal stays all proceedings in furtherance of the action appealed from unless the officer from whom the appeal is taken certifies to the Board after notice of appeal shall have been filed that by reason of facts stated in the certificate a stay would, in his opinion, cause eminent peril to life or property. In such case proceedings shall not be stayed otherwise than by a restraining order which may be granted by the Board of Adjustment or by a court of record on application on notice to the officer from whom the appeal is taken and on due cause shown.

(3). The Board of Adjustment shall fix a reasonable time for the hearing of the appeal and give notice thereof, as hereinafter set forth, and upon the hearing any party may appear in person or by agent or by attorney.

3. The concurring vote of four members/alternates of the board is necessary to:

a. Authorize a variation from the terms of this ordinance; or

b. Reverse an order, requirement, decision, or determination of an administrative official.

B. Planning and Zoning Commission

1. Organization and Operation of the Commission.

a. The Commission shall consist of seven members and three alternates appointed as required by Section 9 of Article VIII of the City Charter. At the first meeting of the Commission following publication of an ordinance appointing members, the Board shall select a Chair and Deputy Chair from its members.

b. A quorum shall consist of four members/alternates of the commission. No final action shall be taken on any matter except pursuant to a majority vote of the members present; however, in no case shall less than four votes constitute a majority, and this requirement shall govern requests for rehearings in zoning cases.

c. Meetings shall be called by the Chair, provided that written notice thereof is mailed or given to each member at least forty-eight (48) hours prior to the time thereof. No approval or disapproval of any zoning application shall be given except at a regular meeting. All meetings of the Commission shall be held at the City Hall.

**EXHIBIT 7**
**EXHIBIT A**

d. The Commission shall keep minutes of its proceedings, showing the vote of each member upon each question, or if absent or failing to vote, indicating such fact, and shall keep records of its examinations and other official actions, all of which shall be immediately filed in the office of the City Secretary and shall be a public record.

e. A member/alternate shall not vote or participate as a member in any matter before the Commission if the member has any interest in this matter, whether such interest is direct or indirect, financial or otherwise. In any case, where the question of a member/alternate's interest is raised, the Chair shall rule on whether the member/alternate should be disqualified.

f. Notice - At least fifteen (15) days notice of any public hearing before the Planning and Zoning Commission of the time and place of such hearing, shall be published in an official paper, or a paper of general circulation in the city. Notice shall be mailed to owners of real property lying within two hundred feet (200') of any lot to be replatted or any property upon which a change in zoning classification is proposed. Such notice shall be given, not less than 15 days before the date set for hearing, to all such owners as indicated on the most recently approved municipal tax roll.

g. A fee of one-hundred dollars ($100.00) to cover the administrative costs of each hearing will be filed with the request for hearing.

2. Platting, Replatting and Recording Subdivisions

a. The provisions of Chapter 212 of the Texas Local Government Code will govern the Commission's consideration of such matters. If the commission disapproves a request no hearing will be held involving the same tract of land for a six months period unless new, relevant and substantial evidence, which could not have been secured at the time set for the original hearing is produced by the applicant under sworn affidavit to that effect.

b. Final Approval Authority. The City Council will be the approval authority for all plats and replats after such requests are considered by the Planning and Zoning Commission in accord with this ordinance, if there are two dissenting votes on the Planning and Zoning Commission action.

c. PROCEDURE: Annex A

d. SHORT FORM PROCEDURE: A short form procedure, omitting the filing of the preliminary plat may be followed when:

(1) All lots in the proposed subdivision front on a previously dedicated street and are so situated that no new streets, alleys, easements or public property are required; and

649                                                                                                  **EXHIBIT 7**
                                                                                                  **EXHIBIT A**

(2) The utilities and drainage facilities are in place to serve each lot in the proposed subdivision and require no alterations; and

(3) Staff review by the city confirms that all engineering data remains accurate.

e. The Planning and Zoning Commission may approve and issue an amending plat as provided in paragraph 212.016 of the Texas Local Government Code without notice, a hearing, and the approval of other lot owners.

3. Changes and Amendments to the Comprehensive Zoning Ordinance

a. The City Council may, from time to time, amend, supplement, or change by ordinance the boundaries of the districts or the regulations herein established.

b. Before taking action on any proposed amendment, supplement or change, the City Council shall submit the same to the Planning and Zoning Commission for its recommendation and report.

c. Procedures for amendments of the zoning regulations.

(1) All petitions, applications, recommendations or proposals for changes in the zoning district classification of property or for changes in the textual provision of the zoning ordinance shall be filed with the Planning and Zoning Commission.

(2) It is further provided that no application for the rezoning of any lot, lots or block of land situated in the city, shall be received or filed with the Planning and Zoning Commission of the city and no hearing had thereon, if within one year prior thereto the City Council, after consideration and hearing, has denied an application for rezoning of the same property.

(3) Recommendations. The Planning and Zoning Commission shall make a preliminary report on all proposed changes and hold a public hearing thereon before submitting its final report to the City Council.

(4) After the final report is submitted by the Planning and Zoning Commission as provided above, the City Council shall act upon said report after a public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard.

(5) Passage when protested. If the Planning and Zoning Commission has disapproved a change in zoning or if there is a protest against any change in the reclassification of the zoning district of any property, signed by the owners of twenty percent (20%) or more either of the area of the lots included in such proposed change, or of those immediately adjacent in

650

**EXHIBIT 7**
**EXHIBIT A**

the rear thereof extending two hundred feet (200') therefrom, or of those directly opposite thereto extending two hundred feet (200') from the street frontage of such opposite lots, such amendment shall not become effective except by favorable vote of three-fourths of all the members of the City Council.

I certify that this is a complete and true copy of Section XV of the Terrell Hills Code of Ordinances.

**Columbus Stutes, City Secretary**

KRISTINE K. SANCHEZ
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 06-01-2017

651

**EXHIBIT 7**
**EXHIBIT A**

# EXHIBIT B

FILED
9/28/2016 5:26:57 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Edgar Garcia

CAUSE NO. 2013-CI-00447

| | | |
|---|---|---|
| SALIM MERCHANT & ELECTRO | § | IN THE DISTRICT COURT |
| SALES AND SERVICES, INC., | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | 57th JUDICIAL DISTRICT |
| | § | |
| THE CITY OF TERRELL HILLS AND | § | |
| BILLY W. ENG AND GIN WEI ENG, | § | |
|     Defendants. | § | BEXAR COUNTY, TEXAS |

### CITY OF TERRELL HILLS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the City of Terrell Hills, Texas (hereinafter the "City"), Defendant in the above-entitled and numbered cause, and files this Reply in Support of Motion for Summary Judgment and in support thereof, would respectfully show the Court as follows:

### I. INTRODUCTION

1.    Plaintiffs', Salim Merchant and Electro Sales and Services, LLC, (referred to collectively herein as "Plaintiff") suit arose because a non-conforming commercial use which had existed on part of the property in question in this lawsuit ("the Property") was abandoned by the prior property owner and prior to Plaintiff's purchase of the Property. This part of the Property may still be used in accordance with the long-standing zoning classification of the Property, "semi-commercial". Plaintiff later asked the City to up-zone the Property to commercial use, but was denied. Instead, the City granted his requests for special use permits for the uses requested.

2.    Plaintiff did not make available appeals to the Board of Adjustment, and, instead filed suit against the City and the sellers of the Property, the Eng defendants. The causes of action against the City are for a taking and for declaratory judgment.

1

686

**EXHIBIT B**

3.    The City filed its Traditional and No-Evidence Motion for Summary Judgment on August 16, 2016, that there is no valid takings claim and the City is entitled to judgment as a matter of law because:

   a.   There is no property right to a change in zoning in this case, and there can be no taking when the City allowed the Plaintiff a special use permit for the use; as a result, Plaintiff has failed to plead a claim which would waive the City's immunity and has failed to establish standing to sue;

   b.   Alternatively, Plaintiff failed to exhaust administrative remedies available;

   c.   Alternatively, Plaintiff's claims are not ripe;

   d.   Alternatively, Plaintiff has failed to provide evidence to create a genuine issue of material fact to defeat summary judgment for the City on the grounds that the denial to up-zone the Property does not unreasonably interfere with Plaintiff's right to use and enjoy the Property and is not a regulatory taking as a matter of law;

   e.   Plaintiff's declaratory judgment action is filed only to seek attorney's fees, will not resolve ripe justiciable issues between the parties, and should be dismissed as a matter of law;

   f.   Alternatively, Plaintiff has provided no evidence of one or more of the material elements of his claims; no evidence of property right that was taken by the City, no evidence of deprivation of economically viable use of the Property or of investment backed expectations, and no evidence any action of the City was the proximate cause of damages.

4.    Plaintiff filed his Response to Defendant City of Terrell Hills' Traditional and No-Evidence Motion for Final Summary Judgment ("Plaintiff's Response") on or about September 22, 2016.  However, Plaintiff's Response fails to create a genuine issue of material fact to defeat Defendant's Motion for Summary Judgment and fails to provide any legal reason why Defendant is not entitled to judgment as a matter of law.

## II.    REPLY ARGUMENT AND AUTHORITIES

**Standard**

5.    Plaintiff has failed to include the complete standards for both the traditional and no-evidence summary judgment as raised by Defendant.  For a traditional motion, as stated in

2

687

**EXHIBIT B**

Paragraph 30 of Defendant's Motion, once the movant establishes the right to judgment as a matter of law, the burden shifts to the non-movant who must then set forth sufficient evidence to create an issue of material fact. (*Citing to Houston v. Clear Creek Basin Auth.*).

6.     For a no-evidence summary judgment, as alleged in paragraph 31 of Defendant's Motion, the movant can move for summary judgment even with no evidence on the grounds that there is no evidence of one or more essential elements of a claim or defense on which the non-movant has the burden of proof.  The burden then shifts to the non-movant to present evidence raising an issue of material fact.

**Objection to Salim Merchant Affidavit**

7.     Defendant objects to the affidavit which is attached to Plaintiffs' Response because it has no legal weight, is self-serving, contains hearsay, is conclusory, not credible and his accusations are not supported by evidence.  In particular, on page 30 of 32, Plaintiff makes statements regarding the thought processes of potential tenants which are not within his knowledge, which are not supported by the evidence, and which, are hearsay.  Plaintiff further makes self-serving statements which are not credible and unsupported by the evidence related to his activity on the premises.  His statements are not plausible given that as he admits, the City has granted him special use permits to use the space for requested uses.  (See Plaintiff's Response, page 2 of 32, par. 4).  Defendant requests these statements in the second paragraph of the affidavit be stricken.

8.     The entire page 31 of 32 is made up of improper legal conclusions by Plaintiff with no evidentiary support.  Defendant requests page 31 of 32 of the affidavit be stricken and that Plaintiff's entire affidavit be stricken from the summary judgment evidence.

3

688

**EXHIBIT B**

**Immunity**

9. All previous paragraphs are incorporated herein as if set forth in full.

10. Plaintiff has misstated the burden of proof for immunity. The plaintiff bears the burden to plead facts that affirmatively demonstrate that governmental immunity has been waived and that the court has subject-matter jurisdiction. *McMahon Contracting, L.P. v. City of Carrollton,* 277 S.W.3d 458, 464 (Tex. App.-Dallas 2009, pet. denied). In the present case, although Plaintiff purports to sue Defendant under takings law, which does contain a waiver of immunity, Plaintiff has failed to plead a valid claim under this law and therefore, has not properly invoked the Takings Clause waiver of immunity.

11. As discussed further herein and in Defendant's Motion, such discussion being included in this section as if set forth in full, as a matter of law, Plaintiff's pleading does not assert facts which establish the necessary elements of a takings claim. Plaintiff must first demonstrate a property right which has been taken. There could be no credible takings claim in Plaintiff's claim. As a matter of law, there is no property right to a zoning classification in one's property. There is no property right to reinstatement of a non-conforming use status after abandonment by a previous owner. Plaintiff's Response has not provided this Court with any case law to support the existence any such property rights and could not do so. Further, by Plaintiff's own admission at page 2 of 32 in Plaintiff's Response, the City provided Plaintiff with special use permits for the use he requested.

12. These facts do not support a takings claim and Plaintiff has failed to invoke the Takings Clause's waiver of immunity. Plaintiff lists factors related to a "viable allegation" from the *City of Dallas* case. The facts in the present case do not rise to the level contemplated in these factors. There can be no credible allegation of ouster, unreasonable restrictions, or overly burdensome

4

689

**EXHIBIT B**

standards when Plaintiff is simply subject to the zoning that existed on the Property when he bought the Property and has by his own admission been given special use permits for the uses he requested, including a barber shop use. If Plaintiff's claims constitute a taking, then landowners all over the land could claim a taking simply because they are subject to zoning classifications set by cities. There is no legal precedent for any such claim to rise to a valid takings case. Plaintiff points the Court to language in his pleading which appears to track the factors. However, he does not demonstrate factual elements to support these legal conclusions.

13.     Plaintiff's case should be dismissed as a matter of law.

**Standing**

14.     Plaintiffs incorrectly assert that a verified plea is required for the defense of standing and confuses "standing" with "capacity." Standing is not an affirmative defense but is a legal question regarding subject-matter jurisdiction. Standing cannot be conceded or waived but is a legal question regarding subject-matter jurisdiction; therefore, it is not an affirmative defense. *See Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 1993 Tex. LEXIS 22, 36 Tex. Sup. J. 607 (Tex. 1993). Because it is not an affirmative defense, a verified answer was unnecessary. In addition, Plaintiff has no standing because he was not personally aggrieved because the non-conforming use expired prior to Plaintiff's purchase of the Property. The right to sue for the injury is a personal right belonging to the person owning the property at the time of the injury. *Denman v. Citgo Pipeline Co.*, 123 S.W.3d 728, 2003 Tex. App. LEXIS 10242, 159 Oil & Gas Rep. 509 (Tex. App. Texarkana 2003) relying on *Abbott v. City of Princeton*, 721 S.W.2d 872, 875 (Tex. App.--Dallas 1986, writ ref'd n.r.e.); *Lay v. Aetna Ins. Co.,* 599 S.W.2d 684, 686 (Tex. Civ. App.--Austin 1980, writ ref'd n.r.e.). Therefore, without express provision, the right does not pass to a subsequent purchaser of the property. *Denman, supra; Abbott*, 721 S.W.2d at 875; Lay, 599

5

690

S.W.2d at 686. "A mere subsequent purchaser cannot recover for an injury committed before his or her purchase." *Denman, supra*; *Lay*, 599 S.W.2d at 686. Here, it is undisputed that Plaintiff bought the Property from the Eng Defendants after the non-conforming use expired. Therefore, Plaintiff's unsupported assertion that standing was somehow acquired when he acquired the Property fails to raise a genuine issue of material fact. As such the City is entitled to summary judgment.

**Ripeness and/or Exhaustion of Remedies**

15. In his response to the City's assertion that Plaintiff's claims are not ripe and that Plaintiff has not exhausted administrative remedies, Plaintiff asserts that his takings claim is based "the reversion from commercial to semi-commercial [which] is a wholly separate issue than [his] subsequent request for a special use permit" and that the City's final decision as to the cessation of the non-conforming use occurred when the City first implemented the zoning of the Property as commercial with a semi-commercial non-conforming clause. *See Response at page 13.* Such assertions fail to overcome the City's ripeness challenge. First, the facts are undisputed that the City's decision to zone this Property as semi-commercial with a non-conforming commercial use occurred in 1962. Second, Plaintiff is not challenging that the Property was zoned with a nonconforming use; Plaintiff is challenging the City staff decision when the cessation of the non-conforming use occurred. *See Plaintiff's Response* at page 13. Plaintiff alleges his claims arise from the cessation of the non-conforming use, or as he states in his response, his takings claim is based on when "the reversion from commercial to semi-commercial" or "when the loss of the commercial status" occurred. Plaintiff does not bring forth any evidence that he obtained a final decision in compliance with the Texas Local Government Code and the Zoning Code with regard

6

691

to the cessation of the nonconforming use for the middle suite of the Property or the decision that the barber shop was not an allowed semi-commercial use in the middle suite.

16.     In addition, Plaintiff's assertion that he obtained a final decision denying the request to upzone the Property to commercial fails to satisfy a ripeness inquiry on his takings claim.  The facts are undisputed that the City granted Plaintiff's applications for a Special Use Permit allowing additional permitted uses for the Property, including a barber shop/hair salon. There is no final decision and the City has not closed the door to continued future uses for the middle suite of the Property. *See Hamilton Bank Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 186 (1985).*  As such, the City is entitled to dismissal of Plaintiff's claims based on ripeness and Plaintiff's failure to exhaust administrative remedies related to those decisions.

**City's Actions do Substantially Advance Legitimate State Interest and Does not Unreasonably Interfere with Rights to Use and Enjoy**

17.     Plaintiff's response mischaracterizes his request for upzoning as a request to upzone only the middle suite, when in fact Exhibit 2 attached to Defendant's Motion for Summary Judgment clearly reflects that Plaintiff requested that the entire Property strip be permanently zoned commercial.  In addition, Plaintiff's reliance on a list of business he claims are allowed to operate within one mile of his strip mall fails to demonstrate that the City's zoning decision regarding the Property does not substantially advance a legitimate City interest. A bare list of business names without providing their specific location, the location relative to residential homes, the availability of parking spaces, the impact on traffic, the signage, the zoning for each, and the impact on the City's development fails to carry Plaintiff's burden to prove that the 50 year old zoning ordinance in this case is somehow arbitrary or unreasonable.  At a minimum, Plaintiff's affidavit does not even substantiate the list of business names contained in the Response.  Plaintiff does not, at a

7

692

minimum, produce evidence that the businesses he relies on are even located within the City of Terrell Hills.  In addition, Plaintiff's personal opinion that it is arbitrary or irrational for the City's zoning to allow for the middle suite not to be zoned commercial when the end suites are zoned commercial is insufficient for the Court to overturn a presumptively valid zoning ordinance.  *See City of Fort Worth, 388 S.W.2d 400, 402 (Tex. 1964).*  Nor does Plaintiff's personal opinion that having the middle suite zoned commercial demonstrate that the suite would somehow be more economically viable.  The former owner Billy Eng testified that the laundromat operated in the middle suite under the nonconforming commercial use and his business failed.  *See* Exhibit 8 attached hereto, excerpt of Billy Eng's Deposition, page 25.  "Historical uses of the property are critically important when determining the reasonable investment-backed expectations of the landowner." *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 937, 41 Tex. Sup. Ct. J. 517 (Tex. 1998).

18.     Lastly, Plaintiff's assertion that the semi-commercial status makes it impossible to lease is a completely unsupported personal opinion, especially when Plaintiff has testified that he had several potential barbershop and hair salon tenants for the middle suite for which the City provided Plaintiff special use permits.  Plaintiff's assertion of impossibility is also not shared by the former owner Billy Eng who testified that he was planning on letting the non-conforming use permit lapse. *See* Exhibit 2 – excerpts of Billy Eng's deposition attached to the City's Motion for Summary Judgment. Furthermore,

**Attorney Fees**

19.     Plaintiff incorrectly asserts that he is entitled to attorney's fees in this takings suit. Attorney's fees are not recoverable unless authorized by statute or by contract. *See New*

8

**EXHIBIT B**

*Amsterdam Casualty Co. v. Texas Indus. Inc.,* 414 S.W.2d 914, 915, 10 Tex. Sup. Ct. J. 357 (Tex. 1967). Texas law provides no statutory authority for awarding attorney's fees in inverse condemnation claims arising under Article I, section 17 of the Texas Constitution. *See State v. Biggar*, 848 S.W.2d 291, 298 (Tex. App.--Austin 1993), aff'd, 873 S.W.2d 11 (Tex. 1994).

**WHEREFORE, PREMISES CONSIDERED**, Defendant City of Terrell Hills prays this Court grant its Motion for Summary Judgment and dismiss all claims against it, that Plaintiffs, Salim Merchant and Electro Sales and Services, Inc. take nothing by their suit against the City, and that the City have and recover such other relief, both general and specific, at law or in equity, to which the City may be justly entitled.

Respectfully submitted,

**MCKAMIE KRUEGER, LLP**
941 Proton Road
San Antonio, Texas 78258
(210) 546-2122
(210) 546-2130 Fax

/s/: Barbara L. Quirk
WILLIAM M. McKAMIE
State Bar No. 13686800
mick@mckamiekrueger.com

BARBARA L. QUIRK
State Bar No. 16436750
barbara@mckamiekrueger.com

ADOLFO RUIZ
State Bar No. 17385600
adolfo@mckamiekrueger.com

SUE ANN GREGORY
State Bar No. 00795392
sue@mckamiekrueger.com

**ATTORNEYS FOR DEFENDANT CITY OF TERRELL HILLS**

9

694

**EXHIBIT B**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of *City of Terrell Hills' Reply to Plaintiff's Response to Motion for Summary Judgment* was served according to the Texas Rules of Civil Procedure on all counsel of record in the manner specified below on September 28, 2016 as follows:

Carlo Garcia
OLIVA, SAKS, GARCIA AND CURIEL, LLP
14255 Blanco Road
San Antonio, Texas 78216
Fax: 210.308.6939
cglaw@osglaw.com

Via E-Serve and e-mail

Jay Moritz
THE LAW OFFICES OF JAY MORITZ
2600 SW Military Drive, Suite 118
San Antonio, Texas 78224
Fax: 210.928.9118
JayLaw5@aol.com

Via E-Serve and e-mail

/s/: Barbara L. Quirk
Barbara L. Quirk

10

695

**EXHIBIT B**

the expiration on the written contract or written lease that you had?

A I allowed him to break the lease.

Q Okay. So let me ask the question again. Okay. Is it -- and I believe I understand the answer, based on your -- you know, your recent answer. If you can listen to this particular question. Is it safe to assume that he left his lease early that was set forth in the lease agreement?

A Yes.

Q Okay. You allowed him to leave?

A Yes.

Q And you allowed him to leave for what reason or reasons?

A His business was failing.

Q Okay. And he had acquired that -- he had acquired that particular business from what particular tenant that you had leased to before?

A Just a previous owner. I don't remember the name.

Q Okay. How was that -- did he -- did the prior tenant fulfill their lease term?

A Yes.

Q Okay. So did this particular tenant, Hometown Cleaners, were they introduced to you by the prior tenant?

A That's correct.

Q Okay. And they acquired the business?

A Yes.

Q Did they pay any type of money to the prior

Q Okay. So on the -- going back to the Laundromat. You

allowed him to terminate the lease. Is there a written document that reflects that you allowed him to terminate that lease or was it a verbal agreement?

A It was a verbal agreement at the time.

Q Okay. And what was the reason that you allowed him to terminate the lease, other than the reason that you gave, which was his business was failing?

A That's all I have.

Q Okay. And did you ever -- I presume that you never pursued any legal action if it was an agreement that he could terminate?

A No.

Q So that was the first time, I presume, since your parents bought that space that that particular location had become vacant for any period of time. Would that be a fair statement?

A Yes.

Q In fact, it had never been vacant, it sounds like -- would that be an accurate statement? -- up until the time that Hometown Cleaners vacated?

A Correct.

Q What was the designation of that middle space, if you know? And we're going back in time -- at the time that Hometown Cleaners vacated that property, do you know what that space was designated for zoning purposes?

A Yes.

Q What was it?

A Semicommercial.

Q It was semicommercial on that particular -- that particular day?

A Yes.

Q Prior to them vacating?

A Yes.

Q Do you know what date that that property became designated as semicommercial?

A Back in the 1960s.

Q Okay. And how do you know that?

A I researched it because we were trying to find out if we could do any kind of change of business at that point.

Q So at the time -- at the time back in the '60s were you involved with the management of that particular space?

A No.

Q Okay. When -- when you say you did research, when did you do research?

A After my mother passed.

Q Okay. So when did -- when did you learn, you specifically learn that that property was semicommercial, 2115?

A When we took over the property from my mother.

Q Okay. So that's the first time that you learned that 2115 was semicommercial?

696

Electronically signed by darlene zuehl (101-167-628-1166)
Electronically signed by darlene zuehl (101-167-628-1166)

EXHIBIT 8
EXHIBIT B
542cc23b-f1f3-430c-92aa-7b88e3f8d262

# EXHIBIT C

significant role in the new computer generated Pre-Plans for the department, and continued his duties with his shift.

## PUBLIC HEARING ON THE REQUEST FROM MR. SALIM MERCHANT FOR THE REZONING OF THE PROPERTY LOCATED AT 2115 HARRY WURZBACH ROAD FROM SEMI-COMMERCIAL TO COMMERCIAL ZONING

Mayor Camp opened the public hearing at 5:05 pm on Mr. Merchant's request. The City Manager explained that this request had been submitted to the Planning and Zoning Commission and the recommendation of the commission was against the request for re-zoning. The property in question is located between the Fort Sam Grocery and Ebbtide Lounge.

Mr. Merchant addressed Council explaining that when he purchased the property he thought the entire strip was commercial and that without the re-zoning he cannot lease the property as he had intended and in addition this will decrease the property value. Mr. Merchant said that he has a similar property on Eisenhauer which is all commercial. There is a sports bar, convenience store as well as his office located there and he has encountered no problems with the neighbors during the past ten years.

Mr. Flagg spoke to Council saying that there was a reason the properties had been re-zoned. The Laundromat that was located there previously has been closed for more than six months and therefore is zoned semi-commercial and it should be kept this way. He said he agreed with the recommendation of the P&Z Commission.

Mrs. Ryan said that her concern is that once the property is zoned commercial there will be no way of controlling what type of business opens there. She said she believed Mr. Merchant's intentions were good but that does not mean if he sells the property the new owner's would be. She explained that their property backs directly up to that one and they have had problems over the years with disturbances from the "drunks and derelicts" that hang out in the parking lot. Mr. Ryan agreed stating that at one time it was such a problem they requested and received a variance to put in a higher fence.

Councilmember Ochse verified with the City Manager that all of those properties are zoned semi-commercial; the store and bar are grandfathered in because they were in existence prior to the re-zoning. The City Manager confirmed this saying they are not zoned commercial. Councilmember Ochse asked what types of businesses were allowed in commercial zoned properties and the City Manager said the descriptions were very broad ranging from retail stores, restaurants, and bakeries to service businesses, car dealerships, and daycares.

Mr. Merchant again told Council that he owned and operated a similar strip center on Eisenhauer and has never brought in a tenant that would go against the neighborhoods wishes. He said the calls he has received regarding the property in question have been for a restaurant, a Cricket store, and a retail store.

There being no further comments or discussion Mayor Camp closed the public hearing at 5:15 pm.

3

621

**EXHIBIT 3**

**EXHIBIT C**

## DISCUSSION/ACTION ON THE REQUEST FROM MR. SALIM MERCHANT FOR THE REZONING OF THE PROPERTY LOCATED AT 2115 HARRY WURZBACH ROAD FROM SEMI-COMMERCIAL TO COMMERCIAL ZONING

The City Attorney said it would take a majority vote from Council to grant Mr. Merchant's request; four out of five. Councilmember Ochse stated that the problem here is that this is a transition area and there are immediate neighbors that are directly affected by whatever business could possibly open at this location. He then verified with the City Manager that Mr. Merchant could make the same request one year from now, and the City Manager confirmed. Mr. Merchant stated that he could also go to court and the City Manager and City Attorney confirmed. Councilmember Ochse made the motion, which was seconded by Councilmember Parish, to deny Mr. Merchant's request for re-zoning. All voted in favor and the motion passed.

## DISCUSSION/ ACTION APPROVING THE SPECIFICATIONS FOR THE 2011 BOND ROAD PROJECTS AND AUTHORIZING THE BID PROCESS

Mr. Kelley said the project is coming along on schedule and the plans have been submitted for review. The letting portion of the project is underway. The advertisement to solicit bids will be in the Sunday edition of the Express News for the next two weeks; opening date for the bids is September 1st and there will be a recommendation to Council on September 12th. September 26th is the estimated start date for construction. Mr. Kelley said that the construction cost estimates are down for the original submittal to $4.178M.

Mr. Colquhoun explained to Council the process that will be used in scoring the sealed proposals and distributed a handout detailing the criteria that will be used. He said that once submitted the proposals will be reviewed by the committee and a selection made. Councilmember Ochse commented that this will allow the City to avoid the issues we are experiencing with the Garraty Road project. Mr. Colquhoun said that the project will be broken up as follows: Newbury Terrace- one phase, Garraty Road-two phases, and Terrell Road- three phases. He went on to explain the liquidated damages saying these are not a "penalty" but rather "administrative costs" that would be passed on to the contractor if the project goes over; in the amount of $1,000 per day.

Mayor Camp asked if this meant the project would be completely done on schedule and Mr. Colquhoun said there is "substantially complete" and "final completion". Each will have specific dates and will carry the same recovery cost amount. Councilmember Parish made the motion to approve the specifications for the 2011 bond road projects and to authorize the bid process. Councilmember Ballantyne seconded, all voted in favor, and the motion passed.

## DISCUSSION/ACTION AUTHORIZING THE DISPOSAL OF SURPLUS EQUIPMENT

The City Manager said that after moving out of City Hall there are several items no longer utilized. The City would like to take sealed bids on those to dispose of them; the list includes two cubicle work stations, five window a/c units, and four Dell laptops from the Police Department. In addition to these items staff would also like to take the oldest brush truck and tractor to public auction. Upon motion from Councilmember Ochse and second by Mayor Pro tem Brady council unanimously approved the disposal of surplus equipment.

4

622

**EXHIBIT 3**

**EXHIBIT C**

# EXHIBIT C-2

# EXHIBIT D

# EXHIBIT D-2

# EXHIBIT E

# EXHIBIT E-2

## CITIZEN COMMENTS

There were no citizen comments.

## PUBLIC HEARING ON THE REQUEST FROM MR. SALIM MERCHANT FOR THE REZONING OF THE PROPERTY LOCATED AT 2115 HARRY WURZBACH ROAD FROM SEMI-COMMERCIAL TO COMMERCIAL ZONING

Mayor Camp opened the Public Hearing at 4:03 pm. The City Manager explained that Mr. Merchant had come before council a little over a year ago with this request and it was denied. He reminded Council that this is the property that had formerly been a Laundromat and was closed before Mr. Merchant purchased the property and had reverted to semi-commercial. The Planning and Zoning Commission has heard the requests and is recommending that Council deny the request.

Mayor Camp asked Mr. Merchant if he would like to speak and Mr. Merchant said he would appreciate the opportunity to lease the property to a tenant that plans to open a barber shop. Mayor Camp closed the Public Hearing at 4:06 pm.

## DISCUSSION/ACTION ON THE REQUEST FROM MR. SALIM MERCHANT FOR THE REZONING OF THE PROPERTY LOCATED AT 2115 HARRY WURZBACH ROAD FROM SEMI-COMMERCIAL TO COMMERCIAL ZONING

The City Attorney told Council that if they vote to rezone the property it can be used for any business listed as commercial under our ordinance. He said the P&Z had asked if the City could restrict the use; our ordinance does not cover Special Use Permits, if it did the Council could grant the SUP and restrict the use to a barber shop. Mr. Garza went on to say that the only options are deny the request, approve the request, or change the ordinance to allow for the issuance of SUPs.

Mayor Camp asked if this request was for the entire parcel that Mr. Merchant owns and the City Attorney confirmed. Councilmember Ballantyne asked if we could amend the ordinance at a later time to include the SUP and Mr. Garza said that would be possible; the City Manager said that would require a recommendation from the P&Z. It was the consensus of Council to schedule a meeting of the P&Z to discuss amending the ordinance to allow for the issuance of Special Use Permits. There was not motion to approve the request from Mr. Salim Merchant for the rezoning of the property located at 2115 Harry Wurzbach road from semi-commercial to commercial zoning; the request was denied.

## DISCUSSION/ ACTION TO AUTHORIZE THE CITY MANAGER TO ENTER INTO AN INTER-LOCAL COOPERATION CONTRACT WITH THE DEPARTMENT OF PUBLIC SAFETY TO CONTINUE PARTICIPATION IN THE FAILURE TO APPEAR PROGRAM

3

628

EXHIBIT 3

EXHIBIT C-2

# EXHIBIT D

## ORDINANCE NO. 1349

AN ORDINANCE AMENDING ORDINANCE NO. Ord. 929, 1-15-96, THE COMPREHENSIVE ZONING ORDINANCE OF THE CITY OF TERRELL HILLS FOR THE PURPOSE OF ESTABLISHING A SPECIAL USE PERMIT FOR THE PORTION OF CB 5848A BLK 11 LOT E IRRG 122.10 FT OF 11, BEXAR COUNTY, TEXAS WHICH IS ZONED B SEMI-COMMERCIAL. COMMONLY REFERRED TO AS 2115 HARRY WURZBACH, TERRELL HILLS, TEXAS 78209; AND SETTING AN EFFECTIVE DATE.

WHEREAS, notice of public hearings before the Planning and Zoning Commission and City Council were published in a newspaper of general circulation; and

WHEREAS, notice of public hearings before the Planning and Zoning Commission and City Council was sent to property owners within 200 feet of the proposed special use permit via United States Mail; and

WHEREAS, the Planning and Zoning Commission has held a public hearing and considered the special use permit classification and stipulations for the properties hereafter described and made its recommendations to the City Council of the City of Terrell Hills on February 5, 2013; and

WHEREAS, the City Council has held a public hearing and considered the special use permit classification and stipulations for the properties hereafter described on March 11, 2013; and

WHEREAS, the City Council and Planning and Zoning Commission has duly considered the requirements and safeguards for a special use permit; and

WHEREAS, the City Council deems that a special use permit is appropriate for the property with additional stipulations;

NOW, THERFORE BE IT RESOLVED AND ORDERED BY THE CITY COUNCIL OF THE CITY OF TERRELL HILLS, THAT:

Section 1.    Ordinance No. Ord. 929, 1-15-96, the Comprehensive Zoning Ordinance of the City of Terrell Hills, Texas is hereby amended for the purpose of establishing a special use permit for the following property accordingly:

   a.   For the portion of CB 5848A BLK 11 LOT E IRRG 122.10 FT OF 11, Bexar County, Texas which is zoned B Semi-Commercial. Commonly referred to as 2115 Harry Wurzbach, Terrell Hills, Texas 78209. (hereafter "Property")

   b.   The Property retains its original zoning classification of B Semi-Commercial but Council establishes a special use permit for the property described in Section 1 a.

Section 2.    The special use permit shall have attached to it the following stipulations that shall run with the land:

   a.   The sole permitted use of the Property shall be a hair and nail salon which shall have only the following permitted uses: manicures, pedicures, hair cutting, hair styling, hair coloring, and waxing (collectively, the "Permitted Uses");

   b.   The Property, including without limitation, the parking lot and alley, must be maintained in a manner reflective of other first class shopping centers in the area.

   c.   Sale of products at the Property shall be limited to shampoo, hair and nail care products, or as otherwise permitted and approved by the City Council;

   d.   No parking shall be permitted behind the building located on the Property;

   e.   No operation of any business at the Property may occur between midnight and 6 a.m.;

636

EXHIBIT 3

EXHIBIT D

f. The Special Use Permit zoning classification will expire six (6) months after the Property is no longer used for at least one (1) of the Permitted Uses; and

g. The City Council must consider and at their discretion approve a site plan for the Property which shall include proposed parking and signage, which may not be changed except as approved by the City Council.

h. The Property's site plan must include twelve foot (12') high angled lights in the rear of the building on the Property, for the illumination of the rear of the Property, which illumination may not extend to any adjacent lots, the form of the lights, to be approved by the City Council.

**Section 3.**     The City Council has determined that the proposed use will be harmonious with existing buildings, structures and uses on abutting and nearby properties in the vicinity of the property in accordance with the current zoning regulations of the City. The Council has reviewed the project with the required stipulations regarding permitted uses, maintenance, sale of products, parking, operation ours, expiration, and sight plan requirements. The granting of the special use permit is conditioned on the applicant agreeing to accept and agree to be bound by the terms of the conditions set by the Council.

**Section 4. Effective Date.** This ordinance shall take effect immediately upon its adoption by the City Council.

**Section 5.  Severability.**  If any section, subsection, sentence, clause or phrase of this ordinance is for any reason held to be unconstitutional or illegal, such decision shall not effect the validity of the remaining sections of this ordinance. The City Council hereby declares that it would have passed this ordinance, and each section, subsection, clause, or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses or phrases be declared void.

**PASSED, APPROVED AND ADOPTED THIS 13ᵗʰ DAY OF MAY, 2013.**

APPROVED:

J. Brad Camp, Mayor

ATTEST:

**Columbus Stutes, City Secretary**

637

2

EXHIBIT 3

**EXHIBIT D**

AN ORDINANCE AMENDING ORDINANCE NO. Ord. 929, 1-15-96, THE COMPREHENSIVE ZONING ORDINANCE OF THE CITY OF TERRELL HILLS FOR THE PURPOSE OF ESTABLISHING A SPECIAL USE PERMIT FOR THE PORTION OF CB 5848A BLK 11 LOT E IRRG 122.10 FT OF 11, BEXAR COUNTY, TEXAS WHICH IS ZONED B SEMI-COMMERCIAL. COMMONLY REFERRED TO AS 2113 HARRY WURZBACH, TERRELL HILLS, TEXAS 78209; AND SETTING AN EFFECTIVE DATE.

WHEREAS, notice of public hearings before the Planning and Zoning Commission and City Council were published in a newspaper of general circulation; and

WHEREAS, notice of public hearings before the Planning and Zoning Commission and City Council was sent to property owners within 200 feet of the proposed special use permit via United States Mail; and

WHEREAS, the Planning and Zoning Commission has held a public hearing and considered the special use permit classification and stipulations for the properties hereafter described and made its recommendations to the City Council of the City of Terrell Hills on March 16, 2015; and

WHEREAS, the City Council has held a public hearing and considered the special use permit classification and stipulations for the properties hereafter described on April 13, 2015; and

WHEREAS, the City Council and Planning and Zoning Commission has duly considered the requirements and safeguards for a special use permit; and

WHEREAS, the City Council deems that a special use permit is appropriate for the property with additional stipulations;

NOW, THERFORE BE IT RESOLVED AND ORDERED BY THE CITY COUNCIL OF THE CITY OF TERRELL HILLS, THAT:

Section 1.    Ordinance No. Ord. 929, 1-15-96, the Comprehensive Zoning Ordinance of the City of Terrell Hills, Texas is hereby amended for the purpose of establishing a special use permit for the following property accordingly:

   a.  For the portion of CB 5848A BLK 11 LOT E IRRG 122.10 FT OF 11, Bexar County, Texas which is zoned B Semi-Commercial. Commonly referred to as 2113 Harry Wurzbach, Terrell Hills, Texas 78209. (hereafter "Property")

   b.  The Property retains its original zoning classification of B Semi-Commercial but Council establishes a special use permit for the property described in Section 1 a.

Section 2.    The special use permit shall have attached to it the following stipulations that shall run with the land:

   a.  The sole permitted use of the Property shall be a hair and nail salon which shall have only the following permitted uses: manicures, pedicures, hair cutting, hair styling, hair coloring, and waxing (collectively, the "Permitted Uses");

   b.  The Property, including without limitation, the parking lot and alley, must be maintained in a manner reflective of other first class shopping centers in the area.

   c.  Sale of products at the Property shall be limited to shampoo, hair and nail care products, or as otherwise permitted and approved by the City Council;

   d.  No parking shall be permitted behind the building located on the Property;

   e.  No operation of any business at the Property may occur between midnight and 6 a.m.;

638

EXHIBIT 3

EXHIBIT D

f. The Special Use Permit zoning classification will expire six (6) months after the Property is no longer used for at least one (1) of the Permitted Uses; and

g. The City Council must consider and at their discretion approve a site plan for the Property which shall include proposed parking and signage, which may not be changed except as approved by the City Council.

h. The Property's site plan must include twelve foot (12') high angled lights in the rear of the building on the Property, for the illumination of the rear of the Property, which illumination may not extend to any adjacent lots, the form of the lights, to be approved by the City Council.

Section 3.    The City Council has determined that the proposed use will be harmonious with existing buildings, structures and uses on abutting and nearby properties in the vicinity of the property in accordance with the current zoning regulations of the City. The Council has reviewed the project with the required stipulations regarding permitted uses, maintenance, sale of products, parking, operation ours, expiration, and sight plan requirements. The granting of the special use permit is conditioned on the applicant agreeing to accept and agree to be bound by the terms of the conditions set by the Council.

Section 4. Effective Date. This ordinance shall take effect immediately upon its adoption by the City Council.

Section 5. Severability. If any section, subsection, sentence, clause or phrase of this ordinance is for any reason held to be unconstitutional or illegal, such decision shall not effect the validity of the remaining sections of this ordinance. The City Council hereby declares that it would have passed this ordinance, and each section, subsection, clause, or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses or phrases be declared void.

PASSED, APPROVED AND ADOPTED THIS 13ᵗʰ DAY OF APRIL, 2015.

APPROVED:

Anne Ballantyne, Mayor

ATTEST:

Columbus Stutes, City Secretary

639

EXHIBIT 3

EXHIBIT D

# EXHIBIT D-2

B. All such applications for building permits shall further be accompanied by a complete set of written plans and specifications covering the proposed construction. Such plans and specifications shall be deemed insufficient unless they bear the seal of either a registered professional engineer or an architect licensed under the laws of the State of Texas. All foundation plans shall be deemed insufficient unless they bear the seal of a registered professional engineer licensed under the laws of the State of Texas. Such set of plans shall be retained by the Building Inspector until a Certificate of Occupancy and Compliance has been issued.

## SECTION XIV:  CERTIFICATE OF OCCUPANCY AND COMPLIANCE

A. No building hereafter erected or structurally altered shall be used, occupied or changed in use until a certificate of occupancy and compliance shall have been issued by the Building Inspector, stating that the building or proposed use of a building or premises complies with the building laws and the provisions of these regulations.

B. Certificates of occupancy and compliance shall be applied for coincident with the application for a building permit and shall be issued within ten days after the erection or structural alteration of such buildings shall have been completed in conformity with the building laws and these regulations. A record of all certificates shall be kept on file in the office of the Building Inspector.

## SECTION XV:   BOARD OF ADJUSTMENT AND PLANNING AND ZONING COMMISSION

A. Board of Adjustment

1. Organization and Operation of the Board.

a.  The Board shall consist of five members and three alternates appointed as required by Section 10 of Article VIII of the City Charter.  At the first meeting of the Board following publication of an ordinance appointing members, the Board shall select a Chair and Deputy Chair from its members.

b. A quorum shall consist of four members/alternates.  No more than five members/alternates may vote on any issue before the board; the voting alternate(s), if any, shall be designated by the Chair at the start of the meeting.

c.  Meetings of the Board shall be held at the call of the Chair.  Such Chair, or in his absence the Deputy Chair, may administer oaths and compel the attendance of witnesses.  All meetings of the Board shall be open to the public.

d.  The Board shall keep minutes of its proceedings, showing the vote of each member upon

ZONING-3.DOC.WPD 12-10-12

**EXHIBIT 7**
**EXHIBIT D-2**

each question, or, if absent or failing to vote, indicating such fact, and shall keep records of its examinations and other official actions, all of which shall be immediately filed in the office of the City Secretary and shall be a public record.

e.   A member/alternate shall not vote or participate as a member in any matter before the Board if the member has any interest in this matter, whether such interest is direct or indirect, financial or otherwise.  In any case, where the question of a member's interest is raised, the Chair shall rule on whether the member should be disqualified.

f.  Notice - Public notice of hearing before the Board of Adjustment shall be given for each separate appeal thereto by publication two times in a newspaper of general circulation in the City of Terrell Hills, stating the time and place of such hearing, which shall not be earlier than ten (10) days from the first date of such publication, and in addition thereto the Board of Adjustment shall mail notices of such hearings to the petitioner and to the owners of property lying within two hundred feet (200') of any point of the lot or portion thereof on which such variation is desired, and to all other persons deemed by the Board of Adjustment to be affected thereby. Such owners and persons shall be determined according to the current tax rolls of the City. The published notice and the mailed notice may contain notice of a hearing on more than one matter.  Substantial compliance with the provisions of this section shall be deemed sufficient, and the depositing of such written notice in the mail by the Board of Adjustment shall be deemed in compliance with the provisions for mailed notices.

g.  A fee of one-hundred dollars ($100.00) to cover the administrative costs of such hearing will be filed with the request for hearing.

2.  The Board of Adjustment shall have the following powers:

a.  To authorize upon appeals in specific cases such variance from the terms of this ordinance as will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the provisions of this ordinance will result in unnecessary hardships, and so that the spirit of this ordinance shall be observed and substantial justice done.

b.  To hear and decide appeals where it is alleged there is an error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this ordinance.  In exercising this authority, the Board may reverse or affirm, in whole or in part, or modify the administrative official's order, requirement, decision or determination from which an appeal is taken and make the correct order, requirement, decision, or determination, and for this purpose the board has the same authority as the administrative official.

(1). Appeals to the Board of Adjustment may be taken by any person aggrieved or by any officer, department, board or bureau of the municipality affected by any decision of the administrative officer.  Such appeal shall be taken with ten (10) days from the date of any

**EXHIBIT 7**
**EXHIBIT D-2**

such ruling, by filing with the officer from whom the appeal is taken and with the Board of Adjustment a notice of appeal specifying the grounds thereof. The officer from whom the appeal is taken shall forthwith transmit to the Board all papers constituting the record upon which the action appealed from was taken.

(2). An appeal stays all proceedings in furtherance of the action appealed from unless the officer from whom the appeal is taken certifies to the Board after notice of appeal shall have been filed that by reason of facts stated in the certificate a stay would, in his opinion, cause eminent peril to life or property. In such case proceedings shall not be stayed otherwise than by a restraining order which may be granted by the Board of Adjustment or by a court of record on application on notice to the officer from whom the appeal is taken and on due cause shown.

(3). The Board of Adjustment shall fix a reasonable time for the hearing of the appeal and give notice thereof, as hereinafter set forth, and upon the hearing any party may appear in person or by agent or by attorney.

3. The concurring vote of four members/alternates of the board is necessary to:

    a. Authorize a variation from the terms of this ordinance; or

    b. Reverse an order, requirement, decision, or determination of an administrative official.

B. Planning and Zoning Commission

1. Organization and Operation of the Commission.

    a. The Commission shall consist of seven members and three alternates appointed as required by Section 9 of Article VIII of the City Charter. At the first meeting of the Commission following publication of an ordinance appointing members, the Board shall select a Chair and Deputy Chair from its members.

    b. A quorum shall consist of four members/alternates of the commission. No final action shall be taken on any matter except pursuant to a majority vote of the members present; however, in no case shall less than four votes constitute a majority, and this requirement shall govern requests for rehearings in zoning cases.

    c. Meetings shall be called by the Chair, provided that written notice thereof is mailed or given to each member at least forty-eight (48) hours prior to the time thereof. No approval or disapproval of any zoning application shall be given except at a regular meeting. All meetings of the Commission shall be held at the City Hall.

**EXHIBIT 7**
**EXHIBIT D-2**

# EXHIBIT E



**User Name:** BARBARA QUIRK

**Date and Time:** Monday, September 25, 2017 4:01:00 PM CDT

**Job Number:** 53929426

## Document (1)

1. *Sheffield Dev. Co. v. City of Glenn Heights, 140 S.W.3d 660*

    **Client/Matter:** -None-

    **Search Terms:** Sheffield Dev. Co. v. City of Glenn Heights, 140 S.W.3d 660

    **Search Type:** Natural Language

    **Narrowed by:**

    | Content Type | Narrowed by |
    |---|---|
    | Cases | -None- |

**EXHIBIT E**

# *Sheffield Dev. Co. v. City of Glenn Heights*

Supreme Court of Texas

October 30, 2002, Argued ; March 5, 2004, Delivered

NO. 02-0033

**Reporter**

140 S.W.3d 660 *; 2004 Tex. LEXIS 195 **; 47 Tex. Sup. J. 327

SHEFFIELD DEVELOPMENT COMPANY, INC., PETITIONER, v. CITY OF GLENN HEIGHTS, TEXAS, RESPONDENT

**Subsequent History:** Rehearing denied by *Sheffield Dev. Co. v. City of Glenn Heights, 2004 Tex. LEXIS 765 (Tex., Sept. 3, 2004)*

**Prior History:** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE TENTH DISTRICT OF TEXAS

*City of Glenn Heights v. Sheffield Dev. Co., 61 S.W.3d 634, 2001 Tex. App. LEXIS 7212, 45 Tex. Sup. Ct. J. 984 (Tex. App. Waco, 2001)*

**Disposition:** Court reversed in part and affirmed in part the court of appeals' judgment, rendered judgment in part, and remanded the case in part to the trial court.

## Core Terms

rezoning, City's, moratorium, zoning, regulation, court of appeals, damages, argues, city council, trial court, plat, expectations, acre, landowner, economic impact, vested, compensable taking, recommended, deprived, substantially advance, investment-backed, advancement, plans, ripe, declaratory, downzoning, interfered, purposes, factors, issues

## Case Summary

### Procedural Posture

Appellant developer sued appellee city in the district court for two inverse condemnation claims and a declaratory judgment. The district court found for the developer on one of the inverse condemnation claims. The Court of Appeals for the Tenth District of Texas found that the developer was entitled to recover on both takings claims, affirmed the damages award, found the declaratory relief claim was ripe, and remanded. The parties appealed.

### Overview

After a moratorium on development, the city rezoned undeveloped property owned by the developer, reducing the number of residences that could be built on the property. The developer contended that the moratorium and the rezoning each constituted a taking of its property without adequate compensation in violation of *Tex. Const. art. I, § 17*. The developer separately requested a declaration that its development rights became vested when it submitted an application during an earlier hiatus in the moratorium. The Supreme Court of Texas found that, on balance, the city's rezoning substantially advanced legitimate government interests, and was not a taking. Further, the court could not say that the moratorium did not substantially advance a legitimate governmental purpose. Nor could the

BARBARA QUIRK

**EXHIBIT E**

court say that the moratorium went too far towards a taking. Therefore, there was not a compensable taking of the developer's property by the moratorium. However, the developer's vested rights claim was ripe for determination, as there was nothing to prevent the trial court from ruling on the merits of the claim.

**Outcome**

The judgment of the appellate court was reversed on the takings claims and judgment was rendered that the developer take nothing against the city. The judgment of appellate court remanding the developer's claim for a declaration that its development rights were vested was affirmed, and the case was remanded to the trial court to determine whether the developer fixed its rights by submitting a plat during a hiatus in the moratorium.

## LexisNexis® Headnotes

Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings

*HN1*[ ] **Fundamental Rights, Eminent Domain & Takings**

See *Tex. Const. art. I, § 17*.

Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings

Environmental Law > Land Use & Zoning > Eminent Domain Proceedings

Constitutional Law > Bill of Rights > State Application

*HN2*[ ] **Fundamental Rights, Eminent Domain & Takings**

The *Takings Clause of the Fifth Amendment to the United States Constitution* is made applicable to the states through the Fourteenth Amendment.

Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings

*HN3*[ ] **Fundamental Rights, Eminent Domain & Takings**

The Texas Constitution provides that no person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made. *Tex. Const. art. I, § 17*.

Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings

*HN4*[ ] **Fundamental Rights, Eminent Domain & Takings**

The Takings Clause of the Fifth Amendment states that nor shall private property be taken for public use without just compensation. *U.S. Const. amend. V.*

BARBARA QUIRK

**EXHIBIT E**

Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings

Real Property Law > Inverse Condemnation > Constitutional Issues

Civil Procedure > Special Proceedings > Eminent Domain Proceedings > General Overview

Environmental Law > Land Use & Zoning > Eminent Domain Proceedings

Real Property Law > Inverse Condemnation > General Overview

Real Property Law > Inverse Condemnation > Regulatory Takings

*HN5*[⤓] **Fundamental Rights, Eminent Domain & Takings**

By their plain terms, the takings provisions of the state and federal constitutions do not limit the government's power to take private property for public use but instead require that a taking be compensated. Physical possession is, categorically, a taking for which compensation is constitutionally mandated, but a restriction in the permissible uses of property or a diminution in its value, resulting from regulatory action within the government's police power, may or may not be a compensable taking. All property is held subject to the valid exercise of the police power and thus not every regulation is a compensable taking, although some are. There is no one test and no single sentence rule. The need to adjust the conflicts between private ownership of property and the public's interests is a very old one which has produced no single solution.

Real Property Law > Inverse Condemnation > Constitutional Issues

Real Property Law > Eminent Domain Proceedings > General Overview

*HN6*[⤓] **Inverse Condemnation, Constitutional Issues**

The general rule, at least, is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking, this is a question of degree -- and therefore cannot be disposed of by general propositions. The question at bottom is upon whom the loss of the changes desired should fall.

Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings

*HN7*[⤓] **Fundamental Rights, Eminent Domain & Takings**

The United States Supreme Court acknowledges that determining how far is too far in a takings claim has proved to be a problem of considerable difficulty. While the Supreme Court recognizes that the Fifth Amendment's guarantee is designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole, the Supreme Court, quite simply, has been unable to develop any set formula for determining when justice and fairness require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. Indeed, whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely upon the particular circumstances in that case.

BARBARA QUIRK

**EXHIBIT E**

Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings

Real Property Law > Inverse Condemnation > Constitutional Issues

Real Property Law > Eminent Domain Proceedings > General Overview

Real Property Law > Inverse Condemnation > General Overview

Real Property Law > Inverse Condemnation > Regulatory Takings

*HN8*[⬇] **Fundamental Rights, Eminent Domain & Takings**

The United States Supreme Court has identified at least two discrete categories of regulatory action as compensable without case-specific inquiry in a takings claim. One is where regulation compels a property owner to suffer a physical invasion of his property. The direct, physical effect on property, though short of government possession, makes the regulation categorically a taking. Another is where regulation denies all economically beneficial or productive use of land. To deprive an owner of all economically beneficial use of land is tantamount to depriving him of the land itself. But this is limited to the extraordinary circumstance when no productive or economically beneficial use of land is permitted and the landowner is left with a token interest. In addition to these two situations, the Supreme Court has stated that regulation effects a taking if it does not substantially advance legitimate state interests. Otherwise, however, whether regulation has gone too far and become too much like a physical taking for which the constitution requires compensation requires a careful analysis of how the regulation affects the balance between the public's interest and that of private landowners.

Real Property Law > Eminent Domain Proceedings > General Overview

Real Property Law > Inverse Condemnation > Regulatory Takings

*HN9*[⬇] **Real Property Law, Eminent Domain Proceedings**

In engaging in the essentially ad hoc, factual inquiries in takings by regulation cases, the United States Supreme Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action. A taking may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

Real Property Law > Eminent Domain Proceedings > General Overview

*HN10*[⬇] **Real Property Law, Eminent Domain Proceedings**

The factors to consider in a taking by regulation case are as follows: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. Nevertheless, the United States Supreme Court has cautioned that

BARBARA QUIRK

**EXHIBIT E**

these factors do not comprise a formulaic test. Case law does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required. The temptation to adopt what amount to per se rules in either direction must be resisted. Thus, for example, the economic impact of a regulation may indicate a taking even if the landowner has not been deprived of all economically beneficial use of his property. Nor are the three factors the only ones relevant in determining whether the burden of regulation ought in all fairness and justice to be borne by the public.

Real Property Law > Eminent Domain Proceedings > General Overview

*HN11*[↓]  **Real Property Law, Eminent Domain Proceedings**

Whether a regulatory taking has occurred, depends on a complex of factors. The analysis necessarily requires a weighing of private and public interests and a careful examination and weighing of all the relevant circumstances in this context. Courts consider all of the surrounding circumstances in applying a fact-sensitive test of reasonableness.

Business & Corporate Compliance > ... > Real Property Law > Zoning > Constitutional Limits

Environmental Law > Land Use & Zoning > Constitutional Limits

Real Property Law > Inverse Condemnation > Constitutional Issues

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > General Overview

Constitutional Law > Substantive Due Process > Scope

Real Property Law > Eminent Domain Proceedings > General Overview

*HN12*[↓]  **Zoning, Constitutional Limits**

While determining whether a property regulation is unconstitutional requires the consideration of a number of factual issues, the ultimate question of whether a zoning ordinance constitutes a compensable taking or violates due process or equal protection is a question of law, not a question of fact. In resolving this legal issue, courts consider all of the surrounding circumstances.

Civil Procedure > Special Proceedings > Eminent Domain Proceedings > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

*HN13*[↓]  **Special Proceedings, Eminent Domain Proceedings**

While appellate courts depend on the district court to resolve disputed facts regarding the extent of the governmental intrusion on the property, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law.

BARBARA QUIRK

**EXHIBIT E**

Business & Corporate Compliance > ... > Real Property Law > Zoning > Constitutional Limits

Real Property Law > Eminent Domain Proceedings > General Overview

Environmental Law > Land Use & Zoning > Eminent Domain Proceedings

Real Property Law > Inverse Condemnation > General Overview

Real Property Law > Inverse Condemnation > Regulatory Takings

*HN14*[⤓] **Zoning, Constitutional Limits**

The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests.

Governments > Courts > Judicial Precedent

*HN15*[⤓] **Courts, Judicial Precedent**

Prior decisions need not be reaffirmed periodically to retain authority.

Governments > Courts > Judicial Precedent

*HN16*[⤓] **Courts, Judicial Precedent**

If a precedent of the United States Supreme Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, a lower court should follow the case which directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions.

Governments > Courts > Judicial Precedent

*HN17*[⤓] **Courts, Judicial Precedent**

The Supreme Court of Texas looks to federal takings cases for guidance in applying the Texas Constitution.

Real Property Law > Inverse Condemnation > Constitutional Issues

Real Property Law > Eminent Domain Proceedings > General Overview

*HN18*[⤓] **Inverse Condemnation, Constitutional Issues**

Whether regulation substantially advances legitimate State of Texas interests is an appropriate test for a constitutionally compensable taking, at least in some situations.

BARBARA QUIRK

**EXHIBIT E**

Real Property Law > Eminent Domain Proceedings > General Overview

*HN19*[⬇] **Real Property Law, Eminent Domain Proceedings**

Government action may be for a public -- as opposed to a private -- purpose, even if that purpose is not a legitimate one for the government to engage in. For instance, the government may not require a person to give up a constitutional right in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property.

Constitutional Law > Equal Protection > Judicial Review > Standards of Review

*HN20*[⬇] **Judicial Review, Standards of Review**

For equal protection purposes, government action has a rational basis if one can be conceived, regardless of whether the government had it in mind when it took the action complained of.

Business & Corporate Compliance > ... > Real Property Law > Zoning > Constitutional Limits

Real Property Law > Eminent Domain Proceedings > General Overview

Real Property Law > Ownership & Transfer > Public Entities

*HN21*[⬇] **Zoning, Constitutional Limits**

United States Supreme Court cases describe the condition for abridgement of property rights through the police power as a substantial advancing of a legitimate state interest. The Supreme Court is inclined to be particularly careful about the adjective where the actual conveyance of property is made a condition to the lifting of a land-use restriction, since in that context there is heightened risk that the purpose is avoidance of the compensation requirement, rather than the stated police-power objective.

Constitutional Law > Equal Protection > Judicial Review > Standards of Review

*HN22*[⬇] **Judicial Review, Standards of Review**

An elevated standard of review must not be applied, but it ordinarily is, and should be, harder for the government to show that its interests have been substantially advanced by regulation directed at one lone landowner.

Real Property Law > Eminent Domain Proceedings > General Overview

*HN23*[⬇] **Real Property Law, Eminent Domain Proceedings**

BARBARA QUIRK

**EXHIBIT E**

The substantial advancement requirement for a legitimate regulation must be more than a pleading requirement, and compliance with it more than an exercise in cleverness and imagination. But it must not be proved to a certainty.

Real Property Law > Eminent Domain Proceedings > General Overview

*HN24*[⬇] **Real Property Law, Eminent Domain Proceedings**

Lost profits are clearly one relevant factor to consider in assessing the value of property and the severity of the economic impact of rezoning on a landowner.

Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings

Real Property Law > Financing > Construction Loans

*HN25*[⬇] **Fundamental Rights, Eminent Domain & Takings**

The takings clause does not charge the government with guaranteeing the profitability of every piece of land subject to its authority. Purchasing and developing real estate carries with it certain financial risks, and it is not the government's duty to underwrite this risk as an extension of obligations under the takings clause.

Civil Procedure > Special Proceedings > Eminent Domain Proceedings > Jury Trials

Real Property Law > Inverse Condemnation > Regulatory Takings

Real Property Law > Eminent Domain Proceedings > General Overview

Real Property Law > Inverse Condemnation > Remedies

*HN26*[⬇] **Eminent Domain Proceedings, Jury Trials**

Diminution in value is not the only element to be considered in a regulatory takings claim.

Governments > Local Governments > Claims By & Against

*HN27*[⬇] **Local Governments, Claims By & Against**

The actions and motives of individual officials and employees of a city are not those of the city itself.

Governments > Local Governments > Claims By & Against

Governments > Local Governments > Employees & Officials

BARBARA QUIRK

**EXHIBIT E**

*HN28*[ ] **Local Governments, Claims By & Against**

Evidence of one city official's motives cannot be attributed to the city itself.

**Judges:** JUSTICE HECHT delivered the opinion of the Court.

**Opinion by:** Nathan L. Hecht

# Opinion

 **[\*663]**  JUSTICE HECHT delivered the opinion of the Court.

After a twelve-month moratorium on development, the City of Glenn Heights rezoned undeveloped property owned by Sheffield Development Co., reducing the number of residences that could be built on the property. Sheffield contends that the moratorium and the "downzoning" each constituted a taking of its property without adequate compensation in violation of *article I, section 17 of the Texas Constitution.* [1] Sheffield separately requests a declaration that its development rights became vested when it submitted an application during an earlier hiatus in the moratorium. Following a bench trial on liability issues and a jury trial on damages, the district court rendered judgment for Sheffield for $ 485,000, plus pre- and post-judgment interest, on the downzoning takings claim only. The court concluded that Sheffield's claim for declaratory relief was not ripe for adjudication. A divided court of **[\*\*2]** appeals concluded that Sheffield was **[\*664]** entitled to recover on both takings claims, affirmed the damages award for the downzoning claim, and remanded the moratorium claim for trial on damages. [2] The court also concluded that Sheffield's claim for declaratory relief was ripe and remanded it. [3] We hold that Sheffield cannot recover on either takings claim and reverse and render judgment accordingly. We agree with the court of appeals that the case must be remanded to the trial court to determine whether Sheffield fixed its rights by submitting a plat during a hiatus in the moratorium.

**I**

**A**

The City of Glenn Heights is a growing suburban community (1990 pop. 4,564; 2000 pop. 8,050) south of Dallas astraddle the Dallas/Ellis County border. **[\*\*3]** In 1986, the City zoned a 236-acre tract as Planned Development District 10 (PD 10), allowing most of it to be developed for single-family residences on lots no smaller than 6,500 square feet, with a maximum density of 5.5 dwelling units per acre. [4] The owner at the time platted and developed the first phase of the Stone Creek subdivision on just over 43 acres of the tract. Some of the lots in the first phase met only the minimum required sizeminimum-size, but others were larger. The rest of the property was not developed and remained vacant.

In 1995, the City adopted a comprehensive "Future Land Use Plan" which found that the City had an oversupply of high-density residential areas. The plan designated the neighborhood including Stone Creek primarily as a lower density residential area to contain four to five dwelling units per acre. Though PD 10 zoning allowed a

---

[1] *TEX. CONST. art. I, § 17* *HN1*[ ] ("No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . . .").

[2] *61 S.W.3d 634, 45 Tex. Sup. Ct. J. 984 (Tex. App.--Waco 2001)*.

[3] *Id. at 660*.

[4] Relatively small portions around the perimeter were earmarked for lots of 7500 square feet, 9,000 square feet, and 10,000 square feet.

BARBARA QUIRK

EXHIBIT E

maximum **[\*\*4]** of 5.5 dwelling units per acre in the relevant area, the first phase of the development had been built with only 3.9 dwelling units per acre, the trial court found, and thus would comply with the new plan. The plan left PD 10 zoning in place. Except for PD 10 and the thirteen other planned development districts (PDs), all property within the City was rezoned according to the plan, increasing most residential lot sizes to 20,000 square feet minimum. The City did not rezone any of the PDs at that time.

In the summer of 1996, Sheffield Development Co. contracted to purchase the undeveloped part of Stone Creek including certain unbuilt lots in the first phase area, in all about 194 acres, for $ 600 an acre. The price was below market because the owner, a firm headquartered in England, was anxious to liquidate its real estate portfolio in the United States. Sheffield's principal, Gary Sheffield, was an experienced, successful developer of single-family subdivisions. Before closing on the contract, he made a due-diligence investigation of all City regulations and restrictions affecting the property. He met several times with the City Secretary, the City Manager, the Mayor, and various Council **[\*\*5]** members to advise them of Sheffield's plans to continue the Stone Creek development as permitted by the PD 10 zoning and to ascertain that no zoning changes for the property were planned. He specifically requested that Sheffield be notified of any possible zoning changes. No City officer or employee expressed any objection or reservation to Sheffield's plans or stated that the PD 10 zoning might change, but neither did anyone offer any assurance that the zoning would not change.

 **[\*665]** At the time, the Vested Rights Statute allowed a landowner to vest zoning rights by filing a plat. [5] Through the fall of 1996, representatives of the City met to discuss downzoning PD 10 and imposing a moratorium on development, but they did not tell Sheffield of these meetings for fear that it would quickly close on the purchase of the property, file a plat, and vest its zoning rights. When Sheffield finally did close on the purchase of the property in December, the City Council met three days later in executive session to discuss downzoning PD 10.

 **[\*\*6]** On January 6, 1997, without prior notice to Sheffield (the law that now requires four days' notice in such circumstances [6] was not yet in effect), the City Council adopted Resolution No. 287-97 prohibiting the filing and acceptance of plats in PDs until February 6 to allow time to determine whether existing PD zoning was consistent with the comprehensive land use plan. The resolution recited:

> the temporary suspension is solely for the purpose of allowing the City Council to study, in conjunction with the City's planning and administrative officials, the zoning, growth and development related issues and concerns presented by the nonconformity of the City's planned developments with the City's Code and Future Land Use Plan.

Before the end of this moratorium, the City's consultant recommended that PD 10 be rezoned to require lots no smaller than **[\*\*7]** 12,000 square feet, thereby permitting construction of about half the number of houses permitted by PD 10. The consultant also recommended that eleven other PDs be rezoned, leaving two that would not be rezoned. The recommendation was referred to the City's Planning and Zoning Commission, and the City Council extended the moratorium to March 6.

On March 11, after the moratorium had expired on its face, Sheffield submitted a plat for the development of its property under PD 10 zoning requirements. The City Secretary rejected the plat on the asserted ground that the City Manager had continued the moratorium in effect without Council action. On March 17, the City Council extended the moratorium to May 6.

---

[5] Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147 (codified as *TEX. GOV'T CODE §§ 481.141-.143*), "inadvertently" repealed by Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966, and reenacted by Act of April 29, 1999, 76th Leg., R.S., ch. 73, §§ 1, 2 1999 Tex. Gen. Laws 431, 432 (at § 1, finding that statute was "inadvertently repealed"), and now recodified as *TEX. LOCAL GOV'T CODE §§ 245.001-.006*.

[6] *TEX. LOC. GOV'T CODE §§ 212.134(b)* (adopted by Act of May 15, 2001, 77th Leg., R.S., ch. 441, § 1 2001 Tex. Gen. Laws 863).

EXHIBIT E

On March 24, the Planning and Zoning Commission accepted some of the consultant's recommendations for rezoning twelve PDs but rejected the proposed rezoning of PD 10 and four other PDs. Anticipating that the City Council would be unwilling to accept the Commission's decision yet unable to override it -- a three-fourths vote, or six of the seven members, was required by the City charter -- the City Manager recommended that final action be delayed. Accordingly, on April 21, the City Council **[**8]** rezoned three of the twelve PDs as recommended by the consultant and approved by the Commission, and adopted Resolution No. 292-97, essentially identical to Resolution 287-97, extending the moratorium to July 21. The City Council later extended the moratorium under the same resolution to December 31 and finally to May 15, 1998. From July through December 1997, the City rezoned another seven of the twelve PDs as recommended by the consultant, leaving **[*666]** PD 10 and one other on which the City Council had not acted. At the same time, the City and Sheffield made some efforts to negotiate their differences, but the City had no further studies done or reports made on whether PD 10 should be rezoned.

On April 27, 1998, the Planning and Zoning Commission voted to accept the consultant's January 1997 recommendation to rezone PD 10 and the remaining PD. The same day, the City Council approved the rezoning.

**B**

Sheffield sued the City for inverse condemnation, arguing that both the moratorium and the rezoning of the property violated the takings provision of the _Texas Constitution, article I, section 17_. Sheffield also sought a declaratory judgment that the plat it filed in March 1997, during **[**9]** the gap in the moratorium periods authorized by the City Council, had been deemed approved by the City's failure to take action on it [7] and vested Sheffield's rights by statute. Sheffield's pleadings did not assert the claim for declaratory judgment as an alternative to the claims for damages. [8] Sheffield asserted a number of other claims against the City, which the trial court denied. Sheffield has not appealed the trial court's rulings on those claims, and thus they do not concern us here.

The parties agreed to try liability issues to the court and damages, if necessary, to a jury. After the bench trial, the court issued findings and conclusions that:

. Sheffield purchased the property expecting that it could be developed under PD 10 zoning, in good faith reliance on the City's representations and the already substantial development of the Stone **[**10]** Creek subdivision;
. the moratorium:
. "substantially advanced a legitimate governmental interest",
. "did not unreasonably interfere with Sheffield's rights to use and enjoy its property", and thus
. "did not constitute a taking without payment of just compensation";
. the rezoning:
. "substantially advanced a legitimate government interest", but
. "had a severe economic impact on Sheffield",
. "deprived Sheffield of its investment-backed expectations",
. "unreasonably interfered with Sheffield's rights to use and enjoy its property", and thus

. "constituted a taking without payment of just compensation under _Article I, Sec. 17 of the Texas Constitution._"
Although the trial court found that no moratorium was in effect from March 6 to 17, 1997, it concluded, without explanation, that Sheffield's claim that its rights were vested by the plat it filed during that period was not ripe.

In both the bench trial and the subsequent jury trial, the parties offered evidence of the value of Sheffield's property before and after the rezoning. Witnesses for Sheffield testified that the property was worth $ 12,000-$ 14,000/acre ($ 2,328,000 - $ 2,716,000) before the rezoning and **[**11]** $ 600/acre ($ 116,400) afterward, a reduction of 95% or more. The City's appraiser testified that the property was worth only $ 4,000/acre ($ 776,000) before the rezoning

---

[7] See _TEX. LOC. GOV'T CODE § 212.009_.

[8] See _61 S.W.3d at 661_ (Vance, J., concurring and dissenting).

BARBARA QUIRK

EXHIBIT E

and $ 2,500/acre ($ 485,000) afterward, a reduction of 37.5%. Although the trial court found after the bench trial that the rezoning **[*667]** had had "a severe economic impact on Sheffield", it did not quantify that impact. The jury found that the property was worth $ 970,000 ($ 5,000/acre) before rezoning and $ 485,000 ($ 2,500/acre) afterward, a reduction of 50%. In accordance with its findings and the jury's verdict, the trial court rendered judgment awarding Sheffield $ 485,000.

Both the City and Sheffield appealed. Sheffield argued that the moratorium also constituted a taking of its property, and that its claim for declaratory judgment should not have been dismissed. The City argued that neither the moratorium nor the rezoning was a taking of Sheffield's property.

Drawing from this Court's opinion in *Mayhew v. Town of Sunnyvale*, [9] **[**13]** the court of appeals stated that Sheffield could establish a compensable regulatory taking if the rezoning or moratorium either (1) did not substantially advance the City's legitimate **[**12]** interests, [10] (2) deprived Sheffield of all economically viable use of its property, [11] or (3) unreasonably interfered with Sheffield's use of the property [12] as measured by the severity of the economic impact on Sheffield and the extent to which its investment-backed expectations had been defeated. [13] The court held that the rezoning was not a taking under either of the first two tests. The court determined that rezoning Sheffield's property substantially advanced the City's legitimate interest in "protecting the community from the ill effects of urbanization" and "preserving the rate and character of community growth". [14] The court pointed to the City's evidence that rezoning had reduced the estimated potential population of Stone Creek from 3,090 to 1,563, and that a less densely developed subdivision would mean "more open space and less traffic[,] . . . greater setbacks, fewer school children, 'less folks, and less noise . . . .'" [15] The court also held that rezoning did not deprive Sheffield of "all economically viable use" of its property, [16] based on Sheffield's admission that the property was still worth $ 600 acre.

But the court concluded that the rezoning unreasonably interfered with Sheffield's use of its property. The court believed that in determining the economic impact on Sheffield it could not consider the jury's finding in the trial on damages but could look only to the evidence offered in the bench trial on liability issues, even though that evidence was substantially the same as the evidence before the jury. The court reasoned that the minimum economic impact on Sheffield was a 38% reduction in the value of its property, based on testimony the City itself had offered, and concluded that such a reduction was "a sufficient adverse economic impact to satisfy the first factor of the unreasonable interference test." [17] **[**15]** The court then evaluated Sheffield's investment-backed expectations. The court noted that the PD 10 zoning was in place when **[**14]** Sheffield bought the property, that 43 acres of the original tract had already been developed under that zoning, that continued development was consistent with the City's 1995 comprehensive land use plan, and that before closing on the property Sheffield had attempted **[*668]**

---

[9] *964 S.W.2d 922, 41 Tex. Sup. Ct. J. 517 (Tex. 1998)*.

[10] *61 S.W.3d at 644, 645*.

[11] *Id. at 644, 647*.

[12] *Id. at 647*.

[13] *Id. at 647-48*.

[14] *Id. at 646*.

[15] *Id*.

[16] *Id. at 647*.

[17] *Id. at 648*.

BARBARA QUIRK

EXHIBIT E

to confirm its development plans in several meetings with City officials. [18] The court also cited evidence that there was no existing market in Glenn Heights for larger homes and lots, that the highest and best use of the property was to hold it until such a market developed, and that Sheffield had lost anticipated profits of over $ 8 million. [19] The court noted that development under PD 10 zoning would not burden city services because the infrastructure for the development had long been in place. [20] The court recognized that no one fact could determine its inquiry, but concluded, based on all of the circumstances, that the rezoning "unreasonably interfered with Sheffield's investment-backed expectations." [21] Accordingly, the court held that the rezoning "unreasonably interfered with Sheffield's right to use and enjoy the property." [22]

Turning to the moratorium, the court disagreed with the trial court that the moratorium substantially advanced the City's legitimate interests for the entire period it was in effect. [23] The court noted that the City's stated purpose for the moratorium -- to study whether PD 10 and other planned development areas should be rezoned -- was completed when the City's consultant tendered his report and recommendations less than a month after the moratorium was first put in place. [24] Yet the moratorium was extended and re-extended a total of fifteen months (excluding the twelve-day gap found by the trial court). The court of appeals cited testimony by the Mayor and one Councilman that the moratorium was extended because of a stalemate on the Council and in order to pressure Sheffield into accepting the City's development conditions. [25] The Mayor testified that one Councilman "had expressed his concern that the City did not have **[**16]** enough leverage, as he likes to put it, over the developer". [26] From the evidence, the court concluded that "the motivation for the moratorium was never simply to study the zoning issue." [27] "Once the city had all the information it needed to make a decision," the court concluded, "the stalemate on the council [over whether to reject the Planning and Zoning Commission's decision not to rezone PD 10 and four other PDs] was not a legitimate reason to continue the moratorium which prevented development of the property". [28] Thus, the court held that the moratorium was a compensable taking of Sheffield's property beginning with the Council's stalemate on April 21, 1997. [29]

Finally, the court also disagreed with the trial court's dismissal of Sheffield's claim for a declaratory judgment **[**17]** as not ripe. Rather, the court of appeals concluded, "nothing else . . . can occur that will affect Sheffield's entitlement to a determination of" whether it had filed a plat vesting its development rights during a gap in the

---

[18] *Id. at 650*.

[19] *Id. at 650-51*.

[20] *Id. at 651*.

[21] *Id. at 652*.

[22] *Id.*

[23] *Id. at 657*.

[24] *Id. at 655*.

[25] *Id. at 655-56*.

[26] *Id. at 656*.

[27] *Id. at 657*.

[28] *Id.*

[29] *Id.*

BARBARA QUIRK

EXHIBIT E

moratorium. [30] Accordingly, the court affirmed the judgment for damages for the rezoning and remanded the case [*669] for a determination of damages for the moratorium and of Sheffield's claim for declaratory relief. [31] As the dissent noted, however, the court gave no guidance on whether Sheffield could "prevail on approval of the plat (thereby gaining the right to develop the property under the former zoning) *and* recover damages for the moratorium and re-zoning". [32]

We granted both parties' petitions for review. [33]

**[\*\*18] II**

We first consider Sheffield's claims that the rezoning and moratorium each effected a taking of its property without adequate compensation in violation of *article I, section 17 of the Texas Constitution.* Sheffield makes no claim under *HN2*[⬆] the *Takings Clause of the Fifth Amendment to the United States Constitution*, which is made applicable to the states through the *Fourteenth Amendment.* [34] The two guarantees, though comparable, are worded differently. **[\*\*19]** *HN3*[⬆] The Texas Constitution provides that "no person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . . ." [35] *HN4*[⬆] The *Takings Clause of the Fifth Amendment* states: "nor shall private property be taken for public use without just compensation." [36] As the court of appeals noted, it could be argued that the differences in the wording of the two provisions are significant, but neither Sheffield nor the City makes this argument. [37] Both agree that in applying the Texas constitutional provision in this case, we should look to federal jurisprudence for guidance, as we have in the past, [38] and so we do.

**[\*\*20] A**

---

[30] *Id. at 658*.

[31] *Id. at 660*.

[32] *Id. at 661* (Vance, J., concurring and dissenting).

[33] *61 S.W.3d 634, 45 Tex. Sup. Ct. J. 984* (July 3, 2002).

[34] *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 306 n.1, 152 L. Ed. 2d 517, 122 S. Ct. 1465 (2002)* (citing *Chicago, B.& Q. R.R. Co. v. Chicago, 166 U.S. 226, 239, 241, 41 L. Ed. 979, 17 S. Ct. 581 (1897))*; *Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 933, 41 Tex. Sup. Ct. J. 517 (Tex. 1998)* (also citing *Chicago, B.& Q. R.R. Co.*).

[35] *TEX. CONST. art. I, § 17*.

[36] **U.S. CONST. amend. V**.

[37] *61 S.W.3d at 642-44*. *See DuPuy v. City of Waco, 396 S.W.2d 103, 108, 9 Tex. Sup. Ct. J. 42 (Tex. 1965)* ("It was the injustice of requiring an actual [physical] taking which explains the inclusion for the first time in the Constitution of 1876 of the requirement that compensation be paid for the damaging of property for public use."); *Trinity & S. Ry. Co. v. Meadows, 73 Tex. 32, 11 S.W. 145, 146 (Tex. 1889)* ("The insertion of the words 'damaged or destroyed' in [*article I, section 17*] was doubtless intended to obviate this question [of whether a compensable taking required a physical appropriation], and to afford protection to the owner of property, by allowing him compensation, when by the construction of a public work his property was directly damaged or destroyed, although no part of it was actually appropriated.").

[38] *E.g.*, *City of Austin v. Travis County Landfill Co., 73 S.W.3d 234, 238-39, 45 Tex. Sup. Ct. J. 511 (Tex. 2002)*; *Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 932, 41 Tex. Sup. Ct. J. 517 (Tex. 1982)*.

**_HN5_[⬆]** ] By their plain terms, the takings provisions of the state and federal constitutions do not limit the government's power to take private property for public use but instead require that a taking be compensated. [39] Physical possession is, categorically, a taking for which compensation is **[*670]** constitutionally mandated, [40] **[**22]** but a restriction in the permissible uses of property or a diminution in its value, resulting from regulatory action within the government's police power, may or may not be a compensable taking. [41] As we have said, "all property is held subject to the valid exercise of the police power" and thus not every regulation is a compensable taking, although some are. [42]

> There is . . . no one test and no single sentence rule . . . . The need to adjust the conflicts between private ownership of property and the public's interests is a very old one which has produced no single solution. [43]

"Government hardly could go on", wrote Justice Holmes in the first regulatory takings case in the United States Supreme Court, "if to some extent values incident to property could not be diminished [by government regulation] without paying for every such change in the general **[**21]** law." [44] Yet, he continued, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." [45] **_HN6_[⬆]** ] "The general rule at least", he concluded, is "that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking", [46] adding, "this is a question of degree -- and therefore cannot be disposed of by general propositions." [47] "The question at bottom is upon whom the loss of the changes desired _should_ fall." [48]

While the United States Supreme Court has never questioned this rule since Justice Holmes stated it, [49] **[**24]** **_HN7_[⬆]** ] the Court has acknowledged that determining how far is "too far"

---

[39] _See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 314, 96 L. Ed. 2d 250, 107 S. Ct. 2378 (1987)_ ("As its language indicates, and as the Court has frequently noted, this provision does not prohibit the taking of private property, but instead places a condition on the exercise of that power.") (citations omitted).

[40] _Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322, 152 L. Ed. 2d 517, 122 S. Ct. 1465 (2002)_ ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner . . . .").

[41] **_Taub v. City of Deer Park, 882 S.W.2d 824, 826, 37 Tex. Sup. Ct. J. 1079 (Tex. 1994)_** ("An act short of actual physical invasion, appropriation, or occupation can amount to a compensable taking when a governmental agency has imposed restrictions that constitute an unreasonable interference with the landowner's right to use and enjoy the property.")(citation omitted).

[42] _City of College Station v. Turtle Rock Corp., 680 S.W.2d 802, 804, 28 Tex. Sup. Ct. J. 104 (Tex. 1984)._

[43] _Id._ (quoting _City of Austin v. Teague, 570 S.W.2d 389, 392, 21 Tex. Sup. Ct. J. 534 (Tex. 1978))._

[44] _Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413, 67 L. Ed. 322, 43 S. Ct. 158 (1922)._

[45] _Id. at 416._

[46] _Id. at 415._

[47] _Id. at 416._

[48] _Id._ (emphasis added).

[49] _See_, _e.g._, _First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 328, 96 L. Ed. 2d 250, 107 S. Ct. 2378 (1987)_ ("There is no dispute about the proposition that a regulation which goes 'too far' must be deemed a taking.").

EXHIBIT E

has proved to be a problem of considerable difficulty. While this Court has recognized that the "*Fifth Amendment*'s **[\*\*23]** guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," this Court, quite simply, has been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to **[\*671]** pay for any losses proximately caused by it depends largely "upon the particular circumstances [in that] case." [50]

As a result, the Supreme Court has admitted, "cases attempting to decide when a regulation becomes a taking are among the most litigated and perplexing in current law." [51] For our part, we have called these legal battlefields "a 'sophistic Miltonian Serbonian Bog'". [52]

There are small islands in the bog. *HN8*[⬆] The Supreme Court has identified, in its words, "at least two discrete categories of regulatory action as compensable without case-specific inquiry". [53] One is where regulation "compels the property owner to suffer a physical 'invasion' of his property." [54] The direct, physical effect on property, though short of government possession, makes the regulation **[\*\*25]** categorically a taking. Another is "where regulation denies all economically beneficial or productive use of land." [55] To deprive an owner of all economically beneficial use of land is tantamount to depriving him of the land itself. **[\*\*26]** But this is "limited to 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted'" [56] and "the landowner is left with a token interest." [57] In addition to these two situations, the Supreme Court has stated that regulation "effects a taking if [it] does not substantially advance legitimate state interests". [58]

---

[50] *Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123-24, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1978)* (alteration in original) (citations omitted).

[51] *Eastern Enters. v. Apfel, 524 U.S. 498, 541, 141 L. Ed. 2d 451, 118 S. Ct. 2131 (1998)*.

[52] *City of Austin v. Teague, 570 S.W.2d 389, 391, 21 Tex. Sup. Ct. J. 534 (Tex. 1978)* (quoting **Brazos River Auth. v. City of Graham, 163 Tex. 167, 354 S.W.2d 99, 105, 5 Tex. Sup. Ct. J. 12 (Tex. 1962))**; *see also* JOHN MILTON, PARADISE LOST 49, bk. II, ll. 592-94 (Scott Elledge ed., Norton & Co. 1993)(1674)(describing the land beyond *Lethe* as "A gulf profound as that *Serbonian* bog / Betwixt *Damiata* and Mount *Casius* old, / Where armies whole have sunk").

[53] *Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1016, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992)*.

[54] *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435-40, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982))* (holding that "law requiring landlords to allow television cable companies to emplace cable facilities in their apartment buildings constituted a taking").

[55] *Id. at 1015-16* (citing *Agins v. City of Tiburon, 447 U.S. 255, 260, 65 L. Ed. 2d 106, 100 S. Ct. 2138 (1980))*; *see also Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 933, 41 Tex. Sup. Ct. J. 517 (Tex. 1998)*.

[56] *Tahoe-Sierra Pres. Council, Inc., v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 330, 152 L. Ed. 2d 517, 122 S. Ct. 1465 (2002)* (quoting *Lucas, 505 U.S. at 1017-19*); *see also Mayhew, 964 S.W.2d at 935*. *But see Lucas, 505 U.S. at 1016 n.7* ("Regrettably, the rhetorical force of our 'deprivation of all economically feasible use' rule is greater than its precision, since the rule does not make clear the 'property interest' against which the loss of value is to be measured. When, for example, a regulation requires a developer to leave 90% of a rural tract in its natural state, it is unclear whether we would analyze the situation as one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in value of the tract as a whole.").

[57] *Palazzolo v. Rhode Island, 533 U.S. 606, 631, 150 L. Ed. 2d 592, 121 S. Ct. 2448 (2001)*; *cf. Tahoe-Sierra, 535 U.S. at 350* (Rehnquist, C.J., dissenting) (arguing that economically beneficial use in *Lucas* is not synonymous with value).

[58] *Agins, 447 U.S. at 260 (1980)* citation omitted); *see also Mayhew, 964 S.W.2d at 933-34*.

BARBARA QUIRK

**EXHIBIT E**

 **[\*\*27]** Otherwise, however, whether regulation has gone "too far" and become  **[\*672]**  too much like a physical taking for which the constitution requires compensation requires a careful analysis of how the regulation affects the balance between the public's interest and that of private landowners. While each case must therefore turn on its facts, guiding considerations can be identified, as the Supreme Court first explained in *Penn Central Transportation Co. v. City of New York*:

> *HN9*[⬆] In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good. [59]

 **[\*\*28]**  The Supreme Court has restated these factors simply as:

> *HN10*[⬆] (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." [60]

Nevertheless, the Supreme Court has cautioned that these factors do not comprise a formulaic test.

> "*Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required." "The temptation to adopt what amount to *per se* rules in either direction must be resisted." [61]

Thus, for example, the economic impact of a regulation may indicate a taking even if the landowner has not been deprived of all economically **[\*\*29]** beneficial use of his property. Nor are the three *Penn Central* factors the only ones relevant in determining whether the burden of regulation ought "in all fairness and justice" to be borne by the public. [62] *HN11*[⬆] Whether a regulatory taking has occurred, the Supreme Court has said, "depends on a complex of factors *including*" the three set out in *Penn Central*. [63] The analysis "necessarily requires a weighing of private and public interests" [64] and a "careful examination and weighing of all the relevant circumstances in this context." [65] As we have ourselves said of regulatory takings issues, "we consider all of the surrounding circumstances" [66] in applying  **[\*673]**  "a fact-sensitive test of reasonableness". [67] **[\*\*31]**

---

[59] *438 U.S. 104, 124, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1978)* (citations omitted).

[60] *Connolly v. Pension Benefits Guar. Corp., 475 U.S. 211, 225, 89 L. Ed. 2d 166, 106 S. Ct. 1018 (1986)* (quoting *Penn Cent. Transp. Co. v. City of New York, 438 U.S. at 124*).

[61] *Tahoe-Sierra, 535 U.S. at 326-27 n.23* (citations omitted) (quoting *Palazzolo, 533 U.S. at 634, 636* (O'Connor, J., concurring)).

[62] *See*, *e.g.*, *City of Austin v. Teague, 570 S.W.2d 389, 393, 21 Tex. Sup. Ct. J. 534 (Tex. 1978)* ("There is still another test which is sometimes helpful. It allows recovery of damages when the government's action against an economic interest of an owner is for its own advantage.").

[63] *Palazzolo, 533 U.S. at 617* (emphasis added).

[64] *Agins v. City of Tiburon, 447 U.S. 255, 261, 65 L. Ed. 2d 106, 100 S. Ct. 2138 (1980)*.

[65] *Tahoe-Sierra, 535 U.S. at 326 n.23* (quoting *Palazzolo, 533 U.S. at 636* (O'Connor, J., concurring)).

[66] *Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 933, 41 Tex. Sup. Ct. J. 517 (Tex. 1998)*.

We have said that *HN12*[⬆] while

determining whether a property regulation is unconstitutional requires the consideration of a number of factual issues, the ultimate question of whether a zoning ordinance constitutes a compensable taking or violates due process or equal protection is a question of law, not a question of fact. In resolving this legal issue, we consider all of the surrounding circumstances. *HN13*[⬆] While we depend on the district court to resolve disputed facts regarding **[\*\*30]** the extent of the governmental intrusion on the property, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law. [68]

We apply this standard to the record before us.

**B**

We come, then, to whether the rezoning of Sheffield's property was a taking. There was no physical invasion of the property, and Sheffield does not argue that it was deprived of all economically beneficial use of the property. Sheffield argues that the rezoning was a taking because it did not substantially advance the City's legitimate governmental interests, and because it went too far in restricting Sheffield's use and enjoyment of its property. We consider each argument in turn.

**1**

**a**

As a threshold matter, the City argues that a regulation should not be considered a taking merely because it does not substantially advance legitimate state interests. The United States Supreme Court flatly stated in *Agins v. City of Tiburon* that *HN14*[⬆] "the application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests". [69] We agreed with that statement in *Mayhew v. City of Sunnyvale* and used it in applying the takings provision in the Texas Constitution. **[\*\*32]** [70] But the City argues that the Supreme Court has receded from its statement in *Agins*, and so should we in applying the Texas Constitution. Whether a regulation furthers a legitimate purpose, the City argues, is really a due process concern and not a test for determining whether the government must compensate a taking of property. Furthermore, the City argues, requiring compensation for a regulation merely because it does not advance state interests and therefore does not benefit the public, unfairly burdens taxpayers by requiring them to pay for something from which they did not benefit.

It is true, as the City says, that the Supreme Court appears to have equivocated somewhat on its statement in *Agins* outside the context of cases involving required dedications or exactions. In *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, the trial court had instructed the jury that **[\*\*33]** a city's refusal to allow development of property would constitute a taking if "there was no reasonable relationship between the city's denial of the . . . proposal and legitimate public purpose". [71] **[\*674]** The Court said that although it had never provided

---

[67] *City of College Station v. Turtle Rock Corp., 680 S.W.2d 802, 804, 28 Tex. Sup. Ct. J. 104 (Tex. 1984)*.

[68] *Mayhew, 964 S.W.2d at 932-33*.

[69] *447 U.S. at 260* (citation omitted).

[70] *964 S.W.2d at 933-34* (quoting Appendix at 304).

[71] *526 U.S. 687, 701, 143 L. Ed. 2d 882, 119 S. Ct. 1624 (1999)*.

BARBARA QUIRK

EXHIBIT E

a thorough explanation of the nature or applicability of the requirement that a regulation substantially advance legitimate public interests outside the context of required dedications or exactions, we note that the trial court's instructions are consistent with our previous general discussions of regulatory takings liability. [72]

"Consistent" does not, of course, equal correct, a fact made all the more noticeable by five Justices' expressly withholding opinion on whether *Agins*' substantial advancement requirement is a proper takings test. [73] **[\*\*34]** But since *Del Monte Dunes*, the Supreme Court has cited the substantial advancement test without criticism, [74] as it had done several times earlier. [75]

Whatever may be made of all of this, one thing is clear: the Supreme Court has never modified or retracted its statement in *Agins*. *HN15*[⬆] Prior decisions need not be reaffirmed periodically to retain authority. As the Supreme Court has admonished:

> *HN16*[⬆] "if a precedent **[\*\*35]** of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [a lower court] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." [76]

We are not, of course, bound to follow *Agins* in this case since Sheffield makes no claim under the United State Constitution, but as we have already said, *HN17*[⬆] we do look to federal takings cases for guidance in applying our own constitution. To that end, we conclude that *Agins* remains authoritative.

Furthermore, apart from what the Supreme Court has said, we continue to believe for purposes of state constitutional law, as we held in *Mayhew*, that the statement in *Agins* is correct: that *HN18*[⬆] whether regulation substantially advances legitimate state interests is an appropriate test for a constitutionally compensable taking, at least **[\*\*36]** in some situations. In this case, for example, Sheffield argues that the City did not rezone Stone Creek for any legitimate purpose, such as to avoid the ill effects of urbanization and provide for orderly development, but simply to muscle Sheffield into modifying its development proposals or going away altogether. If Sheffield were correct, we think the lack of a legitimate purpose alone would make the rezoning a taking, just as it would have in *Mayhew*. The City equates a lack of *legitimate* purpose with a lack of *public* purpose, **[\*675]** the latter being a prerequisite to any taking. [77] Without a public purpose, the City reasons, there is no public benefit, and the public should not be required by the substantial advancement test to pay for government action from which it has received no benefit. But the flaw is in the equation. *HN19*[⬆] Government action may be for a public -- as opposed to a private -- purpose, even if that purpose is not a legitimate one for the government to engage in. For instance, as the

---

[72] *Id. at 704* (citation omitted).

[73] *Id. at 732 n.2* (Scalia, J., concurring in part and concurring in the judgment); *id. at 753 n.12* (Souter, J., joined by O'Connor, Ginsburg, and Breyer, JJ., concurring in part and dissenting in part).

[74] *Tahoe-Sierra Pres. Council, Inc., v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 323-24, 152 L. Ed. 2d 517, 122 S. Ct. 1465 (2002)* ("For the same reason that we do not ask whether a physical appropriation advances a substantial government interest or whether it deprives the owner of all economically valuable use, we do not apply our precedent from the physical takings context to regulatory takings claims.").

[75] *Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1016, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992)* ("As we have said on numerous occasions, the **Fifth Amendment** is violated when land-use regulation 'does not substantially advance legitimate state interests *or denies an owner economically viable use of his land.*' ") (quoting *Agins, 447 U.S. at 260*) (alteration in the original) (citations omitted)).

[76] *Agostini v. Felton, 521 U.S. 203, 237, 138 L. Ed. 2d 391, 117 S. Ct. 1997 (1997)*.

[77] *Marrs v. R.R. Comm'n, 142 Tex. 293, 177 S.W.2d 941, 949 (Tex. 1944)* ("'one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid'") (quoting *Thompson v. Consol. Gas Co., 300 U.S. 55, 80, 81 L. Ed. 510, 57 S. Ct. 364 (1936))*.

EXHIBIT E

Supreme Court has held, "the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government where **[\*\*37]** the benefit sought has little or no relationship to the property." [78] Sheffield argues, not that the City's purposes were not public, but that they were not legitimate. If Sheffield is correct and the rezoning was therefore a taking, the benefit to the taxpayers would be that of the City's having achieved its goal.

Accordingly, we decline the City's invitation to reject the substantial advancement test for compensable takings stated in *Agins* and *Mayhew*.

**b**

The trial court concluded that the rezoning of PD 10 substantially advanced a legitimate governmental purpose, **[\*\*38]** and the court of appeals agreed. Sheffield argues that the assessment of the relationship between the City's actions and legitimate governmental purposes must be confined to the record of events, documents, and meetings leading up to the rezoning -- the "legislative record" -- and cannot consider, as the court of appeals did, *post hoc* arguments made by the City in the course of this litigation. Sheffield also argues that the court of appeals was too deferential to the City in assessing its purposes because the rezoning was not generally applicable but was aimed directly at Sheffield. Finally, Sheffield argues that by any standard, the rezoning was a taking under the substantial advancement test.

Sheffield cites no authority for its argument that the test must be limited to a "legislative record" of statements, positions, or findings by the City prior to the rezoning, and we have found none. While Sheffield correctly points out that the city commission in *Mayhew* gave reasons for its actions at the time they were taken, [79] we considered not only those reasons but evidence later offered in litigation. [80] *HN20*[⬆] For equal protection purposes, government action has a rational basis **[\*\*39]** if one can be conceived, regardless of whether the government had it in mind when it took the action complained of. [81] Sheffield does not explain why the basis for takings analysis should be more constricted, and we know of no reason. The court of appeals did not err in looking to the City's evidence and arguments to assess its purposes.

Sheffield does not argue that the government must always be held to a heightened standard of judicial review when its purposes are assessed in a takings context, but only that a heightened **[\*676]** standard is appropriate when the government has targeted a particular landowner or piece of property. As authority, Sheffield cites the Supreme Court's decision in *Nollan v. California Coastal Commission*, which held that conditioning a home rebuilding permit on the owners' conveyance of a public easement **[\*\*40]** across their beachfront property was a compensable taking. [82] The Supreme Court explained:

> *HN21*[⬆] our cases describe the condition for abridgement of property rights through the police power as a "*substantial* advancing" of a legitimate state interest. We are inclined to be particularly careful about the adjective where the actual conveyance of property is made a condition to the lifting of a land-use restriction, since in that context there is heightened risk that the purpose is avoidance of the compensation requirement, rather than the stated police-power objective. [83]

---

[78] *Dolan v. City of Tigard, 512 U.S. 374, 385, 129 L. Ed. 2d 304, 114 S. Ct. 2309 (1994)*.

[79] *Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 935, 41 Tex. Sup. Ct. J. 517 (Tex. 1998)*.

[80] *Id.*

[81] *Owens Corning v. Carter, 997 S.W.2d 560, 581, 42 Tex. Sup. Ct. J. 883 (Tex. 1999)*.

[82] *483 U.S. 825, 839, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987)*.

[83] *Id. at 841* (alteration in the original).

EXHIBIT E

We agree, but we read "particularly careful" to mean, not that *HN22*[⬆] an elevated standard of review must be applied, but that it ordinarily is, and should be, harder for the government to show that its interests have been substantially advanced by regulation directed at one lone landowner. Moreover, the record does not support Sheffield's argument that it was singled out. Eventually, the City's downzoning of residential property was virtually city-wide, affecting non-PD property and most of the PDs. It was certainly not restricted to PD 10. In determining whether the rezoning substantially advanced the City's **[\*\*41]** legitimate purposes, the court of appeals was not, we think, unduly deferential.

The court of appeals concluded that the City's rezoning substantially advanced its interests in avoiding the ill effects of urbanization and preserving the rate and character of community growth. [84] The court pointed to evidence that the downzoning would reduce the potential population and eventually result in more open space, less traffic, greater setbacks, and fewer school children, although the court also noted that roads, schools, and utilities had all been designed to accommodate original population estimates. [85] Sheffield argues that the most the evidence shows is that rezoning could *theoretically* advance the City's legitimate purposes, and that is not enough. We agree that *HN23*[⬆] the substantial advancement requirement must be, in the Supreme Court's words, "more than a pleading requirement, and compliance with it . . . more than an exercise in cleverness and imagination." [86] But we do not think it must be proved to a certainty. Indeed, the actual effects of the City's rezoning are for the future and can only be projected and estimated. The City offered evidence that rezoning the PDs would lower **[\*\*42]** its potential population by about 6,000, from about 31,000 to 25,000, and that rezoning PD 10 accounted for about one-fourth of this reduction. The City could reasonably conclude that this would substantially advance its legitimate interest in preserving a smaller community environment. Also, the City's concern with its growth first arose in 1995 and thus was not prompted by Sheffield's acquisition of Stone Creek, even though Sheffield's imminent development plans clearly stirred the City's anxiety. Thus, while the evidence establishes that from the fall of 1996 on, the City had its eye on Sheffield all during the rezoning efforts, the Stone Creek subdivision was not the City's only **[\*677]** focus, and its efforts were not so narrowly directed at Sheffield alone as to indicate that the City's legitimate interests in controlled growth had taken a back seat.

 **[\*\*43]** On balance, we agree with the lower courts that the City's rezoning substantially advanced legitimate government interests.

**2**

Even so, we must consider whether the City went so far in restricting Sheffield's use of its property that the rezoning was more like a taking and "in all fairness and justice", the burden of that restriction should be borne by the public. We begin with the three *Penn Central* factors, mindful as we do that our analysis cannot be merely mathematical.

First, as the lower courts concluded, the rezoning clearly had a severe economic impact on Sheffield. By the City's own evidence, the rezoning reduced the value of Sheffield's property by 37.5%, below what it was when Sheffield purchased it, although not below the bargain price Sheffield paid. The jury found that the value of the property had been reduced by half, but that it was still worth more than four times what Sheffield paid for it. From Sheffield's perspective as a developer, the economic impact of the rezoning included more than $ 8 million in lost profits from the planned development. There was no existing market for the larger lots required by the rezoning, and the evidence was disputed whether **[\*\*44]** one would ever develop. The City argues that evidence of lost profits should be ignored, but we agree with the court of appeals that *HN24*[⬆] lost profits are clearly one relevant factor to consider in assessing the value of property and the severity of the economic impact of rezoning on a landowner. It must be kept in mind, however, that

---

[84] *61 S.W.3d at 646*.

[85] *Id.*

[86] *Nollan, 483 U.S. at 841*.

EXHIBIT E

---

HN25[↑] the takings clause . . . does not charge the government with guaranteeing the profitability of every piece of land subject to its authority. Purchasing and developing real estate carries with it certain financial risks, and it is not the government's duty to underwrite this risk as an extension of obligations under the takings clause. [87]

But while the impact of rezoning on Sheffield was unquestionably severe, it did not approach a taking. The court of appeals focused on the diminution in the value of Sheffield's property, nearly 38% by the testimony of the City's expert. We think the relevant number [**45] is 50%, as found by the jury. But HN26[↑] diminution in value is not the only, or in this case even the principal, element to be considered. It is more important that, according to the jury verdict, the property was still worth four times what it cost, despite the rezoning, because this makes the impact of the rezoning very unlike a taking. Sheffield argues that its business acumen or good fortune in acquiring the property cannot be considered in assessing the economic impact of rezoning, but we think that investment profits, like lost development profits, must be included in the analysis.

Second, again as the lower courts concluded, the rezoning significantly interfered with Sheffield's reasonable, investment-backed expectations. Sheffield's expectations were certainly reasonable. The PD 10 zoning had been in place for ten years before Sheffield acquired the property, and part of the subdivision had already been developed under that zoning scheme consistent with the City's comprehensive land use plan. [88] [**47] Moreover, [*678] Sheffield's expectations were not merely those of any landowner, or even those of any developer; rather, Sheffield's expectations were based in large part, and legitimately so, [**46] on its efforts to deal with the City. Sheffield met with city officials to present his plans for development and inquire about any contemplated zoning changes, and as the trial court found, its reliance on representations made in those meetings was in good faith. Although no City employee ever promised Sheffield that there would be no change in zoning (nor would any such promise have bound the City [89]), it is fair to say that the moratorium and rezoning blindsided Sheffield, just as the City intended. Evidence of Sheffield's dealings with the City is not, as the City argues, an improper basis to estop the City, but proof of the reasonableness of Sheffield's expectations. However, it must also be said that the investment backing Sheffield's expectations at the time of rezoning -- the $ 600/acre purchase price and the expenses of exploring development with the City -- was minimal, a small fraction of the investment that would be required for full development. And as with most development property, Sheffield's investment was also speculative, [90] as evidenced by the fact that the property Sheffield acquired had not been developed in the ten years since it was first zoned PD 10.

Third, the rezoning, as we have already explained, was general in character and not exclusively directed at Sheffield. This case is not like [**48] *Nollan*, for example, where an easement was exacted from a single landowner for a rebuilding permit. Zoning changes are to be expected, especially in growing communities like Glenn Heights. The rezoning here was typical of such changes.

Beyond the three *Penn Central* factors, we are concerned, as we have already indicated, about the City's conduct. The evidence is quite strong that the City attempted to take unfair advantage of Sheffield, and quite lacking in any

---

[87] **Taub v. City of Deer Park, 882 S.W.2d 824, 826, 37 Tex. Sup. Ct. J. 1079 (Tex. 1994)**.

[88] *See Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 936, 41 Tex. Sup. Ct. J. 517 (Tex. 1998)* ("Knowledge of existing zoning is to be considered in determining whether the regulation interferes with investment-backed expectations.").

[89] *See, e.g., City of Pharr v. Pena, 853 S.W.2d 56, 62 (Tex. App.--Corpus Christi 1993, writ denied)* ("statements or assurances regarding zoning made by individual members of the city council, board or commission are not binding and do not give private property owners a vested right to the use or disposal of their property so as to deny the city the exercise of its police power"); *Alamo Carriage Serv., Inc. v. City of San Antonio, 768 S.W.2d 937, 941-42 (Tex. App.----San Antonio 1989, no writ)* ("Statements of individual council members are not binding on the City."); *City of Farmers Branch v. Hawnco, Inc., 435 S.W.2d 288, 292 (Tex. Civ. App.--Dallas 1968, writ ref'd n.r.e.)* ("[assurances regarding continued zoning] by individual members of a council or board are not binding on a governmental body which may act only in its official capacity").

[90] *See* **Taub, 882 S.W.2d at 826**.

BARBARA QUIRK

EXHIBIT E

indication of unfair action on Sheffield's part. The City, fearful that we might consider the improvident statements of individual officials and employees, argues that *HN27*[⬆] the actions and motives of those individuals are not those of the City itself. Of course, we agree. [91] But it is exactly the City's conduct, not that of its officials **[*679]** and employees, that is so troubling. The City did not rezone or impose a moratorium on development, or indicate that it had the remotest intention of doing so, until Sheffield closed on the purchase of the property. The moratorium it imposed was for the purpose of "study", which was unquestionably completed within a month. Yet for a year the City Council delayed action on the Planning and **[\*\*49]** Zoning Commission's decision that PD 10 not be rezoned. According to the City's own records, a reason for the delay was to muster the votes to reject the Commission's decision. On the other hand, the City Council continued to consider the zoning of many other PDs during the same time period, suggesting that the delay was lethargic rather than ill-motivated. And while the City's conduct is troubling, it must also be said that the benefits the City legitimately sought to achieve from rezoning were not thereby diminished.

**[\*\*50]** Taking all of these factors into account, the trial court concluded that the rezoning was not unreasonable, and a divided court of appeals disagreed. We agree with the court of appeals that the downzoning in this case is much different from the refusal to upzone in *Mayhew*, thereby maintaining the *status quo* and preventing the landowner from proceeding with an enormous development on land that had long been used solely for agricultural purposes in a small, uniquely rural environment. Nevertheless, we do not agree that the rezoning in this case went too far, approaching a taking. Rather, we think that the City's zoning decisions, apart from the faulty way they were reached, were not materially different from zoning decisions made by cities every day. [92] On balance, we conclude that the rezoning was not a taking.

**[\*\*51] C**

We now turn to whether the fifteen-month moratorium preceding the rezoning was a taking.

**1**

We first consider whether the moratorium substantially advanced legitimate government interests. Sheffield does not argue that the moratorium should never have been imposed. Rather, Sheffield would hold the City to its own words. The moratorium, according to the City, was

solely for the purpose of allowing the City Council to study, in conjunction with the City's planning and administrative officials, the zoning, growth and development related issues and concerns presented by the nonconformity of the City's planned developments with the City's Code and Future Land Use Plan.

After April 21, 1997, Sheffield argues, there was nothing left "to study". The consultant's report was complete, the Planning and Zoning Commission had reviewed it, the issues were drawn, and it was time for decision. At its meeting on that date, Sheffield argues, the City Council could have taken up the Commission's decision to reject the consultant's recommendation that PD 10 not be rezoned, and could have accepted or rejected it, but did neither because of a stalemate among councilmembers. Furthermore, **[\*\*52]** there is evidence that at least one

---

[91] *See, e.g., City of Corpus Christi v. Bayfront Assocs., Ltd., 814 S.W.2d 98, 105 (Tex. App.--Corpus Christi 1991, writ denied)* ("an individual city council member's mental process, subjective knowledge, or motive is irrelevant to a legislative act of the city, such as the passage of an ordinance"); *Mayhew v. Town of Sunnyvale, 774 S.W.2d 284, 298 (Tex. App.--Dallas 1989, writ denied)* ("the subjective knowledge, motive, or mental process of an individual legislator is irrelevant to a determination of the validity of a legislative act because the legislative act expresses the *collective will* of the legislative body") (quoting *Sosa v. City of Corpus Christi, 739 S.W.2d 397, 405 (Tex. App.-- Corpus Christi 1987, no writ))*, *aff'd after remand*, *964 S.W.2d 922, 41 Tex. Sup. Ct. J. 517 (Tex. 1998)*.

[92] *See Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1027, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992)* ("It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in the legitimate exercise of its police powers . . . .").

BARBARA QUIRK

EXHIBIT E

councilmember wanted to use delay to give the City more leverage in pressuring Sheffield to agree to a less dense development plan.

 **[\*680]**  Again, we agree with the City that *HN28*[⬆] evidence of one official's motives cannot be attributed to the City itself. We look entirely to the objective evidence regarding the City's actions. The City argues, candidly but remarkably, that using delay to extract concessions from landowners is a legitimate government function. We disagree, [93] and were we convinced that this was the sole reason for the City's delay, we would be required to consider whether the moratorium constituted a compensable taking. Delay may be necessary or appropriate to allow everyone affected by a zoning decision an opportunity to fully consider all options and negotiate solutions, but the use of delay for extortion is hardly a legitimate government function. The City also contends that we cannot second-guess its motives and must presume that the extended moratorium was due to nothing other than an honest disagreement over the appropriate zoning for the planned development areas. But the takings provision of the Texas Constitution would suffer a huge **[\*\*53]**  loophole if we were required to presume that a city's endless refusal to permit a landowner the reasonable use of his property was justified by an honest disagreement of councilmembers.

The fact is that during eight months of the moratorium, the City rezoned seven PDs. It took time. There is no evidence that the City meant to unfairly pressure all of the affected landowners. On the contrary, the evidence reflects an orderly, albeit slow, process toward resolving the differences between the City Council, the Planning and Zoning Commission, and the City's consultant. One can wish that the process had hurried along, but we cannot say that the moratorium did not substantially **[\*\*54]**  advance a legitimate governmental purpose.

**2**

Nor can we say that the moratorium went too far towards a taking. Sheffield did not show during the liability trial, as it was required to do, what economic impact it suffered from the moratorium as distinct from the rezoning. Nor does the record show how Sheffield's reasonable, investment-backed expectations excluded the possibility of a fifteen-month delay in a decision on its development plans. No other aspects of the moratorium make it more like a temporary taking -- that is, an unreasonable prohibition in the use of property for a defined period [94] -- than a mere delay in decision. We can easily imagine circumstances in which delay was aimed more at one person, or was more protracted with less justification, and more indicative of a taking. But the evidence in this case does not approach that situation.

**III**

Having failed **[\*\*55]**  to find that the City's rezoning was a compensable taking of Sheffield's property, we are left with one issue: whether Sheffield's vested rights claim was ripe. Sheffield claims that the plat it filed on March 11, 1997, vested its development rights because the moratorium was not then in effect and the City did not act on the filing. We agree with the court of appeals that this claim was ripe. The City argues that the parties did not argue ripeness to the trial court, but that does not lessen the fact that ripeness  **[\*681]**  was the basis for the trial court's ruling. As the court of appeals concluded, there was nothing to prevent the trial court from ruling on the merits of Sheffield's claim.

The concern expressed in the dissent in the court of appeals that Sheffield might *both* recover damages for restrictions on the development of its property *and* nevertheless be permitted to develop its property unimpaired by

---

[93] *Cf. Westgate, Ltd. v. State, 843 S.W.2d 448, 454, 36 Tex. Sup. Ct. J. 282 (Tex. 1992)* ("The policy reasons that support our decision today [that delaying condemnation of property after announcement of an intent to do so is not a taking] might not be applicable where the condemning authority is accused of intentionally injuring a landowner.").

[94] *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 152 L. Ed. 2d 517, 122 S. Ct. 1465 (2002)*.

BARBARA QUIRK

**EXHIBIT E**

those restrictions [95] is no longer real, since we have held that Sheffield cannot recover damages. However, another issue remains: has Sheffield's pursuit of damages foreclosed its claim that it is entitled to develop its property under PD 10 zoning because of a properly submitted **[**56]** plat during a hiatus in the moratorium, as found by the trial court. While this action has been pending, Sheffield sued the City, asserting that its development rights were statutorily fixed by the original Stone Creek plat in 1986. The court of appeals held in that case that the action for damages now before us was an election of remedies, foreclosing Sheffield's claim, *because* Sheffield did not assert that claim in this action before judgment. [96] But Sheffield's claim for declaratory relief in the present action is on a different footing. Sheffield did assert in this action, before judgment, that its development rights were fixed, not by the originally filed plat, but by a plat submitted to the City during what the trial court found was a hiatus in the moratorium due to the City Council's failure to extend it. The election issue is therefore different. It has not been briefed or argued, and we express no opinion on it.

**[**57]** Since the sole question before us is whether the vested rights issue is ripe for decision, and we agree with the court of appeals that it is, we remand the issue to the trial court for further proceedings.

\* \* \* \* \*

Accordingly, we reverse the judgment of the court of appeals on Sheffield's takings claims and render judgment that Sheffield take nothing against the City, and we affirm the judgment of the court of appeals remanding Sheffield's claim for a declaration that its development rights have been vested by its plat submitted March 11, 1997.

Nathan L. Hecht Justice

---

**End of Document**

---

[95] *61 S.W.3d at 661* (Vance, J., concurring and dissenting).

[96] *City of Glenn Heights v. Sheffield Dev. Co., 55 S.W.3d 158 (Tex. App.--Dallas 2001, pet. denied)*.

BARBARA QUIRK

EXHIBIT E

# EXHIBIT E-2

*Texas Statutes & Codes Annotated by LexisNexis® > Local Government Code > Title 7 Regulation of Land Use, Structures, Businesses, and Related Activities > Subtitle A Municipal Regulatory Authority > Chapter 211 Municipal Zoning Authority > Subchapter A General Zoning Regulations*

## Sec. 211.010. Appeal to Board.

**(a)** Except as provided by Subsection (e), any of the following persons may appeal to the board of adjustment a decision made by an administrative official:

  **(1)** a person aggrieved by the decision; or

  **(2)** any officer, department, board, or bureau of the municipality affected by the decision.

**(b)** The appellant must file with the board and the official from whom the appeal is taken a notice of appeal specifying the grounds for the appeal. The appeal must be filed within a reasonable time as determined by the rules of the board. On receiving the notice, the official from whom the appeal is taken shall immediately transmit to the board all the papers constituting the record of the action that is appealed.

**(c)** An appeal stays all proceedings in furtherance of the action that is appealed unless the official from whom the appeal is taken certifies in writing to the board facts supporting the official's opinion that a stay would cause imminent peril to life or property. In that case, the proceedings may be stayed only by a restraining order granted by the board or a court of record on application, after notice to the official, if due cause is shown.

**(d)** The board shall set a reasonable time for the appeal hearing and shall give public notice of the hearing and due notice to the parties in interest. A party may appear at the appeal hearing in person or by agent or attorney. The board shall decide the appeal within a reasonable time.

**(e)** A member of the governing body of the municipality who serves on the board of adjustment under Section 211.008(g) may not bring an appeal under this section.

## History

Enacted by Acts 1987, 70th Leg., ch. 149 (S.B. 896), § *1*, effective September 1, 1987; am. Acts 1997, 75th Leg., ch. 363 (S.B. 1736), § *2*, effective September 1, 1997.

Annotations

## Case Notes

**Administrative Law: Judicial Review: Reviewability: Exhaustion of Remedies**

**Administrative Law: Judicial Review: Reviewability: Standing**

**Civil Procedure: Justiciability: Standing: General Overview**

BARBARA QUIRK